```
                                                             Page 1

 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2                FORT LAUDERDALE DIVISION
 3               CASE NO. 1:12-cv-62086-WJZ
 4   ADAM MIRABELLA, on behalf of himself
     and all others similarly situated,
 5
           Plaintiff,
 6
     vs.
 7
     VITAL PHARMACEUTICALS, INC., a
 8   Florida corporation, doing business as VPX,
 9         Defendant.
10   _____/
11
12                              Veritext Court Reporting
                                One East Broward Boulevard
13                              Suite 1101
                                Fort Lauderdale, Florida 33301
14                              Friday, 9:33 - 10:50 a.m.
                                April 4th, 2014
15
16
               VIDEOTAPE DEPOSITION OF EUGENE BUKOVI
17
18
19       Taken on behalf of the Plaintiff before Amber
20   Cheek, Court Reporter, Notary Public in and for the
21   State of Florida at Large, pursuant to Plaintiff's
22   Amended Notice of 30(B)(6) Videotaped Deposition and
23   Requests for Production of Documents and Tangible Things
24   (Subject Matter: Consumer Complaints and Adverse
25   Reaction Reports) in the above cause.
```

Page 2

1  APPEARANCES:
2  ATTORNEY FOR PLAINTIFF
3    JOSHUA H. EGGNATZ, ESQUIRE
       jeggnatz@eggnatzlaw.com
4    THE EGGNATZ LAW FIRM
       1920 North Commerce Parkway
5      Suite 1
       Weston, Florida 33326
6      (954)634-4355
7
8  ATTORNEYS FOR DEFENDANT
9    JORDAN S. COHEN, ESQUIRE
       jcohen@wickersmith.com
10   WICKER, SMITH, O'HARA, MCCOY & FORD, P.A.
       515 East Las Olas Boulevard
11     Suite 1400
       Fort Lauderdale, Florida 33301
12     (954)847-4800
13
14   VICTORIA GODWIN, ESQUIRE
       victoria@godwin@vpxsports.com
15     Vital Pharmaceuticals, Inc.
       1600 North Park Drive
16     Weston, Florida 33326
       (954)641-0570
17
18  ALSO PRESENT:  Christian Hernandez - Videographer
                   Anthony Abiuso
19
20
21
22
23
24
25

Page 3

1            I N D E X
2  WITNESS:                           PAGE:
   _____
3
4  EUGENE BUKOVI
5  Direct Examination by Mr. Eggnatz....................5
   Cross-Examination by Mr. Cohen......................67
6  Witness Signature Page..............................69
   Errata Sheet........................................70
7  Certificate of Oath of witness......................71
   Letter to Witness Re:  Reading......................73
8
9            EXHIBITS
10  (Exhibits 2, 3 and 4 Retained by Mr. Eggnatz
            and Not Attached)
11
12  NUMBER         DESCRIPTION              PAGE:
    _____
13
    EXHIBIT 1    VPX Web site printout.................15
14       (Composite)
15  EXHIBIT 2    Redline Xtreme Energy Drink...........20
         Triple Berry
16
    EXHIBIT 3    Redline Xtreme Energy Drink...........20
17       Lime
18  EXHIBIT 4    Redline Xtreme Energy Drink...........21
         Lemonade
19
    EXHIBIT 5    Sales and Distribution Records........41
20
    EXHIBIT 6    Order Form............................59
21
22
23
24
25

Page 4

1       THE VIDEOGRAPHER: Okay.  We're are on the
2  record.  The date is April 4th, 2014.  The time is
3  9:33 a.m.  This is media unit one.  This is the
4  video deposition of the corporate representative of
5  Vital Pharmaceuticals, Inc. in the matter of Adam
6  Mirabella vs. Vital Pharmaceuticals, Inc.  This
7  deposition is been held at One East Broward
8  Boulevard, Fort Lauderdale, Florida 33301.
9       The court reporter is Amber Cheek.  The
10  videographer is Christian Hernandez.
11      At this time we'll have an introduction of
12  counsel.
13      MR. EGGNATZ:  Joshua Eggnatz on behalf of Adam
14  Mirabella.
15      MR. COHEN:  I think everyone in the room
16  should be identified.
17      MR. EGGNATZ:  He's not an attorney.
18      MR. ABIUSO:  Anthony Abiuso, law clerk of the
19  Eggnatz Law Firm.
20      MR. COHEN:  Jordan Cohen with Wicker Smith on
21  behalf of Vital Pharmaceuticals.
22      MS. GODWIN:  Victoria Godwin, in-house
23  counsel, Vital Pharmaceuticals.
24  Thereupon:
25          EUGENE BUKOVI

Page 5

1  was called as a witness and, having been first duly
2  sworn and responding, "I do," was examined and testified
3  as follows:
4           DIRECT-EXAMINATION
5  BY MR. EGGNATZ:
6     Q   Good morning, sir.
7     A   Good morning.
8     Q   Can you please state your name for the record.
9     A   Eugene Bukovi.
10    Q   Good morning, Eugene.  Is it okay if I call
11  you Eugene?
12    A   That's fine.
13    Q   Okay.  My name is Josh Eggnatz and I represent
14  a Plaintiff by the name of Adam Mirabella.  We have
15  asked for the person with knowledge of the sales and
16  distribution of Vital Pharmaceuticals to come here
17  today.  Are you, in fact, that person?
18    A   Yes.
19    Q   Do you work for Vital Pharmaceuticals?
20    A   Yes, I do.
21    Q   And Vital Pharmaceuticals is also known as
22  VPX?
23    A   Yes.
24    Q   And for the remainder of today, we'll call it
25  VPX and we'll know what we're talking about.

Page 6

1  A  Okay.
2  Q  What is your position with VPX?
3  A  Vice President of Beverage Sales.
4  Q  What are your duties?
5  A  I have Regional Sales Managers that I manage,
6  I handle the U.S. and beverage distribution, key
7  accounts and food, drug, mass.
8      THE COURT REPORTER: Food, drug?
9      THE WITNESS: Food, drug, mass.
10 BY MR. EGGNATZ:
11 Q  What does that mean, food, drug, mass?
12 A  That's grocery, Krogers, Walgreens, CVS, Rite
13 Aid.
14 Q  Okay. And you said you have sales associates
15 that work for you?
16 A  Yes.
17 Q  Work under you?
18 A  Yes.
19 Q  Are you the person responsible for overseeing
20 all the sales associates of VPX?
21 A  Yes.
22 Q  How many sales associates are there?
23 A  Currently I have two.
24 Q  Are you actively in the field doing sales as
25 well?

Page 7

1  A  Yes.
2  Q  How long have you worked for VPX?
3  A  November will be five years.
4  Q  Were you always the VP of Beverage Sales?
5  A  No.
6  Q  What was your position prior to being VP of
7  Beverage Sales?
8  A  I had multiple positions. I started as West
9  Coast Regional Sales Manager.
10 Q  West Coast of Florida or the United States?
11 A  The U.S.
12 Q  And after that?
13 A  Then I was promoted to national -- to Vice
14 President of Sales nationally.
15 Q  And that's your current position?
16 A  Yes.
17 Q  So you've had two positions with VPX?
18 A  Yes.
19 Q  And VPX is located in Weston, Florida?
20 A  Yes.
21 Q  That's where its corporate offices are
22 located?
23 A  Yes.
24 Q  Would you agree with me that a prudent energy
25 drink manufacturer keeps adequate records regarding the

Page 8

1  sales and distribution of its products?
2      MR. COHEN: Object to the form. Calls for a
3  legal conclusion.
4      MR. EGGNATZ: You can answer the question.
5      MR. COHEN: To the extent you understand it.
6      THE WITNESS: No, I'm not sure what you're
7  referring to.
8  BY MR. EGGNATZ:
9  Q  Would you agree with me that a prudent energy
10 drink manufacturer keeps records regarding the sales and
11 distributions of its products?
12     MR. COHEN: Object to the form. Calls for a
13 legal conclusion.
14     MR. EGGNATZ: You can answer the question.
15     THE WITNESS: Generally.
16 BY MR. EGGNATZ:
17 Q  Yeah, that's important for something -- that's
18 important for VPX to do, to keep records.
19 A  We do have records.
20 Q  I'm not trying to trick you here.
21 A  Yes.
22 Q  Why is it important to keep your sales and
23 distribution records?
24     MR. COHEN: Form. Predicate.
25     You can answer.

Page 9

1      THE WITNESS: Okay. I mean, we -- in order to
2  manage your inventories, we maintain, you know,
3  sales records so we know how we're doing in each
4  territory.
5  BY MR. EGGNATZ:
6  Q  How many territories are there?
7  A  The territories are basically the way you see
8  it when you look at the map. You got the west coast,
9  you've got the southwest, the midwest, the mid-atlantic,
10 the northeast, southeast. And those are pretty much
11 the -- that's pretty much how we carve the U.S. out.
12 Q  Okay. You carve it out into six separate
13 territories?
14 A  (Nods head.)
15     MS. GODWIN: Gene, if you could give a verbal
16 response for the transcript.
17     THE WITNESS: Yes.
18     MS. GODWIN: Thank you.
19 BY MR. EGGNATZ:
20 Q  As part of VPX's sales and distribution
21 records, do they keep track of how many units of a
22 particular product are sold?
23 A  Yes.
24 Q  Do they keep track of the location where the
25 products are being sold?

