Page 1

1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF FLORIDA
2                 FORT LAUDERDALE DIVISION
3                CASE NO. 1:12-cv-62086-WJZ
4       ADAM MIRABELLA, on behalf of himself
        and all others similarly situated,
5
             Plaintiff,
6
        vs.
7
        VITAL PHARMACEUTICALS, INC., a
8       Florida corporation, doing business as VPX,
9            Defendant.
10      _____/
11
12                        Veritext Court Reporting
                          One East Broward Boulevard
13                        Suite 1101
                          Fort Lauderdale, Florida 33301
14                        Friday, 11:03 a.m.- 1:57 p.m.
                          April 4th, 2014
15
16
              VIDEOTAPE DEPOSITION OF JONATHAN OWOC
17
18
19          Taken on behalf of the Plaintiff before Amber
20      Cheek, Court Reporter, Notary Public in and for the
21      State of Florida at Large, pursuant to Plaintiff's
22      Amended Notice of 30(B)(6) Videotaped Deposition and
23      Requests for Production of Documents and Tangible Things
24      (Subject Matter: Consumer Complaints and Adverse
25      Reaction Reports) in the above cause.

Page 2

```
 1  APPEARANCES:
 2  ATTORNEY FOR PLAINTIFF
 3    JOSHUA H. EGGNATZ, ESQUIRE
        jeggnatz@eggnatzlaw.com
 4    THE EGGNATZ LAW FIRM
        1920 North Commerce Parkway
 5      Suite 1
        Weston, Florida 33326
 6      (954)634-4355
 7
 8  ATTORNEYS FOR DEFENDANT
 9    JORDAN S. COHEN, ESQUIRE
        jcohen@wickersmith.com
10    WICKER, SMITH, O'HARA, MCCOY & FORD, P.A.
        515 East Las Olas Boulevard
11      Suite 1400
        Fort Lauderdale, Florida 33301
12      (954)847-4800
13
14    VICTORIA GODWIN, ESQUIRE
        victoria@godwin@vpxsports.com
15    Vital Pharmaceuticals, Inc.
        1600 North Park Drive
16      Weston, Florida 33326
        (954)641-0570
17
18  ALSO PRESENT:  Christian Hernandez - Videographer
                    Anthony Abiuso
19
20
21
22
23
24
25
```

Page 3

```
 1              I N D E X
 2  WITNESS:                    PAGE:

 3
 4  JONATHAN OWOC
 5  Direct Examination by Mr. Eggnatz.................5
      Witness Signature Page.......................80
 6  Errata Sheet....................................81
      Certificate of Oath of witness...............82
 7  Letter to Witness Re:  Reading..................84
 8
 9            EXHIBITS
10       (No exhibits were marked)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1      THE VIDEOGRAPHER:  We're on the record.  The
 2  date is April 4th, 2014.  The time is 11:03 a.m.
 3  This is media unit one of the video deposition of
 4  the corporate representative of Vital
 5  Pharmaceuticals, Inc. in the matter of Adam
 6  Mirabella versus Vital Pharmaceuticals, Inc.
 7      This deposition is being held at One East
 8  Broward Boulevard, Fort Lauderdale, Florida 33301.
 9      The court reporter is Amber Cheek.  The
10  videographer is Christian Hernandez.
11      At this time may I have an introduction from
12  counsel.
13      MR. EGGNATZ:  Joshua Eggnatz on behalf of Adam
14  Mirabella.
15      MR. ABIUSO:  Anthony Abiuso, law clerk of the
16  Eggnatz Law Firm.
17      MR. COHEN:  Jordan Cohen with Wicker Smith on
18  behalf of Vital Pharmaceuticals and the witness.
19      MS. GODWIN:  Victoria Godwin, in-house counsel
20  for Vital Pharmaceutical.
21  Thereupon:
22              JOSHUA OWOC
23  was called as a witness and, having been first duly
24  sworn and responding, "Yes," was examined and testified
25  as follows:
```

Page 5

```
 1              DIRECT-EXAMINATION
 2      Q   Good morning.  How are you going?
 3      A   Good.  How are you?
 4      Q   Good.
 5          My name is Josh Eggnatz.  I represent Adam
 6  Mirabella.  Could you please state your name for the
 7  record.
 8      A   Jon Owoc.
 9      Q   Is Jon your full name?
10      A   Jonathan is my full name.
11      Q   J-O-N?
12      A   Yes.
13      Q   And do you work for VPX?
14      A   Yes.
15      Q   What is your position?
16      A   Director of Marketing.
17      Q   We asked VPX to produce a corporate
18  representative regarding the subject matter of consumer
19  complaints and Adverse Reaction Reports.  Do you
20  understand that's why you're here today?
21      A   Yes.
22      Q   Do you have anything to do with consumer
23  complaints and Adverse Reaction Reports as the Director
24  of Marketing?
25      A   Yes.
```

2 (Pages 2 - 5)

Page 6

1    Q   What is your involvement with consumer
2 complaints and Adverse Reaction Reports?
3    A   If a customer will complain via phone call, I
4 usually am the one to field these phone calls. I
5 monitor some of our general e-mail In boxes and I also
6 handle those complaints as well in addition to some
7 other people. I will then log the data, fill out the
8 appropriate forms where necessary. In the case of an
9 adverse event, I will pass that information along to our
10 individual within our Quality Control Department.
11    Q   Is there anyone else at VPX who has a specific
12 title or responsibility for consumer complaints and
13 Adverse Reaction Reports or is that person you?
14    A   Can you be more specific.
15    Q   Yeah. Other than Director of Marketing, is
16 there anybody else responsible for fielding consumer
17 complaints and Adverse Reaction Reports?
18    A   Yes.
19    Q   Who is that person?
20    A   Those are handled by some of our sales staff.
21    Q   Okay. Other than the Director of Marketing
22 and sales staff, is there anyone else responsible for
23 fielding consumer complaints and Adverse Reaction
24 Reports?
25    A   No.

Page 7

1    Q   Do you have a relationship to the President,
2 Mr. Jack Owoc?
3    A   Yes.
4    Q   How are you related to him?
5    A   I'm his son.
6    Q   Okay. Do you work in the Weston office, in
7 the corporate offices?
8    A   Yes.
9    Q   Now, in response to Plaintiff's
10 interrogatories, VPX previously identified Winsome
11 Kirlew as the person with knowledge of all consumer
12 complaints and Adverse Reaction Reports in connection
13 with the product.
14    What is Mr. Kirlew's position?
15    A   Ms. Kirlew is --
16    Q   Oh, I apologize. Ms. Kirlew.
17    A   -- the head of our Quality Control Department.
18    Q   How long has Ms. Kirlew worked for the
19 company?
20    A   I don't recall at this time.
21    Q   Do you have a general idea?
22    A   I do.
23    Q   And what is that general idea?
24    A   I'd rather not guess.
25    Q   You can't give me a general idea of how long

Page 8

1 Ms. Kirlew has been working for the company?
2    A   I'd rather not guess.
3    Q   I understand you don't know the exact date and
4 we get that. I want to know if she's been working there
5 for one day or ten years or somewhere in the middle.
6    A   Somewhere in the middle.
7    Q   Does VPX have records of that?
8    A   Yes.
9    Q   Do you know anything about Ms. Kirlew's
10 background or educational background?
11    A   I do not know about Ms. Kirlew's educational
12 background.
13    Q   Do you know anything about her training in
14 dealing with consumer complaints and Adverse Reaction
15 Reports?
16    A   I do not know.
17    Q   Do you know anything about her training in
18 quality control?
19    A   I do not know.
20    Q   Do you have any training in quality control?
21    A   Can you be more specific.
22    Q   Do you have any training whatsoever with
23 regard to quality control as it pertains to products
24 that VPX is selling on the marketplace?
25    A   Can you be more specific.

Page 9

1    Q   Have you gone to any school for quality
2 control?
3    A   No.
4    Q   Have you done any vocational training for
5 quality control?
6    A   Can you be more specific.
7    Q   Do you know what vocational training is?
8    A   Can you elaborate.
9    MR. EGGNATZ: Can you please instruct the
10 witness to stop being cute and answer the
11 questions.
12    If you don't understand the questions, you
13 could tell me, but --
14    THE WITNESS: Okay. I don't understand the
15 question.
16    MR. COHEN: I think asking you to elaborate is
17 advising you he doesn't understand the question,
18 Counsel. But if you think he's cute, the record
19 will note that.
20 BY MR. EGGNATZ:
21    Q   All right. Are you telling the jury that you
22 don't know what vocational training is?
23    A   In the context of your question, I do not.
24    Q   Have you been to any formal program for
25 quality control where they teach you how to field calls

Page 10

1 for quality control?
2    A    No.
3    Q    Have you been to any -- attended any informal
4 program dealing with quality control?
5    A    Such as what?
6    Q    I'm asking you the question.  If you haven't
7 been to anything, you can tell me that.  If you've been
8 to something, then you can let me know.
9    A    I would like to give you an accurate answer,
10 so I would like a more specific question.
11    Q    Can you tell me if you've been to any training
12 whatsoever, formal or informal, for quality control?
13    A    Yes.
14    Q    What is that training?
15    A    Internal training.
16    Q    Internal training put on by VPX?
17    A    Yes.
18    Q    Who puts on that internal training?
19    A    Quality Control Department.
20    Q    And that would be Ms. Kirlew?
21    A    In my specific instance, yes.
22    Q    Who else is in the Quality Control Department?
23    A    I don't know.
24    Q    Can you provide the name of one individual
25 other than Ms. Kirlew in the Quality Control Department

Page 11

1 for your dad's company?
2        MR. COHEN:  Object to the form.
3        THE WITNESS:  I don't know.
4 BY MR. EGGNATZ:
5    Q    How long have you worked for VPX?
6    A    Four consecutive years.
7    Q    Does the Quality Control Department work in
8 the same building as you?
9    A    Yes.
10    Q    Do you know how many people work in the
11 Quality Control Department?
12    A    No.
13    Q    What kind of internal training did Ms. Kirlew
14 provide for you?
15    A    We have a standard list of standard operating
16 procedures that we are required to follow.  We reviewed
17 those, discussed, had Q and A, and some examples of
18 possible scenarios.
19    Q    How long was that training?
20    A    I can't recall.
21    Q    Was it more than one day?
22    A    I can't recall.
23    Q    You can't recall if you spoke with Mr. Kirlew
24 for more than one day or not regarding training of
25 quality control?