3 (Pages 6 - 9)

Page 10

1  A   I need clarification. You mean the products
2  being sold to what? To who?
3  Q   For example, if a product is being sold at a
4  gas station in Texas, for example, would VPX have record
5  that that gas station was selling VPX's products?
6  A   We may or may not.
7  Q   Under what circumstances would you have record
8  of that?
9  A   If we sold directly to them, then we would
10 have record of it.
11 Q   Under what circumstances would you not have
12 record of that?
13 A   If we sold to a distributor, we would not have
14 record of it.
15 Q   So you're saying there's certain instances
16 when the retailer doesn't buy directly from VPX, there
17 would be an intermediary known as a distributor?
18 A   Correct.
19 Q   Does VPX keep record of the distributors that
20 purchased its products?
21 A   Yes, we do.
22 Q   How many distributors does VPX sell to?
23     MR. COHEN: Form.
24     Currently?
25     THE WITNESS: Currently?

Page 11

1  BY MR. EGGNATZ:
2  Q   Yeah. How many distributors does VPX sell to?
3  A   Roughly we have a hundred distributors.
4  Q   And has that number changed or fluctuated over
5  the course of the past four years?
6  A   Yes.
7  Q   Would you have -- does VPX have record of the
8  number of distributors it would have had at any given
9  point in time over the past four years?
10 A   Yes.
11 Q   And these distributors are located all over
12 the United States?
13 A   Yes.
14 Q   Does the distributor provide any record to VPX
15 as to what particular retailer that may be selling
16 its -- ultimately selling its product to?
17 A   Not necessarily.
18 Q   What do you mean by that?
19 A   It's common to get a Depletion Report but
20 without a list of exactly who the retailers they're
21 selling to. So we just know the net -- the volume that
22 they're selling.
23 Q   Does VPX have record of the states that a
24 particular distributor would be selling its product to?
25 A   That's a little vague. Some distributors

Page 12

1  cross over states. So we have a general idea of what
2  their territory is, but that doesn't mean they won't
3  expand or cross over into other territories without our
4  knowledge.
5  Q   What was the name of that report you were
6  saying? You said there was a report that you received
7  from the distributor?
8  A   Depletion Report.
9  Q   Okay. What is a Depletion Report?
10 A   They're sales.
11 Q   That's a report that would be given to you by
12 the distributor?
13 A   Yes.
14 Q   And what information is on that Depletion
15 Report?
16 A   The units sold of each skew.
17 Q   And does it say -- does the Depletion Report
18 tell you the number of -- scratch that.
19     Does the -- strike that.
20     Does the Depletion Report tell you the number
21 of units sold in a given territory?
22 A   No.
23 Q   But you know the distributor's territory?
24     MR. COHEN: Form. Asked and answered.
25 BY MR. EGGNATZ:

Page 13

1  Q   Would the distributor -- do you know if the
2  distributor would know what their own territory is?
3     MR. COHEN: Form. Predicate.
4     You can --
5  BY MR. EGGNATZ:
6  Q   You're in the business. Is that something
7  that they would have?
8  A   It's -- it's -- it's common, yes, but it
9  doesn't necessarily mean they're going -- they're going
10 to tell me. It's their business, so --
11 Q   That's not something that you care about?
12 A   We care about it, but it's something beyond
13 our control.
14 Q   If you asked for it, would they give it to
15 you?
16     MR. COHEN: Form.
17     THE WITNESS: I'm not sure. Maybe
18   sometimes -- sometimes they would. Sometimes they
19   wouldn't.
20 BY MR. EGGNATZ:
21 Q   Have you ever asked the distributor whose
22 states they're distributing your product to?
23 A   That's part of the whole distribution up
24 front, yes.
25 Q   That's something you ask them?

Page 14

```
 1    A    Yes.
 2    Q    Okay.  And do you keep record of that?
 3         MR. COHEN:  Form.
 4         THE WITNESS:  Yes.
 5  BY MR. EGGNATZ:
 6    Q    Do you know why those reports wouldn't have
 7  been produced to Plaintiff in this case?
 8         MR. COHEN:  Object to the form.
 9         If you have questions about discovery,
10    Counsel, you can direct them to me.
11  BY MR. EGGNATZ:
12    Q    Were you involved with the preparation of any
13  of the discovery in this case as it relates to the sales
14  and distribution records?
15    A    I provide what was requested.
16    Q    And what was requested?
17    A    I couldn't tell you right offhand.
18    Q    Were the sales and distribution records
19  requested?
20    A    I don't remember.
21    Q    You don't remember if you were asked for the
22  sales and distribution records?
23    A    Right.  Yep.
24    Q    That's your testimony?
25    A    Yes.
```

Page 15

```
 1         MR. COHEN:  Object to the form.  You're
 2    harassing the witness.
 3  BY MR. EGGNATZ:
 4    Q    VPX has a Web site, right?
 5    A    Yes.
 6    Q    And part of its sales come from that Web site?
 7    A    Yes.
 8    Q    The Web site is www.vpxsports.com?
 9    A    Yes.
10    Q    And the Web site can be accessed anywhere in
11  the United States?
12    A    Yes.
13    Q    And no matter whether I am in Florida or in
14  Seattle, in Washington, it's the same Web site?
15    A    Yes.
16    Q    I'm showing your printout from VPX's Web site
17  which we'll mark as Plaintiff's Exhibit 1.  Take a look
18  at that for me please.  Is that your bio from the Web
19  site?
20    A    Yes.
21         (Plaintiff's Composite Exhibit 1 was marked
22  for Identification.)
23  BY MR. EGGNATZ:
24    Q    And it identifies you as being part of the
25  beverage sales team?
```

Page 16

```
 1    A    Yes.
 2    Q    And as it looks like at the top of the Web
 3  site, it indicates here that VPX's Web site has a shop?
 4    A    Yes.
 5    Q    Is that fair to say?
 6    A    Yes.
 7    Q    We're going to continue this as a composite
 8  exhibit, everything that relates to their Web site.
 9         Next I'm showing you a bio of Mr. Joe
10  Huntowski.  Is he one of your sales reps?
11    A    Yes.
12    Q    What is his position?
13    A    He's a Regional Sales Manager.
14    Q    What region is he responsible for?
15    A    Currently?
16    Q    Yes.
17    A    He has the northeast, the midwest, and the
18  mid-atlantic.
19    Q    Who is responsible for the other three
20  regions?
21    A    I have another -- another Regional Sales
22  Manager in San Diego.
23    Q    Who is -- what's his name?
24    A    Teyo Branwell.
25    Q    Can you spell that for me please.
```

Page 17

```
 1    A    T-E-Y-O, Branwell, B-R-A-N-W-E-L-L.
 2    Q    Are you responsible for overseeing
 3  Mr. Huntowski?
 4    A    Yes.
 5    Q    And the last person that's identified on the
 6  Web site as part of VPX's sales team is Mr. Dave Wisdom.
 7  What is his job?
 8    A    He is the Vice President of International
 9  Sales.
10    Q    Do you oversee him?
11    A    There is a dotted line.  He reports directly
12  to the CEO with a dotted line to myself.
13    Q    Are you -- are you at the same level, lateral
14  level?
15    A    It's more lateral.
16    Q    Okay.  You don't directly oversee him?
17    A    No.
18    Q    Now, we're here today to discuss the
19  distribution of the product throughout the United States
20  during the class period.  Now, you understand that the
21  product at issue is Redline Xtreme Energy Drink, right?
22    A    Yes.
23    Q    I'm showing you another printout from the Web
24  site, VPX's Web site, which is the page for the Redline
25  Xtreme Energy Drink, right?
```

5 (Pages 14 - 17)

Page 18

1    MR. COHEN: Is this still part of 1?
2    MR. EGGNATZ: Yes. We're going to have a
3  composite exhibit for all the Web site printouts.
4    MR. COHEN: Thank you, Counsel.
5  BY THE WITNESS:
6    Q  Is it your understanding -- you understand
7  that's the product we're here for today?
8    A  Yes.
9    Q  And on this Web site, there is a link where
10  you can buy it now right on the Web site?
11    A  Yes.
12    Q  And this is the drink that claims it's -- that
13  university -- it's university proven to amp your
14  performance?
15    MR. COHEN: Are you asking if he can read,
16  Counsel?
17    MR. EGGNATZ: I'm unclear if --
18    THE WITNESS: Yes, that's what it says.
19    MR. EGGNATZ: -- as to your answer if it's the
20  product at issue.
21    THE WITNESS: Yes.
22    MR. EGGNATZ: Please let me ask my questions.
23    MR. COHEN: Well, I'd also appreciate it if
24  you would stick to the topics of the deposition
25  notice, Counsel. Mr. Bukovi is not here to talk

Page 19

1  about the labeling.
2  BY MR. EGGNATZ:
3    Q  You've been identified by VPX as someone
4  having knowledge of sales, distribution, promotions and
5  branding VPX's products, right? You have knowledge of
6  those four topic areas?
7    A  Yes.
8    Q  Okay. I'm showing you an actual product that
9  was previously marked as Defendant's Exhibit 1 from Adam
10  Mirabella's deposition and I'd like you to take a look
11  at it and I'd ask you to confirm for me if that product
12  is the same Redline Xtreme Energy Drink product that is
13  being advertised on VPX's Web site here as the Redline
14  Xtreme Energy Drink?
15    A  It appears to be.
16    Q  And the one that you're holding in your hand
17  is a Watermelon flavor?
18    A  Yes.
19    Q  And according to the Web site, it's sold in
20  four different flavors?
21    A  There's actually --
22    Q  Well, I'm sorry. There's five different
23  flavors.
24    A  Right.
25    Q  Five different flavors?