Page 12

1        MR. COHEN:  Form.
2        THE WITNESS:  I can't recall.
3 BY MR. EGGNATZ:
4    Q    Was it less than one day?
5    A    I can't recall.
6    Q    When did that training take place?
7    A    Approximately two years ago.
8    Q    Do you have any memory of training with Ms.
9 Kirlew regarding quality control for longer than one
10 day?
11    A    I can't recall.
12    Q    So you don't remember?
13    A    I don't remember.
14    Q    You don't remember any training lasting more
15 than one day?
16    A    I don't remember how long the training lasted.
17    Q    Does VPX have any policies or procedures
18 regarding quality control training?
19    A    Can you rephrase the question.
20    Q    Does VPX have any written policies or
21 procedures regarding quality control training of its
22 employees?
23    A    Such as how to train the employees?
24    Q    Yes.
25    A    I don't know.

Page 13

1    Q    Do you think there is someone that should be
2 here today other than you that has the answers to these
3 questions?
4        MR. EGGNATZ:  Object to the form.
5        Don't answer that.
6 BY MR. EGGNATZ:
7    Q    Is there someone at VPX that has more
8 knowledge than you of these questions?  I don't want to
9 waste your time.
10        MR. COHEN:  Counsel, if you want to actually
11    ask the witness about issues that are topics
12    identified on your Notice, I think you'll find that
13    the witness is more than capable of doing so.  If
14    you want to ask him questions about something that
15    he remembers, if he remembers something occurring
16    for a day or two days a couple of years ago and he
17    tells you he didn't -- he doesn't recall, he
18    doesn't recall.
19        Take a deposition.
20 BY MR. EGGNATZ:
21    Q    Does VPX have any policies or procedures --
22 any written policies or procedures regarding quality
23 control?
24    A    Yes.
25    Q    What are those policies and procedures?

4 (Pages 10 - 13)

Page 14

1   A   Can you be more specific.
2   Q   I was handed ten minutes ago Bates Stamp 1742
3   through Bates Stamp 1754. Does that help assist your
4   testimony as to what VPX's policies and procedures are?
5   A   In regards to adverse event reporting, yes.
6   Q   Does anything in those documents deal with
7   quality control?
8   A   This is a function of quality control, so yes.
9   Q   Okay. Are there any other documents or
10  policies that you're aware of other than the documents
11  that I've handed you?
12  A   Yes.
13  Q   What are those documents?
14  A   I don't know.
15  Q   So you know there's other documents, but you
16  just don't know what they are?
17  A   Yes.
18  Q   How do you know there is other documents?
19  A   Quality control has more functions than
20  customer complaints and adverse event reporting. I know
21  they have plenty of standard operating procedures
22  outside of just the document in front of you.
23  Q   Have you seen those documents?
24  A   I have not.
25  Q   Does VPX have any written policies or

Page 15

1   procedures regarding consumer complaints and Adverse
2   Reaction Reports other than what -- other than the
3   documents you have just identified?
4   A   I'm sorry. Can you repeat that.
5   Q   Does VPX have any written policies or
6   procedures regarding consumer complaints and Adverse
7   Reaction Reports other than the documents that you've
8   just identified for us?
9   A   Could you be more specific.
10  Q   Any other documents that may exist that you
11  can physically hold in your hand, do they exist?
12  A   May I see that document?
13      MR. EGGNATZ: We're going to be here a long
14  time.
15      MR. COHEN: It doesn't matter to me. It may
16  go a little quicker if you ask him about actually
17  the topics on the Notice.
18      MR. EGGNATZ: Consumer complaints and Adverse
19  Reaction Reports is the subject matter.
20      MS. GODWIN: Not on quality control.
21      MR. COHEN: Yeah, and you wasted 20 minutes on
22  quality control.
23      MR. EGGNATZ: She may care how long we are.
24      MS. GODWIN: I don't. I'm on salary. Let's
25  go.

Page 16

1       MR. EGGNATZ: Your boss might.
2       MR. COHEN: The boss cares very much about the
3   lawsuit, Counsel.
4       THE WITNESS: This is the only document I can
5   recall at this time along with the attachments
6   contained therein.
7   BY MR. EGGNATZ:
8   Q   Okay. Would you agree with me that an energy
9   drink manufacturer must not unnecessarily endanger its
10  customers?
11      MR. COHEN: Object to the form.
12  BY MR. EGGNATZ:
13  Q   Is that a fair statement?
14      MR. COHEN: Form.
15      You can answer if you understand the question.
16      THE WITNESS: Can you rephrase the question.
17  BY MR. EGGNATZ:
18  Q   Would you agree with me that no energy drink
19  manufacturer is allowed to unnecessarily endanger its
20  customers?
21      MR. COHEN: Object to the form.
22      THE WITNESS: I believe that an energy drink
23  manufacturer should do the best to put out a
24  responsible product and let users know of the
25  potential side effects and instruct users how to

Page 17

1   properly and responsibly use the product. It is
2   then up to the consumer to make their own
3   responsible decision.
4   BY MR. EGGNATZ:
5   Q   So if the product is dangerous, the consumer
6   should be made aware of that through the product --
7   through the label on the product?
8       MR. EGGNATZ: Object to the form.
9       THE WITNESS: Through the warning label?
10  BY MR. EGGNATZ:
11  Q   Yeah. Something on this label should tell the
12  consumer about this product.
13  A   May I see that?
14  Q   No, you can't. I'm asking you a general
15  question. We can get into specifics of the bottle later
16  on.
17      MR. COHEN: Which he's not here on. But go
18  ahead, Counsel. Is there a question pending?
19      THE WITNESS: What is your question?
20  BY MR. EGGNATZ:
21  Q   Is it your testimony that if a product -- is
22  it your testimony that if an energy drink manufacturer
23  is going to endanger its customers, that it should put a
24  warning or instruction on its bottles so the consumer
25  knows about that?

5 (Pages 14 - 17)

1      MR. COHEN:  Object to the form.
2      THE WITNESS:  Is there a warning instruction
3  on that label?
4  BY MR. EGGNATZ:
5   Q   I'm asking the questions.  You're answering
6  the questions.
7   A   Can you ask again.
8   Q   Did you not understand the question?
9   A   I forgot it.
10   Q   Is it your testimony that if an energy drink
11  manufacturer is going to endanger its customers, that
12  the energy drink manufacturer should make its customer
13  aware of that by something on the label?
14      MR. COHEN:  Object to the form.
15      THE WITNESS:  I believe that an energy drink
16  manufacturer should provide a proper warning for
17  the product as well as instructions on how to
18  properly use the product.
19  BY MR. EGGNATZ:
20   Q   Okay.  Do you agree with me that a prudent
21  energy drink manufacturer must investigate adverse
22  reactions resulting from consumption of its products?
23      MR. COHEN:  Object to the form.
24      THE WITNESS:  I believe an energy drink
25  manufacturer should do everything in their power to

1  put out a product that is safe to consume.
2  BY MR. EGGNATZ:
3   Q   You didn't answer the question.  I asked you
4  would you agree with me that a prudent energy drink
5  manufacturer must investigate adverse reactions
6  resulting from consumption of its products?
7      MR. COHEN:  Object to the form.
8      You can answer if you understand the question.
9      THE WITNESS:  I don't understand the question.
10  BY MR. EGGNATZ:
11   Q   Do you know what investigate means?
12   A   Yes.
13   Q   Do you know what an adverse reaction is?
14   A   Yes.
15   Q   Do you know what an energy drink manufacturer
16  is?
17   A   Yes.
18   Q   Do you understand that VPX is an energy drink
19  manufacturer?
20   A   Yes.
21   Q   Do you know what consumption means?
22   A   Yes.
23   Q   So you understand every word in the sentence.
24      Do you agree with me that a prudent energy
25  drink manufacturer must investigate adverse reactions

1  resulting from comsumption of its products?
2      MR. COHEN:  Object to the form.
3      THE WITNESS:  I believe that an energy drink
4  manufacturer should follow the proper procedures
5  regarding the reporting of all adverse events and
6  follow up with any requests by the FDA or comply
7  accordingly.
8  BY MR. EGGNATZ:
9   Q   Does VPX have any written policies or
10  procedures regarding the investigation of adverse
11  reactions resulting from the consumption of its
12  products?
13   A   Can you be more specific.
14   Q   All right.  Well, earlier you've identified
15  these documents for us here.
16   A   Yes.
17   Q   And you told us these are the only documents
18  you're aware of regarding adverse reaction reporting,
19  right?
20   A   With the attached documents contained therein,
21  yes.
22   Q   Okay.  Is there anything in there that tells
23  you as an employee of VPX what VPX's policies are
24  regarding the investigation of adverse incidents
25  reported by its customers?

1   A   Yes, I would say it's on here.
2   Q   Can you show the jury what VPX's
3  responsibilities are.
4      This is what you do daily you've told us, so
5  you should know this.
6   A   Section F, "Responsibility."
7   Q   And what does it say right there?
8   A   "It is the responsibility of the customer care
9  personnel at VPX to report any possible AE to the
10  Quality Manager or designee as soon as possible but no
11  later than three calendar days.  At a minimum, the
12  customer care personnel will correct the name and
13  contact information of the reporter, the nature of the
14  adverse event and the product name.
15      It is the responsibility of the Quality
16  Manager or designee to assure that all incoming reports
17  of adverse events on an Adverse Event Data Collection
18  Form.  If possible, this form should be used at the time
19  of an initial report of an AE and upon completion
20  forwarded to the Quality Manager or designee as soon as
21  possible but not later than three business days.
22      It is the responsibility of the Quality
23  Manager or designee to assure that adequate information
24  is collected on each case to seek permission to contact
25  the injured person's health care provider if necessary

Veritext Florida Reporting Co.