Page 20

1    A  Yes.
2    Q  And although there are five different flavors,
3  they're all the same Redline Energy Drink product?
4    MR. COHEN: Form.
5    THE WITNESS: Yes.
6  BY MR. EGGNATZ:
7    Q  I mean, you sell the product.
8    A  Generally, yes.
9    Q  Other than the flavor, there's nothing
10  different about that product?
11    A  Well, there's -- the flavoring does make it --
12  the composition a little different, so --
13    Q  Okay. But the product, it does the same thing
14  regardless of the flavor?
15    A  That's the idea, yes.
16    Q  All right. I'm showing you three separate
17  products. One of them is Triple Berry which is
18  advertised on the Web site. One of them is Lime which
19  is advertised on the Web site, and I think we'll mark
20  these as Plaintiff's Exhibits 2 and 3. And these
21  ones -- these products are also the Redline Xtreme
22  Energy Drink?
23    A  Yes.
24    (Plaintiff's Exhibit 2 and Exhibit 3 were
25  marked for Identification.)

Page 21

1  BY MR. EGGNATZ:
2    Q  And last as Plaintiff's Exhibit 4, here is the
3  Redline Xtreme Energy Drink lemonade flavor. Is that
4  right?
5    A  Yes.
6    (Plaintiff's Exhibit 4 was marked for
7  Identification.)
8  BY MR. EGGNATZ:
9    Q  Do you know why this lemonade flavor is not
10  advertised on the Web site?
11    A  We discontinued the flavor.
12    Q  Okay. Why is that?
13    A  Sheer sales volumes.
14    Q  Okay. So you kept track of -- you kept record
15  of those sales and you realized they weren't doing good
16  in the marketplace?
17    A  Correct.
18    Q  Now, all the Redline Energy Drink, other than
19  Xtreme Energy products, other than the flavoring
20  indicated at the top, they all come in the same bottle?
21    A  Yes.
22    Q  I notice on the bottom of each one of these
23  bottles it comes with a lot number. Can you tell us
24  what that lot number is?
25    MR. COHEN: I mean, you can read.

Page 22

1   THE WITNESS: Yeah, I mean --
2   BY MR. EGGNATZ:
3   Q   Not the specific number on that one, but what
4   is a lot number?
5   A   It's -- you know, I mean, I'd like to answer
6   the question pertaining to sales. That's more -- that's
7   operations and production control.
8   Q   You're here for sales and distribution.
9   A   Correct.
10   Q   I'm trying to explore if the lot number
11   provides us any information as to that. So can you tell
12   us what a lot number is?
13   A   The lot number is -- it's an identification.
14   Q   What information is it giving you?
15   A   If I want to know, you know, who bought or
16   when this product was run, I can tell by the lot number.
17   Q   What does that mean, when run?
18   A   I'm sorry?
19   Q   What does that mean when it was run?
20   A   When production ran it.
21   Q   When it was bottled?
22   A   Bottled, yes.
23   Q   And you said it also tells you who bought it?
24   A   It helps us.
25   Q   How does it help you?

Page 23

1   A   Because we -- we ran a certain amount on -- in
2   a batch and we know what batch -- what lot numbers go on
3   what trucks. So I can narrow it down. But if there's
4   multiple orders on a truck, then it doesn't really do me
5   any good.
6   Q   If I were to provide you this lot number,
7   would you have information in VPX's system that would
8   give you an idea of when this product was run?
9   A   Yes.
10   Q   And would this lot number give you an idea of
11   when this product was sent out into the marketplace?
12   A   Yes.
13   Q   And would it give you an idea of where in the
14   marketplace it went to?
15   A   No.
16   Q   It would not?
17   A   I wouldn't be able to narrow it down.
18   Q   How close of a scope could you narrow it to?
19       MR. COHEN: Form.
20   BY MR. EGGNATZ:
21   Q   You know what truck it went on.
22   A   Well --
23       MR. COHEN: Do you want him answer your
24   questions, Counsel?
25       THE WITNESS: It could go on multiple trucks.

Page 24

1   So if I send a truck to the northeast and the
2   midwest, I could -- and they all went -- that lot
3   number all went to that area, then I've got an
4   idea. I can narrow it down to, you know, a dozen
5   distributors.
6   BY MR. EGGNATZ:
7   Q   All right. How about the bar code? Does that
8   give us any information regarding sales and
9   distribution?
10   A   No.
11   Q   What information would this give us?
12       MR. COHEN: Form. Predicate.
13       THE WITNESS: That's used to -- you know, it's
14   used for inventory control through -- with most of
15   the distributors and the retailers.
16   BY MR. EGGNATZ:
17   Q   So at a minimum, we know that the lot number
18   can tell us when it left your facility?
19   A   In a reasonable time frame, yes.
20   Q   And you generally know what distributor it
21   went to, but you may not know where that distributor may
22   have actually ultimately sent the product?
23       MR. COHEN: Form. Asked and answered.
24       THE WITNESS: I can't narrow it down to a
25   distributor. I can narrow it down to a time frame

Page 25

1   and what shipments went out during that time frame
2   and the trucks that it went on, but I -- you know,
3   I can't narrow it down that close. So I've got an
4   idea, but --
5   BY MR. EGGNATZ:
6   Q   How about products that aren't purchased from
7   the distributor?
8       MR. COHEN: Form.
9   BY MR. EGGNATZ:
10   Q   Would that lot number give you more
11   information?
12   A   No.
13   Q   If a product is purchased directly from a
14   retailer or directly by a retailer from VPX, would that
15   lot number tell you or would you be able to know what
16   lot numbers went to a certain retailer?
17       MR. COHEN: Form. Predicate.
18       THE WITNESS: I don't know.
19   BY MR. EGGNATZ:
20   Q   You don't know one way or the other --
21   A   No.
22   Q   -- if it would tell us that information?
23   A   No.
24   Q   Do you know who would know that answer?
25   A   No.

7 (Pages 22 - 25)

Page 26

1  Q  Would anybody at VPX know that?
2  A  I don't know how -- if we collect that --
3 collect the information that way.  So I don't know.
4  Q  Does VPX keep records of the retailers who
5 purchase directly from VPX?
6  A  Yes.
7  Q  Do more of your sales come from retailers that
8 purchase or do they come -- or are they from
9 distributors who purchase from you?
10     MR. COHEN:  Form.
11     THE WITNESS:  The majority of our sales is
12   through distributors.
13 BY MR. EGGNATZ:
14  Q  Can you give me a percentage of what portion
15 of your sales are from distributors versus retailers?
16  A  I mean, I don't know the exact numbers.
17  Q  Does VPX have those numbers?
18  A  Yes.
19  Q  Did you come prepared today with those
20 numbers?
21  A  No.
22  Q  Is there a reason why you didn't come prepared
23 with those numbers?
24     MR. COHEN:  Other than the fact that it's not
25   on the Notice?

Page 27

1   You can answer.
2     THE WITNESS:  I'm sorry.  Could you restate
3   your question.
4 BY MR. EGGNATZ:
5  Q  Did you come prepared -- or why didn't you
6 come prepared today with information concerning who
7 purchased your product in terms of a distributor or a
8 retailer?
9     MR. COHEN:  Object to the form.  He's already
10   answered questions on that, Counsel.  You're
11   harassing the witness.  You're attempting to harass
12   the witness.
13     You can answer.
14     THE WITNESS:  I didn't bring a detailed report
15   with me.  I handle the whole U.S.  So, I mean, I've
16   got ballpark numbers, but I don't have exact
17   numbers.  I wasn't requested to bring in detailed
18   numbers.
19 BY MR. EGGNATZ:
20  Q  Can you give me a ballpark number then?
21  A  Probably 60 -- 60 to 70 percent probably goes
22 through distribution.
23  Q  If a customer had a credit card receipt for
24 their purchase, would you be able to determine when and
25 where that product was sold?