1 and to communication with the FDA as appropriate.
2        Information on the SAE is to be submitted to
3 the FDA using MedWatch 3500A, mandatory form, which is
4 to be mailed no later than 15 business days after the
5 report was received by the VPX Quality Manager or
6 designee.  The date of first receipt by the VPX Quality
7 Manager or designee is considered day zero.
8        It is the responsibility of the Quality
9 Manager or designee to assure that follow-up information
10 on a particular case received within one year of the
11 initial SAE report is communicated to FDA in written
12 form.  In addition, any relevant information received
13 after one year should be communicated to FDA.
14        It is the responsibility of the NC to maintain
15 an ongoing log of AEs and to review the log at a minimum
16 of every quarter to look for adverse safety signals.  If
17 an adverse safety signal is identified, the NC will
18 inform the Quality Manager or designee within three days
19 or becoming aware.
20        It is the responsibility of the Quality
21 Manager or designee to communicate any adverse safety
22 signals to the executive in legal management within
23 three days of becoming aware.
24        It is the responsibility of the Quality
25 Manager or designee to assure that the source documents

1 for reports and final narratives or MedWatch Forms are
2 retained for six years in compliance with Sections 2E
3 and 3E of the Dietary Supplement and Nonprescription
4 Drug Consumer Protections Act approved 12/22/2006 and
5 effective 2007."
6    Q   Are you done?
7    A   Yes.
8    Q   Thank you.
9        Do you know if VPX complies with all of these
10 procedures in every instance?
11    A   Yes.
12    Q   And you also told us that these procedures
13 apply to all adverse event reporting, is that right,
14 AERs?
15    A   I'm sorry.  Can you repeat.
16    Q   These procedures apply to all adverse event
17 reporting.  I'm shorthanding calling it AER.
18    A   Yes.
19    Q   Now, would you agree with me that it's
20 important for VPX to receive those AERs from customers?
21        MR. COHEN:  Form.
22        THE WITNESS:  VPX is the one that fills out
23    the AERs.
24        MR. EGGNATZ:  I'll rephrase the question.
25 BY MR. EGGNATZ:

1    Q   Do you think it's -- would you agree with me
2 that it's important for VPX to receive incidents of
3 adverse events from customers?
4        MR. COHEN:  Object to the form.
5        MR. EGGNATZ:  That's something that VPX would
6    want to be made aware of.
7        MR. COHEN:  You can answer.
8        THE WITNESS:  Yes.
9 BY MR. EGGNATZ:
10    Q   Why is it important for VPX to be made aware
11 of adverse incidents or adverse events?
12    A   To put out a safe product.
13    Q   Do you think it's important for VPX to -- or
14 do you think it's important for VPX's customers to have
15 a way to notify VPX of an adverse event?
16    A   Yes.  That is why we have the contact
17 information for VPX on the bottle of every product.
18    Q   Okay.  And you instruct your customers to
19 report any adverse event, right?
20    A   Yes.  That is on the bottle for the product as
21 well.
22    Q   Isn't it true that you only instruct your
23 customers to notify you of serious adverse events?
24    A   "Serious" is a subjective term.
25    Q   But it says it right there on the bottle,

1 right, "serious"?
2    A   "Serious" is subjective.  It does say
3 "serious" use on the bottle, yes.
4    Q   What's the difference between a serious
5 adverse event and just an adverse event?
6    A   That's subjective.  I wouldn't know.
7    Q   Would you agree with me that an energy drink
8 manufacturer must document and keep track of customer
9 complaints and adverse -- customer complaints of adverse
10 reactions?
11        MR. COHEN:  Form.  Calls for a legal
12    conclusion.
13 BY MR. EGGNATZ:
14    Q   Well, you just told us what your policies are.
15        Would you agree with me they must keep records
16 of that?
17        MR. COHEN:  Object to the form.
18        THE WITNESS:  I previously answered that
19    question.
20 BY MR. EGGNATZ:
21    Q   So that's a yes?
22        MR. COHEN:  Form.
23        THE WITNESS:  I previously answered that
24    question.
25 BY MR. EGGNATZ:

1    Q   Would you agree with me that it's important to
2 document those and to be made aware of those problems so
3 that if there, in fact, is a problem, that VPX can try
4 to correct those problems?
5       MR. COHEN: Form. Predicate.
6       THE WITNESS: Can you repeat the question.
7 BY MR. EGGNATZ:
8    Q   Would you agree with me that it's important to
9 be made aware of and document and keep track of adverse
10 events?
11   A   I agree that we should document the reports
12 that come through to us, yes.
13   Q   Would you agree with me that one of the
14 reasons why that's important is so that if there is a
15 recurring problem, that VPX can take a corrective
16 measure so it doesn't happen again?
17       MR. COHEN: Form. Predicate.
18   Q   That's obviously important to VPX, right?
19       MR. COHEN: Form.
20       Which question do you want him to answer,
21 Counsel?
22       THE WITNESS: Which question?
23 BY MR. EGGNATZ:
24   Q   Is that important to VPX?
25       MR. COHEN: Form.

1       THE WITNESS: Is what important?
2 BY MR. EGGNATZ:
3       MR. EGGNATZ: To take any corrective measures
4    if there's something wrong with the product.
5       MR. COHEN: Form. Predicate.
6       THE WITNESS: It is important for us to log
7    all adverse events and to track as mentioned in the
8    standard operating procedures.
9 BY MR. EGGNATZ:
10   Q   Once those adverse events are tracked and
11 logged as you've as discussed, does VPX do anything
12 after that other than just reporting it to the FDA?
13   A   That would vary on a case-by-case basis.
14   Q   Are you aware of any case where they've
15 conducted any further investigation regarding adverse
16 events regarding its products?
17   A   Who is they?
18   Q   VPX.
19       I don't want you to guess. If you don't know,
20 tell me you don't know.
21   A   I don't know.
22   Q   Prior to today, we asked for documents related
23 to consumer complaints and adverse events, and VPX
24 provided us documents Bates Stamps 1 through 188, 188.
25 Are you familiar with those documents?

1    A   Can you produce them?
2    Q   Have you reviewed them before today?
3       MR. COHEN: He asked if he could see them. I
4    mean, you're asking like a memory test about Bates
5    Numbers, Counsel. Come on.
6       MR. EGGNATZ: Fair enough.
7 BY MR. EGGNATZ:
8    Q   And just for clarification, I did remove some
9 things in here that weren't really pertaining to this
10 case. But most of them are all there. So we start at
11 page 15. Have you seen these documents before?
12   A   I have reviewed them, yes.
13   Q   When did you review them?
14   A   Recently.
15   Q   How recently?
16   A   This week.
17   Q   When was the first time you reviewed them?
18   A   This week.
19   Q   Were you involved at all in the collection and
20 production of those documents?
21   A   No.
22   Q   Do you know who was involved with the
23 collection and production of those documents?
24   A   I do not.
25   Q   Do you know if any other documents exist

1 regarding consumer complaints and adverse events other
2 than those documents?
3    A   Such as a log?
4    Q   Sure.
5    A   This is our log.
6    Q   That's everything?
7    A   (Nods head.)
8    Q   Every consumer complaint should be in there?
9    A   Yes.
10   Q   Every consumer e-mail should be in there when
11 they complained about a product?
12   A   We do not keep track of every consumer e-mail.
13   Q   You don't?
14   A   We do not.
15   Q   Would you consider an e-mail a communication?
16   A   Yes.
17   Q   What is your records retention policy for
18 e-mails?
19   A   We keep all e-mails within one year.
20   Q   And even e-mails that involve adverse events
21 and consumer complaints you get rid of after a year?
22       MR. COHEN: Form.
23       THE WITNESS: The e-mail specifically, yes.
24 Any relevant documents or anything is all kept with
25 the log.

8 (Pages 26 - 29)

Page 30

1 BY MR. EGGNATZ:
2     Q   Do you know if deleting those e-mails is a
3 violation of your own internal adverse event reporting
4 procedures?
5         MR. COHEN: Form.  Predicate.
6         THE WITNESS:  May I see the standard operating
7 procedures.
8         It is not.
9 BY MR. EGGNATZ:
10    Q   It's not what?
11    A   It is not against the standard operating
12 procedures.  It is required that we keep all Adverse
13 Event Reports under the section for record retention.
14    Q   Okay.  So I guess we'll dive right into it.
15 I'd like to go through some of these reports here with
16 you, and as we are going through them, I'm going to make
17 some markings here on this paper as to the number on
18 them and you can confirm that I'm keeping track of the
19 right number.  Okay?
20    A   Okay.
21    Q   All right.  Looks like here starting on Bates
22 Stamp 15, it looks like a consumer called in and he
23 purchased an item and said it make him sick.  It looks
24 like in the middle, here Quality Control said that the
25 sampling was within compliance and there was no problems

Page 31

1 noted with the product.  Is that fair to say?
2     A   Yes.
3     Q   And it looks here it was reviewed by Winsome
4 Kirlew, right?
5     A   Yes.
6     Q   And, "Further investigation reports required?"
7 "No."
8         MR. COHEN: You mean where it's says, "Not
9 Applicable," Counsel?
10 BY MR. EGGNATZ:
11    Q   All right.  Was any further --
12        MR. EGGNATZ:  All right.  Fair enough.
13 BY MR. EGGNATZ:
14    Q   Do you know if any further investigation was
15 undertaken after this review -- or I'm sorry -- in
16 regards to this complaint?
17    A   It does not mention.
18    Q   Would VPX have a record of that?
19    A   I do not know.
20    Q   If there was any further investigation, is
21 that something that would be noted here in the record?
22    A   Can you repeat the question.
23    Q   Sure.
24        If VPX had undertaken any further
25 investigation of this particular incident, would that be

Page 32

1 noted here?
2     A   I do not know.
3     Q   In the bottom it says, "Customer Complaint
4 Form."  Is this a form that is a VPX-specific form?
5     A   Yes.
6     Q   Okay.  Next we'll move to Bates Stamp 16.
7         Again, "Customer complained the product was
8 cloudy and had a foreign substance."  VPX inspected it
9 and said it was within compliance for product
10 specifications.  Is that right?
11    A   Yes.
12    Q   Again reviewed by Winsome Kirlew.
13    A   Yes.
14    Q   So customer found something wrong.  VPX said
15 nothing wrong.  Is that right?
16    A   Yes.
17    Q   That's number 2.
18        Turn to Bates Stamp 17, "Customer complained
19 about funny looking kind of matter at the bottom of the
20 RLX Redline Xtreme Watermelon.  He sent a picture to
21 prove his statement."  Again quality control sample
22 tested, complied with the finished product
23 specifications.  Reviewed by Winsome Kirlew.  Is that
24 right?
25    A   Yes.

Page 33

1     Q   Bates Stamp 18, "Customer complained that
2 Redline fluid tasted like greasy -- like dirty greasy
3 old rubber hose in customer's mouth and nose.
4 Experienced stomach issues."  VPX found the product was
5 in compliance.  Is that right?
6     A   Yes.
7     Q   Again Winsome Kirlew?
8     A   Yes.
9     Q   Do you consider a stomach issue an adverse
10 event?
11    A   Yes.
12    Q   Do you know if this stomach issue was reported
13 to the FDA?
14    A   I cannot recall.
15    Q   Should it have been reported to the FDA?
16    A   Yes.
17    Q   And if it wasn't, that would be improper,
18 right?
19        MR. COHEN:  Form.
20        THE WITNESS:  I previously answered that.
21 BY MR. EGGNATZ:
22    Q   That's a yes?  Stomach issues should be
23 reported to the FDA?
24        MR. COHEN:  Form.  Asked and answered.
25 BY MR. EGGNATZ:

9 (Pages 30 - 33)

Page 34

1    Q   Would you agree with me that according to
2  VPX's own policies, that an adverse event would include
3  something but not limited to a headache, abdominal pain,
4  dizziness or lightheadedness?  Is that a fair statement?
5    A   Yes.
6    Q   Up to five.
7        Number 19, "Customer purchased from GNC.
8  Customer complained product was cloudy and no good.
9  They drank some prior to looking at it and almost
10 vomited."  Again VPX said the product met the standard.
11 Did not resemble a customer complaint."  Again reviewed
12 by Winsome Kirlew.  Is that fair?
13   A   Yes.
14   Q   Number 20, "Gentleman e-mailed us about bad
15 product but declined a replacement.  VPX found the it
16 met the.  Standard product did not resemble the customer
17 complaint."  Again reviewed by Winsome Kirlew.  Is that
18 right?
19   A   Yes.
20   Q   Number 21, "Recurring customer of Redline.
21 Opened up bottle.  Said Redline tasted like plastic."
22 VPX found that it did not match the customer's complaint
23 and the product was acceptable.  Again reviewed by
24 Winsome Kirlew.  Is that right?
25   A   Yes.