Page 28

1     MR. COHEN:  Object to the form.  Predicate.
2     THE WITNESS:  I'd have to see the receipt.  I
3   have no idea.
4 BY MR. EGGNATZ:
5  Q  I mean, you've purchased products before,
6 right?
7  A  Yes.
8  Q  And generally that receipt will tell you where
9 it was purchased and when it was purchased?
10  A  Not all the time, no.  I mean, you know, you
11 buy from a small retailer, it may not.  So I don't know
12 where -- it just depends on the -- it depends on where
13 you bought it and the information they put on the
14 receipt.
15  Q  If a customer presented you an actual bottle
16 that they purchased with a lot number on it, would you
17 be able to determine when it left VPX's facility?
18     MR. COHEN:  Form.  Asked and answered.
19     THE WITNESS:  We would know a time frame when
20   that product shipped.
21 BY MR. EGGNATZ:
22  Q  If a customer were to tell you a particular
23 store that they purchased it at and the time period they
24 purchased it at, would VPX be able to determine from its
25 records if the product was sold by that particular

Page 29

1 retailer?
2  A  No.
3  Q  Are there any retailers that you don't allow
4 to sell your products?
5  A  Not that I know of.
6  Q  Once you put it in the distributor's hands,
7 you're okay whoever the distributor -- or whatever
8 retailer the distributor sells it to?
9  A  I mean, you're generalizing.  But the
10 distributors that we -- that, you know, we sell to, are
11 reputable distributors that sell to the channels we want
12 our products sold in.
13  Q  And what do you mean by channels?
14  A  The same channels we talked about.
15  Q  The territories?
16  A  No.  The channels being food, drug, mass, you
17 know, convenience, grocery.  All the stuff we talked
18 about earlier.
19  Q  And you told us that you're also involved on
20 the ground with direct sales as well?
21  A  I have some direct sales responsibilities
22 myself.
23  Q  When the product gets to a particular retailer
24 or sold to a particular retailer, does VPX provide any
25 instruction or directive to that retailer on where in

8 (Pages 26 - 29)

Page 30

1  the store to display that product?
2  A  I mean, we do -- I mean, we request for, you
3  know, the ideal locations which is, you know,
4  chest-to-eye height and not on the hinge side of a
5  cooler door, but we don't -- we don't control the
6  planograms.  They control where they want the products.
7  Q  And you said the ideal location is
8  chest-to-eye height?
9  A  Yes.
10  Q  Is there any other instruction whether or not
11  it should be stored in a cooler or not in a cooler?
12  A  No, we don't provide the instructions.
13  Q  Do you give any instruction to them as to
14  whether or not it should be displayed with other energy
15  drinks or dietary supplements?
16     MR. COHEN:  Form.  Predicate.
17     THE WITNESS:  Could you clarify your question.
18  BY MR. EGGNATZ:
19  Q  Do you give any instruction to the retailer as
20  to whether or not this product should be displayed with
21  other energy drinks or with dietary supplements?
22     MR. COHEN:  Form.
23     You can answer if you understand the question.
24     THE WITNESS:  I mean, we want it in the -- we
25  want it in the cooler first and foremost, you know.

Page 31

1  BY MR. EGGNATZ:
2  Q  Why is it -- why do you want it in the cooler
3  first and foremost?
4  A  That's -- there's a 38 percent increase in
5  sales when a product is cold versus warm based on
6  Nielson data.
7  Q  And this may sound like the same question.
8  I'm trying to ask it a different way just to explore.
9     Do you give any instruction or directive to
10  the retailer on where not to place the product; for
11  example, don't put it in this section of the store?
12  A  No.  Again, they control where they want the
13  products.  They tell us where they're going to put the
14  product.  We have little to no control.  We can make
15  suggestions, but we have zero control over that.
16  Q  Is the retailer given any instruction or
17  directive regarding selling the product to minors?
18  A  I mean, we have a -- no.  I mean, but we have
19  an age on our -- on our bottle.
20  Q  So you don't -- even though you have an age on
21  the bottle, you don't give any instruction to the
22  retailer about regarding selling it to minors?
23  A  I mean, we stand by what we put on the bottle.
24  They ask the question and basically, you know, we don't
25  market to minors.  So that's -- we stand behind the age.

Page 32

1  Q  So that's a no?
2  A  I'm sorry.  Could you --
3     MR. COHEN:  Object to the form.
4  BY MR. EGGNATZ:
5  Q  It's a no, you do not instruct them to not
6  sell to minors?
7     MR. COHEN:  Object to the form.
8     THE WITNESS:  It's -- again, we can't control
9  who they sell to.
10  BY MR. EGGNATZ:
11  Q  So that's a no, you do not instruct them to
12  sell to minors -- to not sell to minors?
13     MR. COHEN:  Object to the form.
14     THE WITNESS:  I mean, we have a warning on
15  there, 18.  It's not -- you know, a target market
16  is above 18 years of age.
17  BY MR. EGGNATZ:
18  Q  It sounds like you're saying no.
19     MR. COHEN:  Object to the form.  That's not
20  even a question.  Ask him a question.
21  BY MR. EGGNATZ:
22  Q  Is the retailer given any instruction or
23  directive to I.D. people when they -- before they
24  purchase that product?
25  A  No.

Page 33

1  Q  Now, what types of stores sell the product?
2  A  All types of stores.
3  Q  Gas stations?
4  A  Gas stations, grocery stores.
5  Q  Pharmacies.
6  A  Again, all the stuff that I mentioned before;
7  food, drug, mass.
8  Q  Now, you told us about the "Buy Now" button on
9  the Web site.  Once you click that "Buy Now" button, it
10  takes you to the VPX store on the Web site.  And I'm
11  showing you that page.  And it looks like VPX directly
12  from its Web site sells a four pack for 14.76.  Is that
13  right?
14  A  That's what's it showing on here, yeah.  Yes.
15  Q  And that would be a four pack of those four
16  bottles that are in front of you there?
17  A  Yes.
18  Q  That's about -- do you know how much that is
19  per bottle?
20  A  Divide the 14 by 4.
21  Q  And that will give us the number, the price
22  per bottle?
23  A  Yes.
24  Q  And can you confirm for me that all four
25  flavors are sold for the same price?

9 (Pages 30 - 33)

Veritext Florida Reporting Co.
800-726-7007                                                                     305-376-8800

Page 34

1   A   Yes.
2   Q   Do you know if someone purchasing from the Web
3   site would also have to pay shipping and handling?
4   A   I don't know that.
5   Q   If you flip to the second page, it looks like
6   a customer can pay by using American Express, Pay Pal,
7   Visa or MasterCard?
8   A   Yes.
9   Q   Would VPX keep record of that?
10   A   I would imagine it's there.  I don't handle
11   Web orders.
12   Q   Okay.
13   A   I'm not the expert or person.
14   Q   Who does handle Web orders?
15   A   The Web group handling all the buttons and the
16   controls on how this works, and accounting processes the
17   orders.
18   Q   After a customer -- or when a customer wants
19   to purchase from the Web site, here's the second page
20   they're taken to and it looks like they're taken to an
21   address book.  Is that right?
22   A   Again, I've not bought off of our Web site.  I
23   don't handle how processing is.  I don't handle the
24   pricing on it.  So, I mean, I could look at this just
25   like you.

Page 35

1   Q   That's what --
2   A   But I don't know.
3   Q   That's what I'd like you to do.
4   A   Sure.  It look like an address book tab.
5   Q   And the customer is asked to enter their
6   e-mail address and create a password?
7   A   That's what it appears, yes.
8   Q   And VPX keeps record of all that?
9   A   I would imagine we do.
10   Q   And you would also imagine that the customer
11   would provide you their shipping information so they
12   know -- so VPX knows where to send the product?
13   A   Yes, they would provide the ship-to address.
14   Q   And you would expect VPX to keep a record of
15   all that?
16   A   Yes.
17   Q   Now, whether or not a customer pays on-line or
18   purchases from the store, they're still purchasing the
19   Redline Xtreme Energy Drink product.  Is that right?
20   A   If they're ordering this product, yes, it
21   would be the same.
22   Q   And whether they purchase it on-line or
23   purchase in the store, it still comes in this same
24   sealed container?
25   A   Yes.

Page 36

1   Q   And the bottle doesn't change any way once it
2   gets to the retailer?
3        MR. COHEN:  Form.
4        THE WITNESS:  They're going to get exactly
5     what you see here.
6   BY MR. EGGNATZ:
7   Q   Would you agree with me that no energy drink
8   manufacturer is allowed to unnecessarily deceive the
9   public?
10        MR. COHEN:  Object to the form.
11        THE WITNESS:  I mean, I don't know how to
12     answer that question.
13   BY MR. EGGNATZ:
14   Q   I think it's a common sense answer.  I mean,
15   would you agree with me that no energy drink
16   manufacturer is allowed to unnecessarily deceive the
17   public?
18        MR. COHEN:  Object to the form.  Calls for a
19     legal conclusion.
20   BY MR. EGGNATZ:
21   Q   Yes or no?
22   A   Do you want me to answer that?
23   Q   Yeah.  It's a question.
24   A   Well, I have no idea how to answer that.
25   Q   You can't tell me if an energy drink

Page 37

1   manufacturer is allow to unnecessarily deceive the
2   public?
3        MR. COHEN:  Object to the form.
4   BY MR. EGGNATZ:
5   Q   That's something the energy drink
6   manufacturers shouldn't do.  You would agree with that
7   statement, right?
8        MR. COHEN:  Object to the form.
9        You can -- if you understand his question, you
10     can answer it.
11        THE WITNESS:  I mean, it's -- okay.  Yes, I
12     guess.
13   BY MR. EGGNATZ:
14   Q   When the product is purchased from VPX
15   directly by the retailer, how does it get to the
16   retailer?  Does VPX ship it directly or is there a third
17   party that's used?
18   A   Could you clarify what you mean by retailer.
19   Q   Say a gas station is selling the product in
20   its store and it purchases it directly from VPX.  How
21   would it get to the gas station?
22   A   It depends.
23        MR. COHEN:  Form.  Predicate.
24        You can answer.
25        THE WITNESS:  Yeah, just -- it depends.