Page 35

1    Q   Number 22, "Customer had RTD Watermelon QE and
2  threw up immediately.  He was sick for two days.
3  Product had green floaties in the bottle."  VPX checked
4  it out --
5        Well, actually let me ask you about this.  In
6  the middle here it says, "Retained, show no evidence."
7  What does that mean, if you know?
8    A   I don't have a copy of that particular
9  document.
10   Q   Number 22?
11   A   Hmm-um.
12       MR. EGGNATZ:  If it's okay with your attorney,
13 I'll have him look on with mine, Bates Stamp 22.
14 For whatever reason, it looks like a few of the
15 documents got omitted from this copy.
16       MR. COHEN:  No.  That's fine, Counsel.
17       MR. EGGNATZ:  Okay.
18 BY MR. EGGNATZ:
19   Q   Starting on number 22, in the middle it says,
20 "Retained, show no evidence."  Does that mean that VPX
21 found there was no evidence that was consistent with the
22 consumer's complaint?
23   A   That means that they found no green floaties.
24   Q   Okay.  So the customer found green floaties,
25 was sick for two days."  VPX said nothing was wrong.  No

Page 36

1  evidence, right?
2    A   Yes.
3    Q   Again reviewed by Winsome Kirlew.
4        Number 23, "Customer said Redline was rancid.
5  VPX found that the sample was representative of the
6  finished product.  "No rancidity noted."  Again reviewed
7  by Winsome Kirlew.  Is that fair to say?
8    A   Yes.
9        MR. COHEN:  What number was that, Counsel?
10       MR. EGGNATZ:  Twenty-three.
11       MR. COHEN:  Thank you.
12 BY MR. EGGNATZ:
13   Q   Number 25, "Customer bought Redline at a GNC
14 in Boston.  Three of the bottles were okay, but one of
15 them tasted horrible and smelled really gross."  Again
16 VPX found the product conformed with the finished
17 product standard.  Reviewed by Winsome Kirlew.  No
18 problems noticed, right?
19   A   Yes.
20   Q   Number 27, "Customer states they found a bug
21 in Redline."  VPX said the product conformed with the
22 finish product standard.  Again reviewed by Winsome.  Is
23 that right?
24   A   Yes.
25   Q   Do you know if Winsome Kirlew ever found

Page 37

1  anything wrong with the product?
2        MR. COHEN:  Object to the form.
3        THE WITNESS:  I don't know.
4        MR. COHEN:  Predicate.
5  BY MR. EGGNATZ:
6    Q   Number 30, "Customer stated the last three
7  Redlines she purchased may have been moldy or sour.  The
8  first caused her to throw up as she drank it without
9  looking at it."  VPX said they retained it.  "There was
10 no smells or no sour tastes.  Records are within
11 specification."  Again reviewed by Winsome Kirlew.  Is
12 that right?
13   A   Yes.
14   Q   Number 31, this customer said they found white
15 moldy flakes in bottle, yet Redline said it had no white
16 flakes in bottle and all records pulled were reviewed
17 and were within product specifications.  Again reviewed
18 by Winsome Kirlew.  Is that right?
19   A   Yes.
20   Q   Number 32, "Customer bought a four back from
21 VS."  Must be a store.  "Said there was mold in the
22 Redline."  VPX found there was no signs of mold and
23 everything was in compliance and within product
24 specification.  Again reviewed by Winsome Kirlew.  Is
25 that right?

10 (Pages 34 - 37)

Page 38

1    A    Yes.
2    Q    Number 33, "Customer -- customer with
3 floating -- or cloudy with floating residue.  Customer
4 drank without noticing it and became very sick."  Again
5 VPX found there was no cloudiness or residues and it was
6 within compliance.  Reviewed by Winsome Kirlew.  Is that
7 right?
8    A    Yes.
9    Q    Number 34, "Customer felt nauseous after
10 drinking.  Sample was checked.  No appearance of yellow
11 liquid or white floating flakes; therefore, it was
12 compliant and was not consistent with retain and process
13 records and it will be treated as an isolated case.  Q&A
14 will continued to monitor."
15         Okay.  So in this one, they found that this
16 one didn't comply with the standard, right?
17         MR. COHEN:  Form.
18 BY MR. EGGNATZ:
19    Q    Is that what that means?
20    A    No.  It looks like that one was still
21 compliant.
22    Q    Oh, this one was still compliant?
23    A    That's what it looks like.
24    Q    Okay.  Number 35 doesn't pertain to us.
25         Do you have number 37 in your package?

Page 39

1    A    Thirty-nine is the next one I have.
2    Q    Okay.  And it looks like the customer
3 complaints we reviewed so far, we're up to number 17.
4 Is that right?
5    A    Yes.
6    Q    Now, number 37 looks like some sort of a log.
7 Can you tell me what that log is?
8    A    No.
9    Q    Have you ever seen this log before today?
10    A    I believe there's a mention of it in the SOPs.
11    Q    Have you ever seen this specific paper number,
12 number 37, before today?
13    A    It doesn't look familiar.
14    Q    When you reviewed these documents before
15 today, is this something that you would have seen?
16    A    Perhaps.
17    Q    And it looks like the log says "2012" on top.
18 Is that right?
19    A    Yes.
20    Q    Do you know where the logs are for 2008, 2009,
21 2011, 2013 and 2014?
22    A    For the adverse events?
23    Q    If that's what this is.
24    A    I don't know what that is.
25    Q    Should that be in this -- in these documents?

Page 40

1    A    I can't say since I don't know what it is.
2    Q    Well, it looks in the left column here it says
3 "Tab five through seven," right?
4    A    Yes.
5    Q    You don't know where tab one through four is
6 though?
7    A    I don't.
8    Q    It looks like the second column is, "Date of
9 Report," and there's some dates there it looks like when
10 the customer probably called in, right?
11    A    It says, "Date of Report," yes.
12    Q    And then the last column -- or I'm sorry.  The
13 middle column is the product.  It talks about what
14 product the customer called about.  You can see the
15 first one is Redline Xtreme Watermelon, right?
16    A    Yes.
17    Q    And it says, "Mother called for daughter who
18 was 20 years old at the time of the event."  There's
19 nothing else noted there.  Do you know if there's any
20 other information in connection with this -- with this
21 log?
22    A    Since I don't know what the log is, I don't
23 know if there is any additional information.
24    Q    What did you do to prepare before today?
25    A    I reviewed the customer complaints and the

Page 41

1 standard operating procedures.
2    Q    But you didn't review these right here?
3    A    I may have.
4    Q    Do you recall reviewing it?
5    A    I don't recall.
6    Q    Did you speak with Winsome Kirlew at all
7 before today regarding -- in preparation for today's
8 deposition?
9    A    I did not.
10    Q    Do you think speaking with her may have helped
11 you with your testimony today?
12         MR. COHEN:  Form.
13         THE WITNESS:  I do not.
14 BY MR. EGGNATZ:
15    Q    Okay.  Now, once we get past these initial
16 complaint forms starting on Bates Stamp 40, it looks
17 like --
18         And you should have that.  Do you have that?
19    A    Yes.
20    Q    Okay.  It looks like there is a form here from
21 the U.S. Department of Health and Human Services, Food
22 and Drug Administration, MedWatch.  This is the FDA
23 reporting form that you were discussing earlier when you
24 were reviewing VPX's procedures?
25    A    Yes.  At the top it mentions that this is form

11 (Pages 38 - 41)

Page 42

1 FDA 3500A.
2    Q   Okay.  I'm going to tally these ones separate.
3 We'll call them FDA reports.
4       It looks like the first one, Bates Stamp 40,
5 was, "A customer had adverse event.  Required
6 hospitalization."  Would you agree with that?
7    A   That the individual required hospitalization?
8    Q   Yes.
9    A   Yes.
10    Q   Okay.  In the description there it says, "The
11 customer e-mailed VPX on Octobers 7th, 2012 saying that
12 he suffered a stroke 30 minutes after consuming the
13 product."  Is that fair to say?
14       MR. COHEN:  Are you asking him if he can read,
15 Counsel?
16 BY MR. EGGNATZ:
17    Q   Is that true that it was a customer complaint?
18    A   Yes.
19    Q   And in response to that, VPX reported it to
20 the FDA like they should have, right?
21    A   Yes.
22    Q   Did VPX undertake any investigation of its own
23 regarding that stroke victim?
24    A   I don't know.
25    Q   Is that something that VPX would have kept a

Page 43

1 record of?
2    A   I don't know.
3    Q   Next we're going to turn to Bates Stamp 44
4 next.  This one looks like it was a 21-year-old male who
5 consumed a half Redline Xtreme with no issues, but then
6 approximately one to two weeks later, he consumed a
7 second on an empty stomach, then went to work out late
8 at night.  It was a two hour-work out consisting of
9 mostly cardio on some weights, and that following the
10 workout, the customers stated that his heart rate raced
11 and wouldn't slow, so he went to the emergency room."
12       Is that fair to say that's something that was
13 reported to VPX?
14    A   Yes.
15    Q   The caller told you that he was released but
16 was given a sedative to keep his heart rate down?
17    A   Yes.
18    Q   Is there any reason why a consumer shouldn't
19 take that product on an empty stomach?
20       MR. COHEN:  Form.
21       THE WITNESS:  I believe the warning label
22 advises against it.
23 BY MR. EGGNATZ:
24    Q   Can you show me?
25    A   I was incorrect.