10 (Pages 34 - 37)

Page 38

1  BY MR. EGGNATZ:
2  Q   Depends on what?
3  A   Depends on, you know, if it's in the state of
4  Florida, we would deliver it. If it's in -- anywhere
5  else and they bought direct, we would ship it.
6  Q   Out on the street here in Broward County, we
7  see the VPX trucks driving all around. Would those be
8  the trucks that are delivering the product?
9      MR. COHEN: Form. Predicate.
10     THE WITNESS: Yes.
11 BY MR. EGGNATZ:
12 Q   And does that distribution process start here
13 in Florida, in Weston?
14 A   Yes.
15 Q   From VPX's facility?
16 A   Yes.
17 Q   Where is the product bottled at?
18 A   In Weston.
19 Q   At VPX's facility?
20 A   Yes.
21 Q   All right. Now we're going to start getting
22 into some more specific questions.
23     In this case we are trying to find out the
24 sales and distribution information in the U.S. during
25 the class period which is from October of 2008 through

Page 39

1  the present time. And you understand that that's the
2  time period we're referring to?
3  A   Yes.
4  Q   And prior to today's deposition, I asked VPX
5  in discovery for all documents regarding it sales and
6  distribution of the product throughout the U.S. during
7  the time period, and VPX gave me about 1400 pages that
8  are marked Bates Stamped pages 289 through 1674.
9      Are you familiar with those documents?
10 A   If that's the pile I saw yesterday. I mean --
11 Q   Okay.
12 A   You have to clarify.
13 Q   All right. I'm going to show you a copy.
14     MR. EGGNATZ: Don't need to throw it at me.
15     MR. COHEN: I wasn't throwing it.
16 BY MR. EGGNATZ:
17 Q   Now, for simplicity purposes, I have what
18 we're going to mark here as Plaintiff's Exhibit 5, which
19 is -- the first page starts at 289 and the last page
20 which is 1674. All the other pages that are in between
21 are obviously not right here. But can you confirm for
22 me that that is -- that those are the pages 289 through
23 17 -- 74.
24 A   Yeah, it says, 289, 1674.
25     MR. COHEN: Are we done with 2 through 4? I

Page 40

1  don't know why there are a bunch of bottles in
2  front of the witness. Just move those.
3      MR. EGGNATZ: It's my deposition. I'd like
4  them to stay there.
5      MR. COHEN: Move them.
6      MR. EGGNATZ: Why? What is your basis?
7      MR. COHEN: Because we're done with them.
8      MR. EGGNATZ: I'm not done with them.
9      MR. COHEN: These are props. Move them.
10     Gene, move them.
11     MR. EGGNATZ: Do you have any legal basis to
12 move them?
13     MR. COHEN: Move them.
14     MR. EGGNATZ: Can you answer my question
15 please.
16     MR. COHEN: There. I'm handing the exhibits
17 to the court reporter.
18     Ask your question.
19     MR. EGGNATZ: I didn't interfere with your
20 deposition of my witness. I'd ask you not to do
21 that with me.
22     MR. COHEN: I didn't use props with your
23 witness.
24     MR. EGGNATZ: This is the product at issue.
25 This is why we're here. This is not a prop. If

Page 41

1  you have a problem with your product, then I don't
2  know what to tell you.
3      MR. COHEN: Do you want me to call the judge,
4  Counsel?
5      MR. EGGNATZ: I'm not going to engage you on
6  this.
7      (Plaintiff's Exhibit 5 was marked for
8  Identification.)
9  BY MR. EGGNATZ:
10 Q   With the exception of the pages that are not
11 here, because, again, I don't want to drop a whole stack
12 in front of you and ask you to review them because I
13 think that would be a waste of everyone's time today,
14 are these the sales and distribution records that you're
15 familiar with that were produced to Plaintiff in this
16 case?
17 A   Yeah. That's what I saw yesterday.
18 Q   Okay.
19 A   Yes.
20 Q   And would you agree with me this appears --
21 that these documents appear to be a spreadsheet
22 identifying the various sales and distribution
23 information throughout the United States?
24 A   I mean, there's some -- there's some sales
25 here. I mean, I don't know about distribution, but

11 (Pages 38 - 41)

Page 42

1  there's obviously sales orders.
2    Q   And we start at the beginning here on the
3  first one, October of 2008.
4    A   Okay.
5    Q   Is that fair to say?
6    A   Yes.
7    Q   Now, does this spreadsheet come in another
8  format such as Excel?
9    A   It looks like it's Excel.
10   Q   Do you know what program is used to categorize
11 all this information?
12   A   We use Great Plains.
13   Q   Is that like a software management?
14   A   It's an ERP system.
15   Q   ERP --
16   A   Enterprise.
17   Q   What does --
18   A   ERP.
19   Q   What was the R stand for?
20   A   What is it?  Enterprise -- I don't remember
21 offhand.  It's our total operating system that we use.
22   Q   Are you familiar with that operating system?
23   A   Parts of it, yes.
24   Q   What parts are you familiar with?
25   A   The sales portion of it.

Page 43

1    Q   Does the program have an ability to tally up
2  all those sales figures there?
3    A   Yes.
4    Q   Does it have a way to tally up the sales
5  figures by year?
6    A   Yes.
7    Q   In other words, you can put a filter on it?
8    A   Yes.
9    Q   Would it have a way to filter it by location?
10   A   Yes.
11   Q   Would it have a way to filter it by state?
12   A   Yes.
13   Q   How is the information input into that system?
14   A   Are you talking about the customer
15 information?  I'm sorry.  You're going to have narrow it
16 down.  What information?
17   Q   Does a human input that system in there or is
18 something scanned and then it's ultimately populated in
19 there?  How does that information get there?
20   A   A human puts the information in, loads it in.
21   Q   Okay.  Now, on the first column here, it
22 identifies an item number.  What is an item number?
23   A   That's a VPX number that we use for our skew,
24 for a particular skew.
25   Q   Okay.  So the item number is the same thing as

Page 44

1  the skew?
2    A   Well, yeah.
3    Q   When you buy from the Web site, for example,
4  it says the Blue Razz is skew 0576.  So if saw item
5  number 0576 on the spreadsheet, that would mean Blue
6  Razz?
7    A   Yes.
8    Q   And the next column is "Item Description."
9  What is in that column?
10   A   It's the item description with the Redline RTD
11 four pack Xtreme Grape.
12   Q   Okay.  And the next column is "Sales Details."
13 What is in that column?
14   A   That is the invoice number.
15   Q   Is there a separate invoice that's generated?
16   A   There is an invoice generated for every sales
17 order.
18   Q   Does VPX keep record of those invoices?
19   A   Yes.
20   Q   When you were asked to look for sales
21 information, did you try to look for those invoices?
22   A   No.
23   Q   Is there a reason why you didn't?
24   A   Because I don't use the sales invoice number.
25   Q   Did you help collect this spreadsheet right

Page 45

1  here?
2    A   No.
3    Q   Do you know who did?
4    A   No.
5    Q   So what document did you provide regarding
6  sales and distribution of the product?
7    A   I'm -- I don't remember what -- I provided a
8  an order form.  That's what I provided.  This is all in
9  the system.
10   Q   The next column is "Customer Name."  Can you
11 tell me generally what would be in that column.
12   A   Exactly what you see there, the customer's
13 name.
14   Q   And it looks like the first one says, "Vitamin
15 Shoppe North Bergen, New Jersey.
16   A   Yes.
17   Q   And the next column is "Period Date,
18 October 1st, 2008."  Is that the date that the product
19 was placed for order?
20   A   I don't know what the period date is on this
21 form.
22   Q   And the last column is "Sales."  Does this
23 indicate the gross sales received by VPX on each one of
24 these transactions?
25   A   Yes.