Page 44

1    Q   It doesn't say that, does it?
2    A   It does not.
3    Q   There's no warning about that?
4    A   There's not.
5    Q   Is there anything wrong with the customer
6 taking this immediately before a workout?
7       MR. COHEN:  Object to the form.  It's beyond
8 the scope of the deposition, Counsel.  I mean, it
9 just is.  You can make faces if you want.
10       MR. EGGNATZ:  I didn't make a face.
11       You can answer the question.
12       MR. COHEN:  Form.
13       THE WITNESS:  Are you asking my opinion?
14 BY MR. EGGNATZ:
15    Q   I'm asking as a representative of VPX, is
16 there is anything improper or wrong about the customer
17 taking this immediately before the workout?
18       MR. COHEN:  Object to the form.  Beyond the
19 scope.
20       THE WITNESS:  If the product is used in a
21 manner consistent with the label, there should be
22 no issues.
23 BY MR. EGGNATZ:
24    Q   And VPX encourages its customers to take this
25 product before a workout, right, to increase their

Page 45

1 athletic performance?
2       MR. COHEN:  Object to form.
3       THE WITNESS:  It is marketed to increase
4 performance.
5 BY MR. EGGNATZ:
6    Q   Athletic performance?
7    A   Focus, energy.
8    Q   Reaction time?
9    A   Reaction time.
10    Q   Is there anything wrong with the customer
11 taking this right before a workout?
12       MR. COHEN:  Form.
13       THE WITNESS:  I answered that question.
14 BY MR. EGGNATZ:
15    Q   I think your answer was that if the label
16 doesn't say otherwise, then it's okay for them to do it?
17    A   I said that the individual must use the
18 product in a manner consistent with the label.
19    Q   And if the label doesn't say anything about
20 not using it before a workout, then it should be okay
21 for the customer to do that?
22    A   The user must use the product in a manner
23 consistent with the label.
24    Q   Does this label instruct a consumer not to use
25 this before a workout?

12 (Pages 42 - 45)

Page 46

1    MR. COHEN:  Object to the form.  Asked and
2  answered.
3    THE WITNESS:  I previously answered that.
4  BY MR. EGGNATZ:
5    Q    I asked you if it said anything about eating
6  it -- or drinking it on an empty stomach.  Now I'm
7  asking if is says anything about taking it before a
8  workout.
9    A    The product does not mention a workout on
10  there.
11    Q    Bates Stamp 45.
12       First off, does this report tell us who
13  reported this to the FDA, what VPX employee?
14    A    It tells you the initial reporter.
15    Q    Initial reporter?
16    A    Yes.
17    Q    That's Michael Fabiano -- Fabiano?
18    A    Yes.
19    Q    Fabiano?
20    A    Fabiano, yes.
21    Q    Fabiano?
22    A    Um-hmm.
23    Q    Is there someone other than the initial
24  reporter who actually submits this to the FDA?
25    A    Quality Control Department.

Page 47

1    Q    Who would have made the comment here on Bates
2  Stamp 45 where it says, "Caller admitted not following
3  the label guidelines but consuming on an empty stomach"?
4       MR. COHEN:  You're asking if he knows whose
5    handwriting that is?
6  BY MR. EGGNATZ:
7    Q    Do you know who wrote this here?
8    A    I do not.
9    Q    Do you know whose handwriting it is?
10    A    I do not.
11    Q    Okay.  Bates Stamp 46.  Again Redline Xtreme
12  Watermelon.  "Mother called" -- oh, this looks like that
13  call log that we were looking at before.  "Mother called
14  for 21-year-old daughter.  Mother stated that roughly
15  three months ago, her daughter consumed half a bottle of
16  Redline Xtreme and experienced an adverse reaction,
17  elevated heart rate, elevated blood pressure, nausea and
18  weakness.  The daughter was seen by a doctor and
19  released.  The mother claims that three months later,
20  these same or similar symptoms exist."
21       Is it fair to say that one of your
22  consumers -- one of your customers reported that to you?
23       MR. COHEN:  Form.
24       THE WITNESS:  Yes.
25  BY MR. EGGNATZ:

Page 48

1    Q    Do you know if VPX undertook any investigation
2  to determine if its product actually caused this with
3  this girl?
4    A    Can you repeat that.
5    Q    Do you know if VPX undertook any investigation
6  to determine if its product actually caused this
7  21-year-old girl to experience these problems?
8    A    It looks like there was some investigation
9  into the medical history in section 7 that mentions that
10  the daughter has a heart murmur.
11    Q    Okay.
12    A    "Family history of high blood pressure and
13  obesity.  Daughter is on prescription medication."
14    Q    Isn't it true that the mother told you that
15  there was nothing physically wrong with her daughter
16  before the incident?
17    A    The mother did not tell me anything.
18    Q    You're right.
19       Isn't it true the mother reported to VPX that
20  there was nothing wrong with her daughter or her heart
21  before the incident?
22       That would be on Bates Stamp 47.
23    A    Forty-seven?
24    Q    Yes.
25    A    That seems to contradict what was on the paper

Page 49

1  before it.  It doesn't give a time line that I see.
2    Q    That other relevant history you're talking
3  about, about the heart murmur, do you know where that
4  information could have come from?
5    A    That would have come from whoever was on the
6  line.  I assume the mother.
7       MR. COHEN:  Don't guess.
8       THE WITNESS:  Sorry.
9  BY MR. EGGNATZ:
10    Q    So it's your I guess testimony that the mother
11  told you that her daughter has a heart murmur but that
12  she also told you there was nothing wrong with her heart
13  in the same conversation.
14    A    The mother didn't tell me anything.
15    Q    That the doctor -- that the mother told
16  whoever she was talking to at VPX in the same
17  conversation that she has a heart murmur but she also
18  told VPX that there was nothing wrong with her
19  daughter's heart.
20       MR. COHEN:  Object to the form.
21       THE WITNESS:  I don't want to guess.
22       MR. COHEN:  Yeah.
23  BY MR. EGGNATZ:
24    Q    Do you know if VPX did anything to follow up
25  on this incident within a year?

13 (Pages 46 - 49)

Page 50

1    A    Follow up with whom?
2    Q    They did anything to follow up with the
3 caller.
4    A    I don't know.
5        MR. COHEN:  Josh, just while you're pausing
6 for a minute.  It's your depo.  I mean, if you plan
7 on going over every page in that, we may want to
8 consider a lunch break at some point in time.
9        MR. EGGNATZ:  I mean, I'm not going over every
10 page, but, I mean, I could probably be done in an
11 hour.
12        MR. COHEN:  It's up to the witness.
13        MR. EGGNATZ:  It's up to you.  I can be done
14 in an hour and let's call it an hour and 15
15 minutes.
16        THE WITNESS:  What time is it?
17        MR. EGGNATZ:  It's 12:00.  So we could take a
18 break or go right through and I, I mean, get us out
19 of here at 1:15, 1:30.
20        THE WITNESS:  Let's grab lunch.
21        MR. EGGNATZ:  I have no problem with that.
22        MR. COHEN:  Are you at a stopping point?  I
23 mean, it's your depo.  I mean, I don't have your
24 outline, so I don't know if -- is seemed like there
25 was a pause.

Page 51

1        MR. EGGNATZ:  Let me --
2        MR. COHEN:  I'm not trying to be disruptive.
3        MR. EGGNATZ:  Let me get through another
4 couple more here and then let's stop.  Let's go --
5 let's go for about another 10 minutes, maybe
6 sooner, and then we'll stop, okay, and we'll take a
7 break.
8        MR. COHEN:  Is that okay, Jon?
9        THE WITNESS:  Yes.
10 BY MR. EGGNATZ:
11    Q    And this looks -- Bates Stamp 49 looks like
12 this is that stroke victim.  He says -- oh, actually,
13 this is another victim.  He says, "On September 27th, I
14 took a serving of Redline.  I suffered a stroke an hour
15 later due to a spiked blood pressure.  I am still in
16 recovery and facing a long -- I'm still in the hospital
17 and face a long recovery."
18        Is that fair to say that a customer reported
19 that to Redline?
20        MR. COHEN:  Object to the form.
21        THE WITNESS:  Yes.
22 BY MR. EGGNATZ:
23    Q    Okay.  Bates Stamp 53.  This one we had a
24 customer who wrote in -- I'll wait until you get there
25 -- "I am a young professional, and on my way to work a

Page 52

1 couple weeks ago, I stopped at a gas station.  I bought
2 a Redline.  I had never tried one before and was
3 curious.  Anyway, I drank the bottle not knowing it was
4 two servings, as you guys only had that squiggly serving
5 line on the side and I think a tiny, tiny blurb about
6 the serving size.  In other words, your product was not
7 well advertised about its true nature.
8        So after drinking the product, I got to work
9 feeling a little edgy.  Within an hour, my heart rate
10 jumped to 120 beats per minute, my blood pressure was
11 200/120 and I was having an intense panic attack."
12        Next sentence, "However, after drinking a
13 Redline, I had to be rushed to the ER where I spent the
14 rest of my day, heart beating out of my chest, scared
15 and humiliated."
16        And then a couple sentences later he says, "In
17 short, I am upset with VPX for not properly advertising
18 the dangers of their products."
19        A couple sentence -- next sentence later, "I
20 think it is an unacceptable marketing practice to play
21 with innocent American lives.  You need to let consumers
22 know exactly what they are getting into.  Your company
23 is not a trustworthy one and I feel like you're
24 betraying your customers and doing them a disservice."
25        Do you have any knowledge of what actions VPX

Page 53

1 may have taken in response to this customer here?
2        MR. COHEN:  Form.
3        THE WITNESS:  Just what's mentioned in 52.
4        MR. EGGNATZ:  Okay.  Let's stop there and
5 we'll pick it back up after lunch.
6        MS. GODWIN:  Did he finish his answer?
7        MR. EGGNATZ:  Yeah.  You just said what's on
8 52, right?
9        THE WITNESS:  Yes.
10        THE VIDEOGRAPHER:  Off the record.  The time
11 is 12:08 p.m.
12        (Luncheon recess was taken after which the
13 following proceedings were had:)
14        THE VIDEOGRAPHER:  We're back on the record.
15 The time is 1:10 p.m.
16 BY MR. EGGNATZ:
17    Q    Mr. Owoc, we last were discussing Bates Stamp
18 53 it looks like you're looking at it.  Next I'd like to
19 refer you to Bates Stamp 60.  In this case it looks like
20 a hospital record from one of your consumers.  In this
21 case it says that, "The patient is a 27-year-old male
22 who drank an energy drink containing caffeine this
23 morning and subsequently had an episode of palpitations,
24 anxiety, hypertension, and mild diaphoresis."
25        I'm not asking you to be a doctor in any way,

14 (Pages 50 - 53)

Page 54

1 but is it fair to say that one of your -- one of your
2 consumers provided this medical record to you telling
3 VPX that this is something they experienced after
4 drinking your product?
5     MR. COHEN: Object to the form. Predicate.
6     THE WITNESS: No.
7 BY MR. EGGNATZ:
8   Q   It's not? How did you get this record then?
9   A   I don't know. You'll note that the author is
10 David Bower, M.D.
11   Q   Well, I'm asking if one of the -- if one of
12 your customers provided this report to VPX.
13   A   I don't know.
14   Q   Do you know any other reason or any other way
15 VPX could have got the document if it wasn't provided by
16 the customer?
17   A   Yes.
18   Q   How?
19   A   The hospital could have submitted it directly.
20   Q   The hospital -- okay.
21     Your testimony is that Crimdon Hospital
22 Medical Center sent VPX one of its patient's medical
23 records?
24     MR. COHEN: Object to the form. That's not
25     his testimony, Counsel.