12 (Pages 42 - 45)

Page 46

1  Q   Is it fair to say that if a customer came to
2  VPX and said, I bought the Redline Xtreme Grape flavor
3  from a Vitamin Shoppe in North Bergen, New Jersey around
4  October of 2008, you would able to confirm from these
5  record generally that the product was sold at that store
6  during that time period, right?
7        MR. COHEN:  Form.
8        THE WITNESS:  No.
9  BY MR. EGGNATZ:
10  Q   You would not?
11  A   No.
12  Q   Why not?
13  A   Because that's a warehouse.  That right there,
14  Vitamin Shoppe, North Bergen, New Jersey, is a
15  warehouse.  There's a total procurement system.  So by
16  the time that person buys that, I don't know what the
17  sell-through rate is.  It could be from four months ago,
18  three months ago, an order from three months ago.  We
19  sell to that location all the time, a new order every
20  week.
21  Q   So Vitamin Shoppe is a retailer or what do you
22  mean by a warehouse?
23  A   They are a -- they are a large retailer that
24  warehouses their own products.
25  Q   Okay.  And so you can tell from the list

Page 47

1  Vitamin Shoppe sells your product?
2  A   Yes.
3  Q   In North Bergen, New Jersey?
4  A   I don't think you understand.  This is a
5  distribution center.  This is not a Vitamin Shoppe
6  store.
7  Q   Okay.
8  A   Okay.
9  Q   Okay.
10  A   That's -- this Vitamin -- this warehouse ships
11  to two or 300 locations that actually sell the product.
12  Q   They would be shipping to Vitamin Shoppe
13  locations?
14  A   Yes.
15  Q   Do you know if these documents also identify
16  individuals who purchase directly from your Web site?
17  A   If this report pulled all the sales, I'm sure
18  there's individual sales in there.
19  Q   Do you know if this report contains all the
20  sales?
21  A   I didn't run the report myself.  I'm assuming
22  it's all there.
23  Q   So you don't know?
24  A   I don't know.
25  Q   Do you know who would know the answer to that

Page 48

1  question?
2  A   Whoever ran the report.
3  Q   And do you know who that was?
4  A   No.
5  Q   Would these sales have come from purchases
6  from your Web site?
7        MR. COHEN:  Form.
8        THE WITNESS:  Those -- that -- can you be more
9     specific.
10  BY MR. EGGNATZ:
11  Q   Does anything on the -- do these documents
12  tell us in any way if a customer purchased this by
13  clicking "Buy Now" on the Web site in a bulk order or if
14  it was from a direct sale from a sales rep?
15        MR. COHEN:  Form.
16        THE WITNESS:  This report doesn't clarify
17     that.  It appears to be all sales, so it's mixed.
18  BY MR. EGGNATZ:
19  Q   Okay.  Does VPX have record of what sales came
20  from the Web site versus what sales did not come from
21  the Web site?
22  A   Yes.
23  Q   Can you tell the jury the number of units sold
24  in the United States throughout the class period?
25        MR. COHEN:  Form.

Page 49

1        THE WITNESS:  I pulled some -- I pulled some
2     rough -- some rough data.  It appears to be about a
3     [redacted] cases during that time frame.
4        MR. EGGNATZ:  [redacted] cases.
5  BY MR. EGGNATZ:
6  Q   How many bottles come in a case?
7  A   Twenty-four.
8  Q   So if we were to multiply 24 bottles or 24
9  times [redacted] that would give us a general idea of
10  the number of bottles sold in the United States
11  throughout the class period?
12        MR. COHEN:  Form.
13        THE WITNESS:  Yes.
14  BY MR. EGGNATZ:
15  Q   What information did you look at or what did
16  you look at to obtain that information?
17  A   There's -- I have a shell that goes in and
18  pulls the information out of GP, sales data.
19  Q   Is that in the ERP system?
20  A   It's -- it's outside the ERP system, but it
21  works with it.  It's a shell.  So it goes in, pulls the
22  information that I'm looking for.
23  Q   And that's something you can visually see on
24  the computer screen?
25  A   Yes.

Page 50

1  Q   Is that something that you can print out from
2  that computer screen?
3  A   I can dump it into Excel and print it out.
4  Q   Did you make any efforts to supply that
5  information to your attorneys in this case?
6  A   It -- no, no.  I mean, I ran the numbers to
7  look at it, but this has -- this has everything that
8  you're -- you know, it has it all.
9  Q   Okay.  And that's located in Weston?
10 A   Yes.
11 Q   Is that system pretty easy to access?
12     MR. COHEN:  Form.
13     THE WITNESS:  I mean, you have to know how to
14  use it.
15 BY MR. EGGNATZ:
16 Q   If I were to come to your facility, you would
17 be able to show me on the screen and confirm these
18 numbers for me?
19     MR. COHEN:  Object to the form.  That's not
20  going to happen.
21     You can answer.
22     THE WITNESS:  I mean --
23 BY MR. EGGNATZ:
24 Q   That will be something for the judge to
25 decide, but is that something you have the ability to

Page 51

1  do?
2  A   Yes.
3  BY MR. EGGNATZ:
4  Q   Yeah.
5      And those numbers will be for all flavors of
6  the product?
7  A   You would have to specify the time frame.
8  Q   Okay.  Throughout the class period, October of
9  2008 through the present time, these numbers you gave
10 me, would that be for all Redline Xtreme Energy Drink
11 products sold regardless if it was Watermelon, Lemon,
12 Lime or Triple Berry or whatnot?
13 A   In the U.S.
14 Q   In the United States?
15 A   Yes.
16 Q   Are you able to filter those numbers by state?
17 A   Again, if you understood what I was
18 explaining.
19     Here, it's hard to do it exact by state.  This
20 order here went to -- could have gone to nine different
21 states, that shipment.  It's going to come up as New
22 Jersey for us, but it's not New Jersey.
23 Q   Okay.  So this Vitamin warehouse -- this
24 Vitamin Shoppe in New Jersey, they could have -- some
25 could have stayed in New Jersey, some could have went to

Page 52

1  New York, et cetera?
2  A   Yes, throughout the northeast.
3  Q   And that information would have to be obtained
4  from Vitamin Shoppe?
5  A   Yes.
6  Q   I'm sorry.  Can you tell me one more time what
7  the name of this shell system is.
8  A   Target.
9  Q   Can the Target system tell us how many bottles
10 were sold in -- or what -- call them cases -- how many
11 cases were sold in each state throughout the class
12 period?
13     MR. COHEN:  Object to the form.  Asked and
14  answered.
15     THE WITNESS:  No.  I already stated we know
16  where it's shipped to, but --
17 BY MR. EGGNATZ:
18 Q   Can it tell us by year?  Can it be filtered by
19 year?
20 A   Yes.
21 Q   Do you have that information today?
22 A   No.
23 Q   Did you make any efforts to obtain that
24 information before today?
25 A   Again, all of your information is in here.

Page 53

1  This is -- it has it by year.
2  Q   How much does VPX sell a case for?
3      MR. COHEN:  Form.
4      THE WITNESS:  It varies.
5  BY MR. EGGNATZ:
6  Q   Depending on what?
7  A   Depending on the channel of sales.
8  Q   What does that mean?
9  A   So if I sell to Walmart, sell to CVS, sell to
10 Rite Aid, sell to Walgreens, sell to a distributor, a
11 beverage distributor, all -- there's a lot of different
12 parameters that go into the case price.
13 Q   For example, the volume that they may be
14 purchasing and the frequency they may be purchasing?
15 A   Volume, I mean, that's a factor.  Marketing,
16 rebates, slotting, all the fees that it takes to
17 maintain a shelf.  Margin requirements by the retailers
18 are different.
19 Q   Can you tell the jury VPX's gross sales from
20 the product throughout the United States during the
21 class period?
22     MR. COHEN:  Form.
23     THE WITNESS:  I think -- is it on here?  Did
24  it total it?
25 BY MR. EGGNATZ:

Page 54

1  Q   It did not.
2  A   I'm sorry?
3  Q   It did not.
4  A   It did not?
5      You know, I guess -- I mean, I don't have an
6  exact number. I mean, ideally you want would want to
7  total that up.
8  Q   That's something that --
9  A   That would give you a number.
10 Q   That's something that VPX could have easily
11 done?
12 A   Or anyone with the spreadsheet.
13 Q   If it was provided in Excel spreadsheet form,
14 someone could have done that?
15 A   Yes, someone could have.
16 Q   But if that wasn't provided, that's not
17 something that someone could have done?
18     MR. COHEN: Form. Predicate.
19     That's not even a question.
20 BY MR. EGGNATZ:
21 Q   Did you come today with any rough estimate as
22 to VPX's sales?
23 A   Yeah, I mean, I have a -- you know, we roughly
24 sold -- depends on the time frame now.
25 Q   We're talking about during the class period.

Page 55

1  A   And then by year.
2  Q   If you can tell me by year, that would be
3  great.
4  A   So, you know, we were doing about -- I would
5  say 2008 was roughly ▯ -- again, this is just off the
6  top of my head. I don't know if it's exact. But it was
7  somewhere in the ▯ range. Last year we --
8  2013 I think was about ▯ in beverage.
9  Q   Do you know 2009?
10 A   Not offhand.
11 Q   Did you review something before coming in
12 today that gave you that ▯ figure?
13 A   Yeah. I mean, again, I scanned over our sales
14 and our units. We've been increasing in sales from 2007
15 in beverage sales all along. So, you know, ▯
16 is really -- that's the peak.
17 Q   Okay.
18 A   2013 was still a better year than the year
19 before and so on.
20 Q   Okay. So 2009 was more than 2008?
21 A   Yeah.
22 Q   2010 was more than 2009?
23 A   Yeah.
24 Q   All the way up.
25     So the sales for each year between 2008 and