Page 55

1     THE WITNESS: I don't know.
2 BY MR. EGGNATZ:
3   Q   What did you say?
4   A   You asked if there were other ways that we
5 could have acquired this document.
6   Q   Okay. Would you agree with me that this
7 customer's heart palpitation complaint is similar to
8 other complaints that we reviewed today?
9     MR. COHEN: Object to the form.
10     THE WITNESS: I don't know. I'm not a doctor.
11 BY MR. EGGNATZ:
12   Q   Next I'd like to refer you to Bates Stamp 65.
13 It says, "Subject with no medical history had a
14 presyncopal episode this morning. The subject drank
15 half an 8-ounce Redline and then an hour later
16 collapsed."
17     Is it fair to say that this is something the
18 customer reported to Redline and that Redline
19 reported -- I'm sorry -- reported to VPX and that VPX
20 reported to the FDA?
21   A   My copy of this document is a little difficult
22 to read. Is yours similar or is it a little more --
23   Q   Yes.
24   A   -- legible?
25   Q   It's the same. I just read mine before today

Page 56

1 so I was prepared for it.
2   A   Okay.
3     MR. COHEN: Is there a question pending?
4     MR. EGGNATZ: Yes, there is.
5     THE WITNESS: Can you repeat the question.
6 BY MR. EGGNATZ:
7   Q   I was asking if this is information that was
8 reported to you by the customer and that the customer --
9 and that VPX in turn reported to the FDA.
10   A   It was reported to Michael Fabiano by the
11 customer.
12   Q   And Michael Fabiano or someone at VPX in turn
13 reported this to the FDA on this MedWatch form?
14   A   Yes.
15   Q   I'd like to refer you to Bates Stamp 69 and
16 70. So this is a release of some sort involving
17 someone, a customer in Massachusetts. Do you have any
18 information regarding this adverse incident?
19     MR. COHEN: Form. Predicate.
20     THE WITNESS: Just what's here.
21 BY MR. EGGNATZ:
22   Q   Bates Stamp 71, looks like some handwriting
23 written on notebook paper. Do you know whose
24 handwriting this is?
25   A   I do not.

Page 57

1   Q   Do you know what this paper is or why this
2 information was written on here?
3   A   I do not.
4   Q   Is this notebook paper part of VPX's record
5 tracking system for adverse reports that are -- adverse
6 incident reports?
7   A   I don't know.
8   Q   It looks like on page -- or line 3 here,
9 someone at VPX wrote that the customer experienced the
10 seizure. Is that right?
11   A   Someone wrote that the customer experienced a
12 seizure, yes.
13   Q   You told us earlier that you do some of those
14 intakes when a customer calls. Is there anyone else
15 that does these intakes as well?
16   A   From what time period?
17   Q   This looks like it was in March of 2011.
18   A   March of 2000 -- excuse me -- 2011 it was not
19 me.
20   Q   Do you know who it would have been at that
21 time?
22   A   I don't know.
23   Q   Page 72, it looks like someone at VPX wrote on
24 the 15 up there, "Wants Jack to call mother." I'm
25 assuming Jack is your mom -- I apologize. I'm assuming

15 (Pages 54 - 57)

Page 58

1  Jack is your dad.  Do you know if your dad ever called
2  this customer's mother?
3      A   I do not know.
4      Q   If you did, is that something that would be a
5  record in these -- in these documents that were
6  produced?
7      A   I don't know.
8      Q   You don't know if that's something there
9  should be a record of?
10     MR. COHEN:  Form.
11     THE WITNESS:  I don't know if there is a
12  record of it.
13  BY MR. EGGNATZ:
14     Q   Do you know if it's something there should be
15  a record of?
16     A   I don't know.
17     Q   And, again, you're here today as the corporate
18  representative for customer complaints and adverse
19  events, right?
20     MR. COHEN:  He's here as the representative on
21  the actual -- I don't care what the title says,
22  Counsel.  He's here as the representative --
23     MR. EGGNATZ:  You don't care what the Notice
24  says?
25     MR. COHEN:  I don't care what title the title

Page 59

1  says, Counsel.  Let me talk.  He's here as the
2  representative on the actual topics that you listed
3  subject to our objections.
4      Ask your next question.
5  BY MR. EGGNATZ:
6      Q   All right.  Let's look at Bates Stamp 86.  It
7  says, "While using this dietary supplement, I tested
8  positive for amphetamine on a routine drug test,
9  military."
10     Is it fair to say that's something that one of
11  your -- one of VPX's customers reported to VPX and that
12  VPX in turn reported to the FDA?
13     MR. COHEN:  Form.
14     THE WITNESS:  It was reported to VPX by a
15  customer, yes.
16  BY MR. EGGNATZ:
17     Q   And VPX in turned reported that to the FDA?
18     A   It looks like this document is incomplete.
19     Q   Does that mean this it was not reported to the
20  FDA?
21     A   I don't know what that means.
22     Q   You have no way to know one way or the other
23  if it was reported to the FDA by looking at the
24  document?
25     A   The document isn't complete.

Page 60

1      Q   This is a document that should have been
2  completed by VPX?
3      MR. COHEN:  Form.
4      THE WITNESS:  The MedWatch form is completed
5  by VPX.  You had previously mentioned that you've
6  taken some pages out of here, so I don't know where
7  the rest of the document is.
8  BY MR. EGGNATZ:
9      Q   Well, we're on Bates Stamp 86.
10     A   Okay.
11     Q   Next one is 87.
12     A   I can see that.
13     Q   Okay.  And it doesn't look like 87 is the
14  second page of this document.  Fair enough?
15     A   Fair enough.
16     Q   All right.  I'd like to refer you to Bates
17  Stamp 88.  I'll give you a chance to read it, but it
18  looks like in this one a mother reported that her
19  daughter was having a seizure and was taken to the
20  hospital after consuming this product.  Is that right?
21     A   Yes.
22     Q   Do you know if VPX undertook any additional
23  investigation into this seizure that was reported by the
24  mother to determine whether or not it was caused by the
25  product?

Page 61

1      A   Can you repeat that question.
2      Q   Do you know if VPX undertook any investigation
3  to determine whether or not this report of a seizure was
4  caused by the product?
5      A   According to Bates Stamp 89, Section 10,
6  Number One, mentions that Wellbutrin is contraindicated
7  and should not be taken with any form of caffeine.  The
8  warning on Redline clearly states that this product
9  should not be taken with antidepressants.
10     Q   Okay.  I'd like to refer you to Bates Stamp
11  96.  This one says, "I drank an energy drink called
12  Redline.  Shortly after ingesting it, I suddenly began
13  getting heart palpitations.  My heart began to raise and
14  my blood pressure increased dramatically.  I also got
15  paranoia and severe anxiety.  I believe this product is
16  very dangerous as I only drunk half of the bottle.  I
17  cannot imagine what affects it could have on someone who
18  drinks the entire container.  Also, I have no health
19  problems, diseases or disorders and I am a completely
20  healthy individual."
21     Looks like on this one, there is no VPX
22  personnel information on it, and the narrative there is
23  written in the first person, I.  Does that suggest to
24  you that this report was submitted by the consumer
25  directly to the FDA as opposed to being reported to you,

16 (Pages 58 - 61)

Page 62

1 to VPX, and then to the FDA?
2      MR. COHEN: Object to the form.
3      THE WITNESS: I'd rather not speculate.
4 BY MR. EGGNATZ:
5   Q   Is there anything on this form that suggests
6 to you that this was reported to VPX?
7   A   I'd rather not speculate.
8   Q   So there's nothing on the form that suggests
9 that to you?
10   A   From the consumer directly?
11   Q   Yeah. Is there anything looking at Bates
12 Stamp 96 that leads you to believe that this report was
13 even reported to VPX?
14   A   I'd rather not speculate.
15   Q   I'm not asking you to speculate/
16   A   I don't know.
17   Q   Let's look at Bates Stamp 98. Again, this is
18 a report of Redline Xtreme Grape flavor, and it looks
19 that this was a 16-year-old consumed an entire bottle of
20 Redline Xtreme that evening. "Began throwing up.
21 Stomach symptoms." We don't need -- you don't need to
22 read all the language there, but is it fair to say that
23 whatever was reported there by the consumer was reported
24 to VPX and that VPX in turn reported it to the FDA?
25   A   Yes.

Page 63

1      You said he was 16?
2   Q   Yes. Well, that's what was reported by the
3 consumer.
4   A   Okay.
5   Q   I'll refer you to Bates Stamp 103. Again,
6 this customer reported adverse events and then in turn
7 VPX reported it to the FDA. Is that correct?
8   A   I don't know.
9   Q   Is there something on this form that should
10 have been completed that would enable you to know?
11      MR. COHEN: Form.
12      THE WITNESS: Section E.
13 BY MR. EGGNATZ:
14   Q   Initial reporter?
15   A   Correct.
16   Q   And this information is blank on this form?
17   A   Correct.
18   Q   I'd like to refer you to Bates Stamp 110.
19 Again, there's some handwritten notes by someone at VPX.
20 Line four it says, "They're looking for a
21 reimbursement."
22      Is it fair to say the customer called you
23 asking for a reimbursement?
24   A   The customer did not call me, no.
25   Q   Customer called a representative of VPX and

Page 64

1 asked for a reimbursement.
2   A   I don't know his method of communication.
3   Q   A customer contacted VPX by some means and
4 requested a reimbursement?
5   A   It looks like a child age 17 was the consumer
6 of the product who was the son of the person who
7 contacted VPX and the contactor of VPX was looking for
8 reimbursement.
9   Q   Fair enough.
10      Next I'd like to refer you to Bates Stamp 119.
11 It looks like 119 carries over to 120. Can you tell me
12 what this is?
13   A   No.
14   Q   Have you ever seen this document before?
15   A   I have not.
16   Q   Did you, in fact, review these documents
17 before today's deposition as you testified to earlier?
18      MR. COHEN: Object to the form.
19      Counsel, I mean, you're showing him half of a
20 document. I mean, you literally don't show him the
21 page right before where it explains what he is
22 looking at.
23      MR. EGGNATZ: This is something different.
24 Page 119 is a call log from many different people
25 from all around the country. 119 and 120 go

Page 65

1 together. I'm asking if he knows what this is.
2      MR. COHEN: Object to the form.
3      And 118 and 119 go together, Counsel.
4      MR. EGGNATZ: Do you want to testify for him?
5 Apparently you know a lot about the documents.
6      MR. COHEN: Well, actually, I can read. I
7 don't know that that has anything to do with the
8 remainder of your examination. You're
9 misrepresenting the document to the witness. I
10 take issue with that. You affirmatively
11 represented 118 has nothing to do with 119. That's
12 just -- that's just verifiably an untrue statement.
13      MR. EGGNATZ: Well, I'm here to find that out.
14 That's why I'm asking him.
15      THE WITNESS: 118 shares a date that coincides
16 with 119 and 120.
17 BY MR. EGGNATZ:
18   Q   Okay. It looks like page 118 is from a
19 caller, right, a single caller? Fair enough?
20   A   No.
21   Q   Page 118? What is 118?
22   A   Rubin Useche, former employee.
23   Q   Okay.
24   A   The signature at the bottom is Darlene Owoc
25 former employee.