Page 56

1  2013 range between ▯ each year up to ▯
2  which was the peak last year?
3  A   Yes.
4  Q   Would you be able to obtain more specific
5  information for each year if you went home and looked at
6  the Target system?
7  A   I could pull that out.
8  Q   But you just don't have it as you sit here
9  today?
10 A   Correct.
11 Q   And, again, we may not specifically know by
12 state because of everything that you explained before
13 regarding the distribution of the product?
14 A   Yes, that's correct.
15 Q   Are any of the sales on here from individual
16 retailers where you would know the exact store it was
17 sold from?
18 A   I'd have to review it. I'm sure if it has the
19 person's name on there, there's a chance that it's a
20 consumer. I didn't see any on that page.
21 Q   Okay. The other line items that these show an
22 individual name, those were individual people? Those
23 are not retailers?
24 A   Well, most likely.
25 Q   Next document I'm going to show you was

Page 57

1  provided as Bates Stamp 1692.
2      MR. COHEN: Thank you.
3  BY MR. EGGNATZ:
4  Q   Can you tell me what that document is.
5  A   It's an order form.
6      THE COURT REPORTER: An order form?
7      THE WITNESS: An order form.
8  BY MR. EGGNATZ:
9  Q   Is this something that's filled out by the
10 purchaser or filled out by VPX?
11 A   Both.
12 Q   What portion would be filled out by VPX and
13 what portion would be filled out by the customer?
14 A   Some customers we send this form to and they
15 fill it out and we set the -- they have a standard
16 discount already negotiated and then they fill out what
17 they want and they e-mail it in. Others, we actually
18 manage it, and we tell them what the discount is and
19 negotiate what the quantities and the products that they
20 want.
21 Q   Okay. Now, in this third column there, it
22 says, "WHSL." Does that stand for wholesale?
23 A   Yes.
24 Q   And what is that number -- what do those
25 numbers under there indicate?

Page 58

1  A   That's our wholesale price.
2  Q   That would be what the retailer is purchasing
3  it for or the distributor is purchasing it for?
4  A   This is a base -- this is just a base mark.
5  There's no -- there's no -- there's no discount yet.
6  Q   Okay.  So what does [ ] mean on the
7  wholesale line?
8  A   It's a starting point before we start adding
9  discounts.
10 Q   Okay.  I understand that.
11     Regardless of discounts, this number, this
12 "Wholesale" column, would represent the cost per case?
13 A   Yes.
14 Q   Now, the next column, "SRP," what does that
15 mean?
16 A   Suggested retail price.
17 Q   Okay.  So we see here Watermelon Kiwi, four
18 pack, wholesale [ ]  And what this is tell -- and
19 the retailer is you're buying for [ ] and we're
20 suggesting that you sell it for [ ]   Is that what
21 that means?
22     MR. COHEN:  Object to the form.  Misstates
23 testimony.
24     THE WITNESS:  Yes, generally that's what that
25 means.

Page 59

1  BY MR. EGGNATZ:
2  Q   Okay.  I'm not trying to trick you.
3  A   Yeah, no.
4  Q   I'm just trying to find out what this means.
5  A   Yeah.
6  Q   These aren't my documents.
7      And this, again, this would be by case?
8  A   Yes.
9  Q   And it's my understanding that the product
10 doesn't have a set retailer price from the marketplace,
11 right?
12 A   Correct.
13 Q   That price would vary depending on when and
14 where it was sold and any discounts the retailer may
15 want to give to the consumer?
16 A   Yes.
17 Q   But with this invoice, you do provide the
18 retailer a suggested SRP, a suggested retail price,
19 based on what they're purchasing it for?
20 A   Yes.
21     MR. EGGNATZ:  So we'll go ahead and mark this
22 as Plaintiff's 6.
23     (Plaintiff's Composite Exhibit 6 was marked
24 for Identification.)
25 BY MR. EGGNATZ:

Page 60

1  Q   Are there any other documents that VPX may
2  have regarding the suggested retail price in the
3  marketplace?
4  A   Documents as in -- I'm sorry.  Could you
5  clarify.
6  Q   Yeah.  Does VPX have any internal policies or
7  procedures regarding the pricing of the product in the
8  marketplace?
9  A   I mean, we don't have a policy.  I mean, we
10 can't dictate what someone is going to retail the
11 product for.
12 Q   Does it have any policies or procedures
13 regarding what you suggest to the retailer the price
14 should be?
15 A   No.
16 Q   What that SRP should be.
17 A   No.
18 Q   How do you determine that number or come up
19 with the SRP number?
20 A   Based on, you know, the market.
21 Q   Is it fair to say that according to VPX, the
22 fair market value throughout the U.S. would be the 14.76
23 divided by 4?
24     MR. COHEN:  Object to the form.  Calls for a
25 legal conclusion.

Page 61

1  BY MR. EGGNATZ:
2  Q   Well, you told us that VPX sells a four pack
3  for 14.87 on its Web site, right?
4  A   Yes.
5  Q   And whether the consumer is in Florida or
6  Washington, they're still paying that 14.76 for that
7  four pack, right?
8  A   Right.
9  Q   So if we divide 14.76 by 4, that will give us
10 the price per unit that VPX is selling the product for
11 throughout the United States when it sells it directly
12 to consumers?
13 A   Okay.
14 Q   Is that fair to say?
15 A   Yeah, that's fair to say.
16 Q   I also notice on this order form there is a
17 product -- strike that question.
18     MR. EGGNATZ:  We'll be done here in a few
19 minutes.
20     MR. COHEN:  Thank you.
21     MR. EGGNATZ:  You're welcome.
22 BY MR. EGGNATZ:
23 Q   This is another printout from the Web site for
24 a product called Redline Energy Drink RTD.  Are you
25 familiar with that product?

16 (Pages 58 - 61)

Veritext Florida Reporting Co.
800-726-7007                                                     305-376-8800

**Page 62**

1  A  Yes.
2  Q  And now I'm showing you the pricing from VPX's
3  Web site for that product. Would you agree with me that
4  the cost for this product is 13.16 -- $13.26 per four
5  pack?
6  A  Yes.
7  Q  And that's less than you're charging for the
8  Redline Xtreme Energy Drink.
9  A  Yes.
10 Q  Is that right?
11 A  Yes.
12 Q  Do you know why Redline Energy Drink RTD costs
13 less than Redline Xtreme Energy Drink?
14 A  We marketed it that way. The Xtreme is a
15 little stronger than the -- than the regular RTD. There
16 is a few different ingredients in it.
17 Q  Now, when a customer -- you're in sales. When
18 a customer is asking, Should I purchase the RTD or the
19 Xtreme? what do you tell them is the difference between
20 the two?
21     MR. COHEN:  Form.
22     THE WITNESS:  There's a couple different
23     components. It's a little stronger.
24 BY MR. EGGNATZ:
25 Q  Who do you mean by that?

**Page 63**

1  A  So -- I'm sorry?
2  Q  What do you mean by that, it's a little
3  stronger?
4  A  It has beta alanine in it and beta alanine
5  dilates the capillaries so you feel it sooner than you
6  would -- you can feel the energy boost sooner than you
7  would on our standard RTD.
8  Q  Do you think that's something important that
9  should be on the bottles so consumers know that?
10 A  It's on the ingredients.
11 Q  It says you feel it sooner on there?
12 A  No. The beta alanine is on the ingredient --
13 Q  You think most consumers know --
14 A  On the bottle.
15 Q  -- what beta alanine is?
16     MR. COHEN:  Form.  Predicate.
17     You can answer if you know, even though it's
18     --
19     THE WITNESS:  Yeah.
20     MR. COHEN:  I mean, we're definitely beyond
21     the scope of the deposition notice.
22     THE WITNESS:  Yeah. There are people that do.
23 BY MR. EGGNATZ:
24 Q  Okay. So the purpose is because you say feel
25 it faster, but that's not on the Redline Xtreme product?

**Page 64**

1     MR. COHEN:  Object to the form.
2  BY MR. EGGNATZ:
3  Q  As far as you know?
4  A  As far as I know.
5  Q  Aside from feeling it faster, is there any
6  difference between the Xtreme and the regular RTD?
7     MR. COHEN:  Object to the form. Asked and
8     answered.
9     THE WITNESS:  Yeah. Outside of what I just
10    told you, no. I don't know.
11 BY MR. EGGNATZ:
12 Q  No or you don't know?
13 A  Well, I'm not an expert on formulations. So,
14 I mean, based -- the beta alanine is the biggest
15 difference.
16 Q  But you are the man for sales.
17 A  For sales, yes.
18 Q  And as a salesman, you have to be very
19 familiar with these products?
20 A  Yes.
21 Q  And when --
22 A  And I just explained it to you.
23 Q  Okay. So that's your answer to the retailers;
24 because you feel this one faster, that's why you should
25 purchase this one?