17 (Pages 62 - 65)

1  Q   Darlene is discussing what Rubin had told him?
2  A   I don't know who Darlene is discussing it
3 with.
4  Q   It says, "Rubin called me." She signed the
5 paper.
6  A   That does not mean that this communication is
7 between her and Rubin.
8  Q   Okay. Now, page 119 and page 120 show calls
9 coming in from different area codes and different states
10 from all around the country. Do you know what these
11 calls are in reference to?
12  A   I do not know what these calls are in
13 reference to.
14  Q   All right. I'd like to refer you to page 129.
15 In part this is redacted, but it says, "Blank called the
16 care's hotline on 3/27/2008 to report her friend had
17 passed away on or about 3/16/2008. Reported seeing
18 blank consume Redline Xtreme. Daughter reported to
19 blank that blank may have also been consuming a dietary
20 supplement by Redline unspecified. Noted before this
21 event, blank was in good health and had gastric bypass
22 about two years ago."
23      Is it fair to say that this was something that
24 was reported to Redline -- I'm sorry -- VPX?
25  A   It looks like it was initially reported to the

1 hotline mentioned.
2  Q   Why do you say that?
3  A   Based on the information provided in Box B,
4 Number Five, first sentence.
5  Q   Okay. I'd like to refer you to Bates Stamp
6 131. This one says, "My 16-year-old son was riding with
7 a friend to school. They stopped at a store and he
8 purchased an energy drink called Redline. Approximately
9 20 minutes after consuming this product, he felt like
10 his heart was going to beat out of his chest. He went
11 to the school nurse and she took his blood pressure. It
12 was a 190/110. His pulse was 175 beats per minute. An
13 ambulance was dispatched to the school, and I was
14 notified of this emergency," et cetera.
15      Is it fair to say this is something that was
16 reported to VPX and in turn VPX reported it to the FDA?
17  A   It does not look like this was initially
18 reported to VPX, box G, number five.
19  Q   Okay. I'd like to refer you to the Bates
20 Stamp 138. It looks like it bleeds over into 139. Can
21 you tell me what that is?
22  A   The top of the page says it's a Daily Call Log
23 and Tasks.
24  Q   Is this a daily call -- an ongoing daily call
25 log that's stored at VPX?

1  A   I do not know if it was ongoing.
2  Q   When you are fielding calls when customers
3 call, is there an ongoing call log that you're entering
4 this information in?
5  A   Can you repeat the question.
6  Q   You told us that part of your responsibility
7 is fielding calls from customers. When that happens, do
8 you maintain some sort of call log for when those calls
9 come in?
10  A   I personally do not have a call log.
11  Q   How do you document customer complaints?
12  A   Via our customer complaint database.
13  Q   So when a customer calls, at that time you
14 physically import something into the database?
15  A   When I field a call you're asking?
16  Q   Yes.
17  A   I will take down the relevant information and
18 put it into the customer complaint database.
19  Q   What do you mean by take it down?
20  A   Transcribe it onto whatever is nearby.
21  Q   Like a Post-it note or something?
22  A   No. Like the customer complaint database,
23 like an electronic document such as a Word document.
24  Q   Is there a specific name for that document,
25 for that database?

1  A   The customer complaint database which we had
2 provided you with a log of.
3  Q   Where is that, the customer complaint
4 database?
5      MR. COHEN: In your hand.
6 BY MR. EGGNATZ:
7  Q   Okay. So this is the entire database of every
8 customer complaint?
9  A   I don't know. I believe it spans a specific
10 time frame.
11  Q   Is that what we call this? These documents
12 here, collectively they're called the customer complaint
13 database?
14  A   That specific document is one document in the
15 customer complaint database. Actually, there are plenty
16 of other documents in here that are not from the
17 customer complaint database.
18  Q   So, in other words, VPX doesn't maintain a
19 single call log where it says, On this day this person
20 called, here's what they said, here was the complaint,
21 and we could look at that ledger and see what was
22 reported to VPX?
23  A   Can you ask that again.
24  Q   Does VPX maintain any sort of record or log
25 that we could look at that would show on a certain date

Page 70

1 the customer that called and what they complained about
2 and what was said?
3   A   Yes, this document (indicating).
4   Q   These documents collectively 1 through 188?
5   A   This specific document which is an example of
6 the customer complaint database which we have provided.
7   Q   So there is no log we could look at one after
8 another?
9   A   I don't know what else was provided to you.
10   Q   Page 138, it's a Daily Call Log and Tasks.
11   A   Yes.
12   Q   Does VPX still maintain a Daily Call Log and
13 Tasks?
14      MR. COHEN:  Object to the form.  Asked and
15 answered.
16      THE WITNESS:  I already answered that.
17      MR. EGGNATZ:  Well, you can answer it again.
18 BY MR. EGGNATZ:
19   Q   Does VPX maintain a Daily Call Log and Tasks
20 like the document we're looking here at 138?
21   A   Are you asking across our entire facility?
22   Q   No, I'm -- it's with respect to customer
23 complaints.
24   A   With regard to customer complaints, anything
25 relevant is in the customer complaint database.

Page 71

1   Q   Is a log called this, Daily Call Log and
2 Tasks -- at some point VPX created this.  I'm asking if
3 you still have a log like this.
4      MR. COHEN:  Object to the form.
5      THE WITNESS:  If you look at this log, it
6    mentions retailers right here, so this clearly
7    isn't for customer complaints.  Europa is one of
8    our distributors.  Nutrition Depot is a retailer.
9    Complete Nutrition, Health Basket Nutrition, Wayne
10   and Mary's Nutrition Center.
11 BY MR. EGGNATZ:
12   Q   Well, how about all these consumers that are
13 listed here where it just says, "Consumer"?
14   A   Plenty of people are interested in our
15 products, interested in purchasing our products.  They
16 may call to buy.
17   Q   So if there is no Daily Call Log and Tasks
18 specific to customer complaints, then just tell me.  I
19 just need to know so I can request it or not if it
20 exists.
21   A   I'm not aware of a Daily Call Log that is
22 specific to customer complaints.
23   Q   Is there a Daily Call Log in general that's
24 not specific to customer complaints that VPX still
25 maintains?

Page 72

1      And on that list, there may be some calls
2 related to complaints and there also may be some calls
3 also not related to complaints.
4   A   I'm sure we can pull phone records.
5      MR. COHEN:  He's just asking if there's a log.
6      THE WITNESS:  I'm not aware of one.
7 BY MR. EGGNATZ:
8   Q   Okay.  I'm not trying to trick you.  I see a
9 log here.  I don't have any other logs.  So I'm just
10 trying to find out if other logs exist.
11   A   I'm not aware of one.
12   Q   Since you've been working at VPX, you have not
13 maintained any sort of log like this?
14   A   Call log, no.
15   Q   Okay.  Next I'd like to refer you to Bates
16 Stamp 169.  Again, this is a complaint that came in to
17 VPX and that VPX in turn reported to the FDA.
18   A   Yes.
19   Q   And is it fair to say that this customer
20 reported that he went to the hospital?
21   A   Yes.
22   Q   Next I'm showing you a Freedom of Information
23 Act I did to the Department of Health and Human
24 Services, and on this list starting on page 3, it looks
25 likes it lists all reports to the FDA regarding Redline

Page 73

1 Some of them include the Redline Xtreme.  Some of them
2 include other Redline products.
3      Is that a fair depiction of what that is?
4      MR. COHEN:  Object to the form.  Predicate.
5      Do you know what this from is, Jon?
6      THE WITNESS:  I do not.
7      MR. COHEN:  Okay.  Next question.
8 BY MR. EGGNATZ:
9   Q   Do you know if VPX takes it upon itself to
10 inquire from the FDA if adverse events have been
11 reported to the FDA directly?
12      The answer is not on there if you're looking
13 for it.
14   A   I'm just reading it.
15      What was your question?
16   Q   Do you know if VPX takes it upon itself to
17 contact or inquire from the FDA if adverse events have
18 been reported to them directly by consumers?
19   A   I do not know.
20   Q   Do you think that's something that a
21 responsible energy drink manufacturer should do?
22      MR. COHEN:  Object to the form.
23      THE WITNESS:  I believe it's responsible for
24   VPX to address any adverse event reports that they
25   are aware of.

19 (Pages 70 - 73)

1 BY MR. EGGNATZ:
2    Q    Does that include making it aware of adverse
3 events that may be reported to the government?
4        MR. COHEN:  Object to the form.
5        THE WITNESS:  To the best of our abilities.
6 BY MR. EGGNATZ:
7    Q    And what efforts does VPX do to do that?
8    A    I do not know.
9    Q    Other than what we've discussed today and in
10 the documents we've reviewed, are you aware of any other
11 physical injuries or ailments that have been reported by
12 customers as a result of consuming this Redline Xtreme
13 product?
14   A    Can you repeat the question.
15   Q    Other than what we've discussed today and the
16 documents that we've gone through today, are you aware
17 of any other physical injuries or ailments that have
18 been reported by customers after consuming the Redline
19 Xtreme product?
20   A    I'm not aware of any.
21   Q    Are you aware of a lawsuit entitled Cathy
22 Carroll vs. Vital Pharmaceutical?
23   A    Do you have the document?
24   Q    Sure.  That's the first page of the Complaint.
25   A    Prior to this document, I had no recollection

1 of this case.
2    Q    It looks like in this case, Cathy Carroll
3 reports of suffered from a non-q myocardial infarction
4 and spending three days in the hospital after
5 consumption of the Redline product.  Is that right based
6 on what you just read?
7        MR. COHEN:  Form.  I mean, you're asking if he
8    can read the Complaint, the one page that you gave
9    him?
10       MR. EGGNATZ:  I'm asking if that's what this
11   consumer is alleging.
12       MR. COHEN:  Form.
13       THE WITNESS:  That's what it looks like it
14   says.
15 BY MR. EGGNATZ:
16   Q    Next I'm showing you a news article titled --
17 the article states, "Redline offers School District
18 $25,000 after four students drink the product and fall
19 ill."  Have you ever read this article before?
20   A    This specific article, I don't think so.
21   Q    Were you aware of these adverse or these
22 alleged adverse events prior to today?
23       MR. COHEN:  Form.
24       THE WITNESS:  Yes.
25 BY MR. EGGNATZ:

1    Q    And what can you tell me about them?
2    A    Just what's written in the article.
3    Q    The article says, "Three separate news
4 outlets, NBC6 in Miramar, WPLG in Miami, and the Miami
5 Herald, reported that 13- or 14-year-old boys drank sips
6 of Redline before a standardized test at a middle school
7 in Weston, Florida.  And it says, "Redline's CEO and CSO
8 Jack Owoc" -- Owoc, sorry -- "said it is physiologically
9 impossible for four 13-year-old boys to all experience
10 profuse sweating and racing hearts on a few sips of
11 Redline."
12       Do you agree with that statement that it's
13 impossible for this to have happened to these kids?
14       MR. COHEN:  Object to the form.  Predicate.
15   Also beyond the scope of the deposition.  He's not
16   a medical expert, Counsel.
17 BY MR. EGGNATZ:
18   Q    Based on the adverse events, other adverse
19 events that we've gone through today reported by other
20 consumers, do you think it's impossible for this product
21 to cause profuse sweating and a racing heart?
22       MR. COHEN:  Object to the form.
23       THE WITNESS:  I don't know.
24 BY MR. EGGNATZ:
25   Q    Do you have any information on whether it's

1 impossible for the product to cause profuse sweating and
2 a racing heart?
3    A    Can you repeat that.
4    Q    Do you think it's impossible for the product
5 to cause profuse sweating and a racing heart?
6    A    No.  I could drink two of them.
7    Q    How does it make you feel?
8    A    I have a pretty high tolerance.
9    Q    You drink it a lot?  You drank it a lot?
10   A    Every day for four years.
11   Q    And how do you experience the product?  What
12 does it do for you?
13   A    I get an energy boost.  Helps me work.
14   Q    Instead of a cup of coffee, you may grab a
15 Redline?
16   A    Yes.
17   Q    In this case, Adam Mirabella's mother wrote
18 VPX an e-mail regarding her complaints surrounding the
19 product and what had happened to her son.  Do you know
20 why that communication would not be in Bates Stamps 1
21 through 188?
22       MR. COHEN:  Object to the form.
23       THE WITNESS:  I do not know.
24 BY MR. EGGNATZ:
25   Q    Is it fair to say the other consumer

20 (Pages 74 - 77)

Page 78

1 complaints that came in via e-mail may also not be in
2 Bates Stamps 1 through 188?
3       MR. COHEN:  Object to the form.
4       Are you representing that there's not an
5 Adverse Event Form for Mr. Mirabella's case,
6 Counsel?
7       MR. EGGNATZ:  I'm asking about the e-mail,
8 what the words of the consumer were.
9       MR. COHEN:  I appreciate the clarification.
10      Object to the form.
11      THE WITNESS:  Can you repeat that.
12 BY MR. EGGNATZ:
13   Q   Is it fair to say that other e-mails and
14 communications from consumers are not in Bates Stamp 1
15 through 188?
16      MR. COHEN:  Object to the form.
17      THE WITNESS:  I don't know.
18 BY MR. EGGNATZ:
19   Q   You mentioned that there was a one-year
20 records retention policy.  Is that a written policy of
21 VPX?
22   A   I don't know.  That --
23   Q   Sorry.  Go ahead.
24   A   That is a function of our IT Department.
25   Q   Okay.  So, in other words, the IT Department

Page 79

1 after one year may clear out all the e-mails?
2   A   I don't know the process.
3   Q   How about for other records, not e-mails; for
4 example, customer call logs?
5   A   I don't know.
6   Q   Has VPX ever received an Adverse Event Report
7 and then VPX ultimately determined that it was caused by
8 the product?
9       MR. COHEN:  Object to the form.
10      THE WITNESS:  I don't know.
11      MR. EGGNATZ:  All right.  That's all I have
12 for you.  You thank you for coming in today.
13      Appreciate it.
14      THE WITNESS:  Okay.  Thank you.
15      MR. COHEN:  All right.  We'll read.
16      THE VIDEOGRAPHER:  Going off the record.  The
17 time is 1:57 p.m.
18      (The Reading and Signing of this deposition is
19 not concluded and the deposition was concluded at 1:57
20 p.m.)
21
22
23
24
25

Page 80

1 RE     :  Adam Mirabella vs. Vital Pharmaceuticals,
         Inc.
2 DEPO OF :  JONATHAN OWOC
   TAKEN  :  April 4th, 2014
3
4          EXCEPT FOR ANY CORRECTIONS
           MADE ON THE ERRATA SHEET BY
5          ME, I CERTIFY THIS IS A TRUE
           AND ACCURATE TRANSCRIPT.
6          FURTHER DEPONENT SAYETH NOT.
7          _____
8               JONATHAN OWOC

   STATE OF FLORIDA     )
9                        ) SS:
   COUNTY OF BROWARD     )
10
11      Sworn and subscribed to before me this
12 _____ day of _____, 2014.
13 PERSONALLY KNOWN _____ OR I.D. _____
14      _____
        Notary Public in and for
15      the State of Florida at
        Large.
16
17 My commission expires:
18
19
20
21
22
23
24
25

Page 81

1          ERRATA SHEET
2 RE     :  Adam Mirabella vs. Vital Pharmaceuticals,
         Inc.
3 DEPO OF :  JONATHAN OWOC
   TAKEN  :  April 4th, 2014
4
5 DO NOT WRITE ON TRANSCRIPT, ENTER ANY CHANGES HERE
6 Page  # | Line # | Change        | Reason
7 _____|_____|_____|_____
8 _____|_____|_____|_____
9 _____|_____|_____|_____
10 _____|_____|_____|_____
11 _____|_____|_____|_____
12 _____|_____|_____|_____
13 _____|_____|_____|_____
14 _____|_____|_____|_____
15 _____|_____|_____|_____
16 _____|_____|_____|_____
17 _____|_____|_____|_____
18 _____|_____|_____|_____
19 _____|_____|_____|_____
20 _____|_____|_____|_____
21 State of Florida     )
   County of BROWARD    )
22
   Under penalties of perjury, I declare that I have read
23 my deposition transcript, and it is true and correct
   subject to any changes in form or substance entered
24 here.
   _____
25 Date               JONATHON OWOC

21 (Pages 78 - 81)

Page 82

1    CERTIFICATE OF OATH OF WITNESS
2 STATE OF FLORIDA    )
                      ) SS:
3 COUNTY OF BROWARD   )
4
5    I, AMBER CHEEK, COURT REPORTER, Notary Public in
6 and for the State of Florida at Large, certify that the
7 witness, JONATHAN OWOC, personally appeared before me on
8 April 4th, 2014, and was duly sworn by me.
9    WITNESS my hand and official seal this 10th day of
10 April, 2014.
11
12
13    _____
        AMBER CHEEK, Court Reporter
14      Notary Public, State of Florida
        at Large
15
16 Notary # EE 21074
17 My commission expires:  9/17/2014
18
19
20
21
22
23
24
25

Page 83

1    REPORTER'S DEPOSITION CERTIFICATE
2
3    I, AMBER CHEEK, Court Reporter, certify that I was
4 authorized to and did stenographically report the
5 deposition of EUGENE BUKOVI, the witness herein on April
6 4th, 2014; that a review of the transcript was
7 requested; that the foregoing pages numbered from ??? to
8 ??? inclusive is a true and complete record of my
9 stenographic notes of the deposition by said witness;
10 and that this computer-assisted transcript was prepared
11 under my supervision.
12    I further certify that I am not a relative,
13 employee, attorney or counsel of any of the parties, nor
14 am I a relative or employee of any of the parties'
15 attorney or counsel connected with the action.
16    DATED this 10th day of April, 2014.
17
18    _____
        AMBER CHEEK
19      Court Reporter
20
21
22
23
24
25

Page 84

1       VERITEXT FLORIDA REPORTING CO.
             One Biscayne Tower
2         Two South Biscayne Boulevard
                 Suite 2250
3            Miami, Florida 33131
               (305) 376-8800
4
5 April 10th, 2014
6
7 Mr. Jonathan Owoc
    c/o Jordan Cohen, Esquire
8 Wicker, Smith, O'Hara, McCoy & Ford, P.A.
    515 East Las Olas Boulevard
9 Suite 1400
    Fort Lauderdale, Florida 33302
10
11 RE    : Adam Mirabella vs. Vital Pharmaceuticals,
              Inc.
12 DEPO OF : JONATHAN OWOC
       TAKEN  : April 4th, 2014
13 READ & SIGN BY:  May 8th, 2014
14 Dear Mr. Owoc:
15 This letter is to advise you that the transcript of the
    deposition listed above is completed and is awaiting
16 reading and signing.
17 Please arrange to stop by our office in Suite 2250, One
    Biscayne Tower, Two South Biscayne Boulevard, Miami,
18 Florida 33131 to read and sign the transcript.  Our
    office hours are from 8:00 a.m. to 4:00 p.m. Monday
19 through Friday.  Depending on the length of the
    transcript, you should allow yourself sufficient time.
20
    If the reading and signing has not been completed prior
21 to the referenced date, we shall conclude that you have
    waived the reading and signing of the deposition
22 transcript.  Your prompt attention to this matter is
    appreciated.
23 Sincerely,
24 AMBER CHEEK, Court Reporter
25 cc:  All counsel on appearance page

Page 85

1       VERITEXT FLORIDA REPORTING CO.
             One Biscayne Tower
2         Two South Biscayne Boulevard
                 Suite 2250
3            Miami, Florida 33131
               (305) 376-8800
4
5 April 10th, 2014
6
7 Joshua Eggnatz, Esquire
    The Eggnatz Law Firm
8 1920 North Commerce Parkway
    Suite 1
9 Weston, Florida 33326
10
11 RE    : Adam Mirabella vs. Vital Pharmaceuticals,
              Inc.
12 DEPO OF : JONATHAN OWOC
       TAKEN  : April 4th, 2014
13 READ & SIGN BY:  May 8th, 2014
14
15 Dear Counsel:
16 The original transcript of the deposition listed above
    is enclosed for your file.  The witness did not waive
17 reading and signing and has been sent a letter notifying
    them to come in and read and sign their deposition
18 transcript.
19 The witness will be provided a copy of their deposition
    transcript for reading in our office should they come in
20 to review the transcript, and we will forward to you any
    corrections made by the witness at that time, along with
21 an original signature page which should be attached to
    the original transcript which is in your possession.
22
23 Sincerely,
24 AMBER CHEEK, Court Reporter
25

22 (Pages 82 - 85)