**Page 65**

1     MR. COHEN:  Objection to the form. Predicate.
2     Incomplete hypothetical.
3     You can answer if you know what he's talking
4     about, that he's asking you.
5     THE WITNESS:  I mean, that's our sales pitch.
6     It's a little stronger and you can feel it quicker.
7  BY MR. EGGNATZ:
8  Q  It's a sale pitch?
9  A  Yeah.
10 Q  That "Xtreme" written on it helps out too?
11 A  Yeah. Marketing.
12 Q  Did you bring any documents with you today?
13 A  No.
14 Q  And any other document that you're aware of
15 regarding sales and distribution of product that VPX may
16 have we've already discussed?
17 A  Pertaining to?
18 Q  For example, you told us about the ERP system
19 that may contain some information regarding sales and
20 distribution of the product?
21 A  I mean, that's the information that you were
22 provided with, yes.
23 Q  And you also have the Target system that would
24 provide us more information?
25 A  It won't provide you any more. It just makes

Page 66

1  it easier to get to.
2    Q   Are there any other systems that VPX has
3  regarding sales and distribution of the product that we
4  haven't discussed today?
5    A   Not that I know of.
6    Q   If they existed, would you know of them?
7    A   Not really.
8    Q   As the VP of Sales, you wouldn't know if other
9  documents existed?
10   A   Target -- I use Target for sales.
11   Q   Do any of your sales associates use other
12 systems?
13   A   No.
14   Q   Is there anyone above you in sales that uses
15 another system?
16   A   No.
17   Q   Do you have any reason to believe there's
18 other systems in place or other documents in place
19 regarding sales and distribution?
20   A   I'm sorry.  Restate that question.
21   Q   Do you have any reason to believe that there's
22 any other documents or systems in place regarding sales
23 and distribution of the product?
24   A   Not -- I mean, not from any sales group, no.
25   Q   Are there any other sales groups?

Page 67

1    A   No.
2        MR. EGGNATZ:  Okay.  That's all I have.  Thank
3    you very much for your time.  Appreciate you coming
4    in.
5        MR. COHEN:  Mr. Bukovi, I just have a couple
6    of questions.
7           CROSS-EXAMINATION
8  BY MR. COHEN:
9    Q   You were asked some questions by Mr. Eggnatz
10 regarding sales figures for time period of 2008 to 2013.
11 Do you remember those questions and your answers?
12   A   Yes.
13   Q   Generally speaking?
14   A   Generally.
15   Q   It's a not memory test.
16       And I think I took this down correctly.  For
17 example, you testified that the sales in 2008 were [redacted]
18 [redacted] for beverages?
19   A   Yes.
20   Q   Do recall that question --
21   A   Yes.
22   Q   -- and that answer?
23   A   Yes.
24   Q   Okay.  What do you mean when you said that it
25 was [redacted] in beverages?  What does that encompass?

Page 68

1    A   That's our 8-ounce Xtreme beverages.  That's
2  the 8 ounce.
3    Q   Okay.  So that figure of [redacted] in sales
4  for 2008, is that -- that's just for the Redline Xtreme
5  product?
6    A   Yes.
7    Q   Okay.  And then similarly the figures that you
8  provided, you gave a range from 2008 to 2013.  Were
9  those figures also for the Redline Xtreme product?
10   A   Yes.
11       MR. COHEN:  That's all I have.  Thank you.
12       We'll read.
13       THE VIDEOGRAPHER:  Going off the record.  The
14   time is 10:50 a.m.
15       (The Reading and Signing is not waived and the
16 deposition was concluded at 10:50 a.m.)

Page 69

1  RE    :  Adam Mirabella vs. Vital Pharmaceuticals,
      Inc.
2  DEPO OF :  EUGENE BUKOVI
   TAKEN   :  April 4th, 2014
3
4           EXCEPT FOR ANY CORRECTIONS
            MADE ON THE ERRATA SHEET BY
5           ME, I CERTIFY THIS IS A TRUE
            AND ACCURATE TRANSCRIPT.
6           FURTHER DEPONENT SAYETH NOT.
7           _____
            EUGENE BUKOVI
8
   STATE OF FLORIDA  )
9              ) SS:
   COUNTY OF BROWARD  )
10
11    Sworn and subscribed to before me this
12 _____ day of _____, 2014.
13 PERSONALLY KNOWN _____ OR I.D. _____
14          _____
            Notary Public in and for
15          the State of Florida at
            Large.
16
17 My commission expires:

Page 70

```
 1          ERRATA SHEET
 2  RE    :  Adam Mirabella vs. Vital Pharmaceuticals,
            Inc.
 3  DEPO OF :  EUGENE BUKOVI
    TAKEN   :  April 4th, 2014
 4
 5  DO NOT WRITE ON TRANSCRIPT, ENTER ANY CHANGES HERE
 6  Page # | Line # | Change         | Reason
 7  _____|_____|_____|_____
 8  _____|_____|_____|_____
 9  _____|_____|_____|_____
10  _____|_____|_____|_____
11  _____|_____|_____|_____
12  _____|_____|_____|_____
13  _____|_____|_____|_____
14  _____|_____|_____|_____
15  _____|_____|_____|_____
16  _____|_____|_____|_____
17  _____|_____|_____|_____
18  _____|_____|_____|_____
19  _____|_____|_____|_____
20  _____|_____|_____|_____
21  State of Florida    )
    County of BROWARD   )
22
    Under penalties of perjury, I declare that I have read
23  my deposition transcript, and it is true and correct
    subject to any changes in form or substance entered
24  here.
    _____       _____
25  Date                 EUGENE BUKOVI
```

Page 71

```
 1        CERTIFICATE OF OATH OF WITNESS
 2  STATE OF FLORIDA   )
                       ) SS:
 3  COUNTY OF BROWARD  )
 4
 5      I, AMBER CHEEK, COURT REPORTER, Notary Public in
 6  and for the State of Florida at Large, certify that the
 7  witness, EUGENE BUKOVI, personally appeared before me on
 8  April 4th, 2014, and was duly sworn by me.
 9      WITNESS my hand and official seal this 10th day of
10  April, 2014.
11
12
13      _____
            AMBER CHEEK, Court Reporter
14          Notary Public, State of Florida
                  at Large
15
16  Notary # EE 21074
17  My commission expires: 9/17/2014
```

Page 72

```
 1       REPORTER'S DEPOSITION CERTIFICATE
 2
 3      I, AMBER CHEEK, Court Reporter, certify that I was
 4  authorized to and did stenographically report the
 5  deposition of EUGENE BUKOVI, the witness herein on April
 6  4th, 2014; that a review of the transcript was
 7  requested; that the foregoing pages numbered from 1 to
 8  74 inclusive is a true and complete record of my
 9  stenographic notes of the deposition by said witness;
10  and that this computer-assisted transcript was prepared
11  under my supervision.
12      I further certify that I am not a relative,
13  employee, attorney or counsel of any of the parties, nor
14  am I a relative or employee of any of the parties'
15  attorney or counsel connected with the action.
16      DATED this 10th day of April, 2014.
17
18      _____
            AMBER CHEEK
19          Court Reporter
```

Page 73

```
 1  VERITEXT FLORIDA REPORTING CO.
        One Biscayne Tower
 2      Two South Biscayne Boulevard
           Suite 2250
 3      Miami, Florida 33131
          (305) 376-8800
 4
 5  April 10th, 2014
 6
 7  Mr. Eugene Bukovi
    c/o Jordan Cohen, Esquire
 8  Wicker, Smith, O'Hara, McCoy & Ford, P.A.
    515 East Las Olas Boulevard
 9  Suite 1400
    Fort Lauderdale, Florida 33302
10
11  RE    :  Adam Mirabella vs. Vital Pharmaceuticals,
             Inc.
12  DEPO OF :  EUGENE BUKOVI
    TAKEN   :  April 4th, 2014
13  READ & SIGN BY:  May 9th, 2014
14  Dear Mr. Bukovi:
15  This letter is to advise you that the transcript of the
    deposition listed above is completed and is awaiting
16  reading and signing.
17  Please arrange to stop by our office in Suite 2250, One
    Biscayne Tower, Two South Biscayne Boulevard, Miami,
18  Florida 33131 to read and sign the transcript.  Our
    office hours are from 8:00 a.m. to 4:00 p.m. Monday
19  through Friday.  Depending on the length of the
    transcript, you should allow yourself sufficient time.
20
    If the reading and signing has not been completed prior
21  to the referenced date, we shall conclude that you have
    waived the reading and signing of the deposition
22  transcript.  Your prompt attention to this matter is
    appreciated.
23  Sincerely,
24  AMBER CHEEK, Court Reporter
25  cc:  All counsel on appearance page
```

```
                                             Page 74
 1      VERITEXT FLORIDA REPORTING CO.
           One Biscayne Tower
 2        Two South Biscayne Boulevard
               Suite 2250
 3          Miami, Florida 33131
             (305) 376-8800
 4
 5  April 10th, 2014
 6
 7  Joshua Eggnatz, Esquire
    The Eggnatz Law Firm
 8  1920 North Commerce Parkway
    Suite 1
 9  Weston, Florida 33326
10
11  RE     : Adam Mirabella vs. Vital Pharmaceuticals,
             Inc.
12  DEPO OF :  EUGENE BUKOVI
    TAKEN   :  April 4th, 2014
13  READ & SIGN BY:  May 9th, 2014
14
15  Dear Counsel:
16  The original transcript of the deposition listed above
    is enclosed for your file.  The witness did not waive
17  reading and signing and has been sent a letter notifying
    them to come in and read and sign their deposition
18  transcript.
19  The witness will be provided a copy of their deposition
    transcript for reading in our office should they come in
20  to review the transcript, and we will forward to you any
    corrections made by the witness at that time, along with
21  an original signature page which should be attached to
    the original transcript which is in your possession.
22
23  Sincerely,
24  AMBER CHEEK, Court Reporter
25
```