UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE No.0:12-cv-62086-WJZ

ADAM MIRABELLA, on behalf of
himself and all others similarly
situated,

                    Plaintiff,

           -vs-

VITAL PHARMACEUTICALS, INC.,
a Florida corporation doing business
as VPX,

                    Defendant.
_____/

DEPOSITION OF ADAM MIRABELLA
PAGES 1 - 151

Wednesday, February 26th, 2014
9:00 - 12:42 p.m.

US Legal Support
515 East Las Olas Boulevard, Third Floor
Fort Lauderdale, Florida 33301

Reported By:  Sally Wilhelm, FPR
Florida Professional Reporter

---

I-N-D-E-X

WITNESS                                    PAGE
ADAM MIRABELLA

DIRECT EXAMINATION
By Mr. Cohen                                 5

CROSS EXAMINATION
By Mr. Eggnatz                             147

Defendant's Exhibit Number One              90
Photograph
Defendant's Exhibit Number Two              33
Interrogatories

Defendant's Exhibit Number Three           103
Defendant's request for admissions
Defendant's Exhibit Number Four            103
Plaintiff's response to request for admissions

Defendant's Exhibit Number Five            105
Discharge instructions
Defendant's Exhibit Number Six             110
Tumblr posting

Defendant's Exhibit Number Seven           111
Facebook posting
Defendant's Exhibit Number Eight           113
Tumblr posting

Defendant's Exhibit Number Nine            117
Okcupid posting
Defendant's Exhibit Number Ten             121
Instagram photos

---

APPEARANCES:

On behalf of the Plaintiff:
    JOSHUA H. EGGNATZ, ESQUIRE
    The Eggnatz Law Firm
    1920 North Commerce Parkway, Suite 1
    Weston, FL 33326
    jeggnatz@eggnatzlaw.com
    Phone: 954-634-4355

On behalf of the Defendant:
    JORDAN S. COHEN, ESQUIRE
    Wicker Smith O'Hara McCoy & Ford, P.A.
    515 East Las Olas Boulevard, Suite 1400
    Fort Lauderdale, FL 33301
    ftlcrtpleadings@wickersmith.com
    Phone: 954-847-4800

---

Defendant's Exhibit Number 11             122
Instagram photos

Defendant's Exhibit Number 11A            123
Instagram photos
Defendant's Exhibit Number 11B            124
Instagram photos

Defendant's Exhibit Number 11C            127
Instagram photos
Defendant's Exhibit Number 11D            128
Instagram photos

Defendant's Exhibit Number 11E            131
Instagram photos
Defendant's Exhibit Number 11F            131
Instagram photos

Defendant's Exhibit Number 11G            132
Instagram photos
Defendant's Exhibit Number 12             133
Facebook posting

Defendant's Exhibit Number 13             135
Twitter posting
Defendant's Exhibit Number 13A            136
Twitter posting

Defendant's Exhibit Number 13B            137
Twitter posting
Defendant's Exhibit Number 13C            138
Twitter posting

Defendant's Exhibit Number 14             139
Twitter posting
Defendant's Exhibit Number 14A            140
Twitter posting

Defendant's Exhibit Number 14B            140
Twitter posting

**5**

PROCEEDINGS
- - -

Deposition taken before Sally Wilhelm, Florida Professional Reporter and Notary Public in and for the State of Florida at Large, in the above cause.

- - -

THE COURT REPORTER:  Do you solemnly swear to tell the truth, the whole truth and nothing but the truth so help you God?

THE WITNESS:  I do.

Thereupon,

ADAM MIRABELLA

having been first duly sworn or affirmed, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. COHEN:

Q.   Good morning, Mr. Mirabella.  Could you please state your full name for the record.

A.   Adam Christopher Mirabella.

Q.   And your date of birth?

A.   August 13, 1991.

Q.   And your current address?

A.   3916 Kristen Creek Lane, Round Rock, Texas 78681.

Q.   And how long have you lived at that Kristen Creek Lane address?

**6**

A.   About 20 years.

Q.   Did you grow up there?

A.   Yeah.

Q.   Does anyone else reside with you at that address?

A.   Both my parents.

Q.   Your parents are married?

A.   Yes.

Q.   Since you've lived at the Kristen Creek address have your parents ever been legally separated?

A.   No.

Q.   What are your parents' names?

A.   Bob and Elisa Mirabella.

Q.   And would you say, Mr. Mirabella, that you're closer with one of your parents?

A.   Probably my mom.

Q.   Closer to your mom.  You understand that you're here in relation to a lawsuit that you filed against Vital Pharmaceuticals, the manufacturer of Redline, correct?

A.   Yes.

Q.   Okay.  You understand that I represent Vital Pharmaceuticals, correct?

A.   Yes.

Q.   You understand that we have adverse interests, correct?

A.   Yes.

**7**

Q.   Okay.  Have you ever given a deposition before?

A.   No.

Q.   Okay.  Let me just quickly go over the ground rules.  If you have any questions at any point in time, I'm sure your lawyer's told you everything, but certainly feel free to let me know, okay?

A.   Okay.

Q.   I'm going to be asking you a number of questions today, okay?

A.   Okay.

Q.   It's important that you answer verbally, you are doing a good job.  Just so we have a clear record, you just need to verbalize all of your responses, not to head shrugs or movements with your hands, things like that, okay?

A.   Okay.

Q.   It's critically important that we communicate today.  If I ask you a question at any point in time, you don't understand the question, I'm using some words you're not familiar with, maybe it's just a bad question, just let me know and I'll make efforts to rephrase the question so you understand it, okay?

A.   Okay.

Q.   That being said, if I ask a question and you don't ask for any clarification and provide a response, the record will reflect that you understood the question, okay?

**8**

A.   Okay.

Q.   Unless your attorney objects -- unless your attorney specifically instructs you not to answer a question, you are to answer all of my questions, okay?

A.   Okay.

Q.   This is not a marathon, we will be here for a while.  I've done this before so I can start right now and I can go to five o'clock without a break, okay.  We're not going to do that.

A.   Okay.

Q.   So if at any point in time you need to take a break, just let me know and that's fine, okay?

A.   Okay.

Q.   We probably will run into if not over the lunch hour so if you need to take a break to grab a bite to eat that's fine too, okay?

A.   Okay.

Q.   The only courtesy I would ask is that you can't ask for a break while a question is pending.  What I mean by that is if I ask you some, you know, difficult question and it's not my goal to ask you a bunch of trick questions today, if I ask you some difficult question, you can't call time out and go hey Mr. Eggnatz, I'd like to go talk to you about that answer in the hall before I answer it, you can't do that, okay?

9

1   A.  Okay.

2   Q.  Getting back into your testimony, you testified a

3   minute ago that you would consider yourself closer with your

4   mom, Elisa?

5   A.  Uh-huh.

6   Q.  Yes?

7   A.  Yes.

8   Q.  Why do you say that?

9   A.  I guess she was always the go-to parent, usually

10  the one that will say yes if I wanted to do something.

11  Q.  Okay.  And would you think that your mom, Elisa,

12  is pretty familiar with your medical history?

13  A.  Yes.

14  Q.  How about your dad, Bob, would you say that your

15  dad, Bob, is pretty familiar with your medical history?

16  A.  Yes.

17  Q.  Do you have any siblings?

18  A.  A sister.

19  Q.  What's your sister's name?

20  A.  Analise.

21  Q.  Mirabella?

22  A.  Yes.

23  Q.  And how old is she?

24  A.  I think 25.

25  Q.  Does she also reside at the Kristen Creek

10

1   address?

2   A.  Not anymore.

3   Q.  Where does she live?

4   A.  Somewhere in New York.

5   Q.  Do you have her address?

6   A.  Not on me.

7   Q.  Is she in New York City or somewhere in the

8   state?

9   A.  Somewhere in the state.

10  Q.  When is the last time you spoke to your sister?

11  A.  A couple weeks ago.

12  Q.  Okay.  Is she in school, is she employed?

13  A.  I think she's in school and I don't know if she

14  has a job.

15  Q.  Do you know where she's in school?

16  A.  I don't know.

17  Q.  Do you know what she's studying?

18  A.  I think fashion.

19  Q.  Is she married?

20  A.  No.

21  Q.  Do you know her birthdate?

22  A.  Sometime in March.

23  Q.  What year?

24  A.  I think '88 or '89.

25  Q.  And does she have a middle name?

11

1   A.  Catherine.

2   Q.  With a C or a K?

3   A.  C.

4   Q.  Have you had any discussions with your sister,

5   Analise, about this lawsuit?

6   A.  No.

7   Q.  Have you had any discussions with your dad, Bob,

8   about this lawsuit?

9   A.  Just the back and forth between me and my lawyer.

10  Q.  Okay.  So you've been communicating things to

11  your father that your lawyer's been telling you?

12  A.  To both parents.

13  Q.  Okay.  What have you told your dad in terms of

14  things that were communicated to you by your lawyer?

15  MR. EGGNATZ:  Object to form.  Don't discuss

16  communications with your lawyer.

17  MR. COHEN:  What's the basis for the

18  objection?  He's waived the privilege.  There's no

19  privilege for him to talk about discussions he's

20  had with you and his father.

21  MR. EGGNATZ:  You're asking about specific

22  conversations, he can't discuss that.  He can

23  generally say I spoke with my lawyer today about

24  the case.

25  MR. COHEN:  All right.  We'll take that up

12

1   with the Court.

2   BY MR. COHEN:

3   Q.  Mr. Mirabella, please tell me what you've

4   discussed with your father in terms of things that you've

5   discussed with your attorney?

6   A.  That's usually it, that he asked me how the case

7   is doing and I just will say I e-mailed him today or I was

8   on the phone with him today and nothing really else, he

9   didn't ever ask.

10  Q.  Okay.  Does your father, Bob, know that you're in

11  Florida giving a deposition today?

12  A.  Yes.

13  Q.  That's something you discussed with him?

14  A.  Yes.

15  Q.  Did he pay for your plane fare?

16  A.  No.

17  Q.  Who did?

18  A.  My attorney.

19  Q.  And what airline did you take?

20  A.  Southwest.

21  Q.  When did you get in?

22  A.  Around 12:30 yesterday.

23  Q.  In the afternoon?

24  A.  Yes.

25  Q.  And what airport did you fly out of?

3 (Pages 9 to 12)

13

```
1    A.   Austin Bergstrom International Airport.
2    Q.   And did you stay in a hotel last night?
3    A.   Yes.
4    Q.   Where you did stay?
5    A.   Hampton Inn.
6    Q.   Who paid for that?
7    A.   My attorney.
8    Q.   Did you go out last night?
9    A.   Briefly.
10   Q.   Where did you go?
11   A.   The Las Olas Street, just wandered around.
12   Q.   Did you grab a bite to eat?
13   A.   Yeah.
14   Q.   Where did you eat?
15   A.   Some sushi place.
16   Q.   Who paid for that?
17   A.   I did.
18   Q.   Did you have anything to drink last night?
19   A.   Yes.
20   Q.   What did you have?
21   A.   I had a couple beers and water.
22   Q.   At the sushi place?
23   A.   Yes.
24   Q.   What time did you go to sleep last night?
25   A.   12:30, one.
```

14

```
1    Q.   Is that like your typical bedtime?
2    A.   It varies.
3    Q.   Okay.  Are you currently suffering from [____],
4    Mr. Mirabella?
5    A.   Yes.
6    Q.   How long has that been the case?
7    A.   A year and-a-half I think.
8    Q.   And we'll certainly spend some more time talking
9    about your use of the Redline product.  Just kind of
10   generally as a frame of reference do you recall when it was
11   that when you used -- when you last used VPX Redline?
12   A.   That was the last time I used it is --
13   Q.   When was that?
14   A.   Around July 20th of 2012.
15   Q.   Okay.  So just a frame of reference, you
16   testified a moment ago that you've been suffering from
17   insomnia for about one and-a-half years?
18   A.   Yes.
19   Q.   And it's now the end of February of 2014?
20   A.   Uh-huh.
21   Q.   This insomnia, is this something that you were
22   experiencing before you used the Redline product or is it
23   something that developed subsequent to your use of the
24   Redline product?
25   A.   I'm not sure, I'm currently seeing a [____] doctor
```

15

```
1    for it.
2    Q.   Who's that?
3    A.   Dr. [____].
4    Q.   Do you know Dr. [____]'s first name?
5    A.   I think it's James, I'm not sure.
6    Q.   Okay.  And do you know the name of his practice,
7    is it the Sleep Institute or something like that?
8    A.   I'm not sure.
9    Q.   Do you know where his office is located?
10   A.   Out of down 620, I don't know the exact address.
11   Q.   In what town?
12   A.   I guess that's Austin.
13   Q.   And how long have you been treating with
14   Dr. Pohl?
15   A.   A couple months now.
16   Q.   How did you first find Dr. [____]?
17   A.   My mom told me about him.
18   Q.   And is that covered by insurance?
19   A.   Yes.
20   Q.   And who do you currently have health insurance
21   with?
22   A.   Blue Cross Blue Shield.
23   Q.   Is it under your parents' policy?
24   A.   Yes.
25   Q.   Do you know if you have a copay to treat with
```

16

```
1    [____]?
2    A.   I'm not sure.
3    Q.   What time did you wake up this morning?
4    A.   Seven.
5    Q.   So you got about six, six and-a-half hours sleep?
6    A.   Yeah, around that.
7    Q.   Are you feeling okay?
8    A.   A little tired.
9    Q.   Did you drink any coffee this morning?
10   A.   I can't.
11   Q.   You can't drink coffee?
12   A.   I can't have caffeine.
13   Q.   How long has that been the case, Mr. Mirabella?
14   A.   Since my hospitalization from drinking the
15   Redline.
16   Q.   Okay.  Again we'll we're going to spend some time
17   later in the day talking about your use of the Redline and the
18   hospitalization and all those issues.  I'm just kind of
19   asking you some general questions to start.
20        If I understand your testimony, you haven't drank
21   any coffee since your use of the Redline and the
22   hospitalization, true?
23   A.   Yes.
24   Q.   And is that because there was a particular
25   doctor, medical provider who told you that you couldn't
```

4 (Pages 13 to 16)

17

1  consume coffee?
2      A.   Well, the report said no more energy drinks and I
3  I've always considered coffee as a drink that gave me
4  energy.  So I just stopped drinking it because I mean I had
5  a sip of a coke and I got palpitations again.  So if that
6  amount of caffeine can give me palpitations, I didn't want
7  to even try coffee.
8      Q.   Okay, that's fair.  And when was it,
9  Mr. Mirabella, when you had a sip of a coke and it caused
10 palpitations?
11     A.   I guess like a month or two after the
12 hospitalization.
13     Q.   Like August September 2012?
14     A.   Sometime around there.
15     Q.   Okay.  Was anyone with you when you drank a sip
16 of coke and experienced heart palpitations?
17     A.   I guess my family, it was at my house.
18     Q.   Did you tell anyone about that, that that had
19 occurred?
20     A.   Yeah, my mom.
21     Q.   You told your mom.  Did you seek any medical
22 care?
23     A.   No, I just took one of the pills they gave me to
24 use for as needed basis when I get palpitations.
25     Q.   What pill is that, Mr. Mirabella?

18

1      A.   At the time it was ▭.
2      Q.   Okay.  And had you ever taken ▭
3  prior to your use of -- strike that, let me start over.
4      Had you ever used ▭ prior to
5  your ingestion of Redline?
6      A.   No.
7      Q.   And prior to, I'll call it the coke incident when
8  you had the sip of coke in August September of 2012, prior
9  to that incident with what frequency were you taking
10 ▭.
11     A.   I wasn't.
12     Q.   Was that the first time you had taken it since
13 your discharge from the hospital?
14     A.   They said to take it I think the two days after I
15 got home just to keep my heart rate low.  And then they said
16 once I felt back to normal, take it as needed basis because
17 they said palpitations may come back.
18     Q.   Was that the first time you felt that you needed
19 it since those couple of days after the discharge?
20     A.   I think I took it once before then.
21     Q.   Okay.  And was that in relation to the use of any
22 caffeine products?
23     A.   No.
24     Q.   Are you currently taking ▭?
25     A.   No, it was too strong so they switched me to

19

1  ▭.
2      Q.   Okay.  When did that happen?
3      A.   After I took the ▭ it made me pass out
4  for like 12 hours and so I went to the -- my family doctor
5  and she said she just switched me after that.
6      Q.   Is that Dr. ▭?
7      A.   Yes.
8      Q.   Do you recall when that was?
9      A.   I'm not sure.
10     Q.   And are you currently taking ▭ whatever
11 it's called?
12     A.   As needed basis.
13     Q.   When is the last time you took it?
14     A.   Couple weeks ago.
15     Q.   Okay.  Have you taken any medication today?
16     A.   No.
17     Q.   Is there anything that's impeding your ability to
18 testify --
19     A.   No.
20     Q.   -- truthfully this morning?
21     Okay.  You know you testified earlier that you've
22 had some general discussions with your father about
23 communications with your attorney, things like I sent him an
24 e-mail today, things like that.  How about with your mother,
25 have you had any discussions with your mother about this

20

1  lawsuit?
2      A.   Pretty much the same as dad, but she harps on me
3  more to like e-mail him and call him.
4      Q.   Okay.  Why did you file this lawsuit,
5  Mr. Mirabella?
6      A.   Because I think it's unsafe for the public and it
7  caused adverse reaction on me and I think it should be
8  changed.
9      Q.   What do you mean when you say it should be,
10 quote, changed?
11     A.   The labels on the bottle and product placement in
12 stores.
13     Q.   Anything else?
14     A.   Anything else?
15     Q.   Well, that's fair.  You said that you think that
16 it should be changed and I asked you what do you mean by
17 that and you said you think that the label should be changed
18 and something about product placement in the stores.  Is
19 there anything else that will you think, quote, should be
20 changed?
21     A.   No.
22     Q.   Okay.  What do you mean, Mr. Mirabella, when you
23 say that in your view the label should be changed?
24     A.   The -- it's really small print and hard to read.
25 It's not in straight lines, which also makes it difficult to

5  (Pages 17 to 20)

21

1    read.  It's misleading because it's with all the energy
2    drinks and not with the dietary stuff in stores and the --
3    may I see the bottle?
4        Q.   Sure.  Is that the actual bottle that you used?
5        A.   Yes.
6        Q.   Okay.  We'll mark that as, I guess we'll have her
7    take a picture of it, I'll put a stamp on it and make it
8    Defendant's Exhibit One.
9        A.   It's very misleading and it's university proven,
10   it's pre-exercise and I took it before an exercise, correct
11   amount, and it caused me harm.
12       Q.   Okay.  So it's your testimony, Mr. Mirabella,
13   that the fact that you consumed some of the Redline product
14   and had adverse effects, that therefore the label is
15   misleading?
16       A.   Yes.
17       Q.   Okay.  And you had testified earlier that you
18   felt something should be changed in terms of product
19   placement and I think you may have answered that when you
20   said that you feel that it should be with dietary stuff and
21   not with energy drinks?
22       A.   Uh-huh.
23       Q.   Yes?
24       A.   Yes.
25       Q.   Okay.  What about money, are you trying to get

22

1    any money in this lawsuit, Mr. Mirabella?
2        A.   Only reimbursed for purchase price of -- for
3    anybody who purchased this product.
4        Q.   That wasn't my question.  I'm asking about you.
5        A.   No.
6        Q.   Are you trying get any money in connection with
7    this lawsuit, Mr. Mirabella?
8        A.   No.
9        Q.   Why not?
10       A.   I really just wanted people to know the
11   dangerousness of this product.
12       Q.   Okay.
13       A.   What happened happened, there's no changing that.
14       Q.   So for example you don't feel that Vital
15   Pharmaceuticals should reimburse you for your hospital
16   bills?
17       A.   Not really.
18       Q.   Why not?
19       A.   Because I bought the product, but it was
20   misleading and it did cause me harm.  But I just want
21   everybody to know that it could cause them harm too.
22       Q.   Okay.  And I appreciate that response, I asked
23   you a slightly different question.
24            Why would you not be seeking to have Vital
25   Pharmaceuticals pay your hospital bills if it's your view

23

1    that your hospital bills were directly caused by your use of
2    the Redline product?
3            MR. EGGNATZ:  Objection, form.
4    BY MR. COHEN:
5        Q.   You can answer.
6        A.   I'm not sure.
7        Q.   Okay.  Did you actually have to pay for your
8    hospital bills, Mr. Mirabella?
9        A.   No.
10       Q.   Do you know if there was an insurance copay?
11       A.   I'm not -- I don't know.
12       Q.   How about work, did you miss any time off of work
13   after you were hospitalized?
14       A.   I think I missed a day or two.
15       Q.   Okay.  So you missed some pay?
16       A.   Yes.
17       Q.   I mean are you salary or hourly, were you an
18   hourly employee in July 2012?
19       A.   I was hourly.
20       Q.   Okay.  So you lost some work, lost some pay,
21   right?
22       A.   Yeah.
23       Q.   Okay.  Do you think Vital Pharmaceuticals should
24   reimburse you for those monies?
25       A.   No.

24

1        Q.   Why not?
2        A.   I didn't really mind missing work.
3        Q.   And where were you working in July 2012?
4        A.   I'm pretty sure I was at Pier One at the time.
5        Q.   And what were you doing at Pier One?
6        A.   Mainly stock.
7        Q.   And do you recall what your rate of pay was?
8        A.   I think 8.25 an hour.
9        Q.   And how long did you work at Pier One?
10       A.   Almost a year.
11       Q.   Do you know roughly when that started and when
12   that ended?
13       A.   I think from August to I think around May.
14       Q.   August of what year until May of what year?
15       A.   August of 2012 to May of 2013.
16       Q.   Okay.  So you were not working at Pier One in
17   July of 2012?
18       A.   Is that the right day, I'm not sure.
19       Q.   Okay.  You testified earlier that you last used
20   the Redline product July 20 of 2012, correct?
21       A.   Yes.
22       Q.   Were you employed at that time,
23   Mr. Mirabella?
24       A.   I'm not sure.
25       Q.   And what Pier One did you work at, where was it

6  (Pages 21 to 24)

25

1   located?
2       A.   In Georgetown.
3       Q.   Do you know what street it was on?
4       A.   I don't know.
5       Q.   Okay.  Who was your manager at Pier One?
6       A.   Tim Volz, V-o-l-z.
7       Q.   And I understand that you're no longer working at
8   Pier One?
9       A.   Yes.
10      Q.   And where do you currently work if anywhere?
11      A.   I'm currently unemployed.
12      Q.   Currently unemployed.  Have you had any
13  employment since you worked at Pier One?
14      A.   Yes.
15      Q.   What?
16      A.   Berry Cool.
17      Q.   And when you did start at Berry Cool?
18      A.   I think August of this -- 2013.
19      Q.   Okay.  So you had a few months where you weren't
20  working when you left Pier One before you started at Berry
21  Cool, does that sound right?
22      A.   Yes.
23      Q.   About three months?
24      A.   Yes.
25      Q.   What were you doing to support yourself during

26

1   that time period?
2       A.   I was on vacation one of those months and then
3   just with my parents the rest of the time.
4       Q.   You went on a month long vacation?
5       A.   Yes.
6       Q.   Where did you go?
7       A.   Europe.
8       Q.   What month was that?
9       A.   I think May to July.
10      Q.   2013?
11      A.   Yeah.
12      Q.   Did anyone go with you?
13      A.   May to June, yes, my friend Dylan.
14      Q.   What's Dylan's last name?
15      A.   Goldman.
16      Q.   Do you still keep in touch with Mr. Goldman?
17      A.   Yes.
18      Q.   Where does he live?
19      A.   In Austin.
20      Q.   Do you know what the street address is?
21      A.   I don't.
22      Q.   You don't know what street he lives on?
23      A.   No.
24      Q.   Who paid for your trip to Europe?
25      A.   His grandma.

27

1       Q.   That's a pretty good friend.
2       A.   Yeah.
3       Q.   Where did you go in Europe?
4       A.   Spain, Portugal, France, Netherlands, Germany,
5   Austria, Switzerland and Italy.
6       Q.   When you say Netherlands, does that mean
7   Amsterdam?
8       A.   Yeah, we stopped there for a night.
9       Q.   And did you partake in any legal marijuana when
10  you spent one night in Amsterdam?
11          MR. EGGNATZ:  Object to form.
12  BY MR. COHEN:
13      Q.   You can answer.
14      A.   I did.
15      Q.   You did?
16      A.   (Witness nods head).
17      Q.   Had you ever done that before?
18      A.   Like once.
19      Q.   You had smoked marijuana one time before?
20      A.   Around that.
21      Q.   Okay.  And have you smoked marijuana since that
22  one night in Amsterdam?
23      A.   No, I didn't, I didn't like it.
24      Q.   So it sounds like you've smoked marijuana about
25  two times in your life?

28

1       A.   Yes.
2       Q.   And did you inhale or were you like Bill Clinton?
3          MR. EGGNATZ:  Object to form.
4   BY MR. COHEN:
5       Q.   You can answer.
6       A.   I don't know what that means.
7       Q.   Okay.  You started at Berry Cool in August of
8   2013, yes?
9       A.   Yes.
10      Q.   Okay.  Who was your boss there?
11      A.   I don't know how to pronounce his name, it's
12  Sajid I think.
13      Q.   Where was Berry Cool located?
14      A.   Cedar Park, Texas.
15      Q.   And I apologize if I already asked you this, what
16  type of business is Berry Cool?
17      A.   It's a frozen yogurt shop.
18      Q.   Okay.  And what did you do there, Mr. Mirabella?
19      A.   Ran the cashier and cleaned and made the yogurt.
20      Q.   Were you behind the counter?
21      A.   Yeah.
22      Q.   Okay.  And what was your rate of pay?
23      A.   I think 7.25 an hour plus, whatever tips we made
24  that day.
25      Q.   And did you work a certain shift at Berry Cool or

7  (Pages 25 to 28)

29

1    did your hours vary?
2        A.   Usually worked the night shift.
3        Q.   What were those hours?
4        A.   From four to like ten.
5        Q.   Okay.  And when did you stop working at Berry
6    Cool?
7        A.   A little bit after Halloween.
8        Q.   Okay.  So November last year?
9        A.   Yeah.
10       Q.   And have you had any employment since you left
11   Berry Cool in November of last year?
12       A.   I had a temp job at Hey Cupcake.
13       Q.   Hey Cupcake, is that, H-e-y, new word, Cupcake?
14       A.   H-e-y, new word, Cupcake.
15       Q.   Okay.  Were you hired by Hey Cupcake or was that
16   done through a staffing agency?
17       A.   I'm not sure.
18       Q.   When did you have that temp job at Hey Cupcake?
19       A.   It was the week of Valentine's Day.
20       Q.   Of this year?
21       A.   Yes.
22       Q.   You worked there for a week?
23       A.   Yes.
24       Q.   Other than working at Hey Cupcake for a week
25   earlier this month, have you had any other employment since

30

1    you left Berry Cool in November 2013?
2        A.   No.
3        Q.   Okay.  Why did you leave Berry Cool?
4        A.   They fired me.
5        Q.   Did they tell you why they fired you,
6    Mr. Mirabella?
7        A.   No.
8        Q.   And was it something that your manager, Sajid,
9    communicated to you that you were being fired?
10       A.   He let one of the other employees do it, like
11   the -- not the manager, but the head employee.
12       Q.   And who was that?
13       A.   Lauren Corr.
14       Q.   Could you spell her last name?
15       A.   C-o-r-r.
16       Q.   Okay.  And why did you leave Pier One in May of
17   2013?
18       A.   To go to Europe.
19       Q.   Okay.  And how are you currently supporting
20   yourself?
21       A.   Living with my parents.
22       Q.   So you have no income?
23       A.   Not currently.
24       Q.   Okay.  And what does your mom do for work?
25       A.   She is a middle school theater teacher.

31

1        Q.   And in what town?
2        A.   In Cedar Park.
3        Q.   And what does your father do for work?
4        A.   I'm not sure, but he -- but he works at Intel.
5        Q.   How long has your father worked at Intel?
6        A.   A couple years now, I'm not sure exactly.
7        Q.   What's your highest level of education completed?
8        A.   High school.
9        Q.   And what year did you graduate high school?
10       A.   2009.
11       Q.   What high school?
12       A.   Vista Ridge High School.
13       Q.   Where is that located?
14       A.   In Cedar Park, Texas.
15       Q.   Did you graduate on time?
16       A.   Yes.
17       Q.   Have you taken any classes since graduating from
18   Vista Ridge in 2009?
19       A.   Yes.
20       Q.   What classes have you taken?
21       A.   The exact classes?
22       Q.   I mean if you know the exact classes, tell me the
23   exact classes.  If you want to be more general, that's fine
24   too.
25       A.   I've just been taking basics at Austin Community

32

1    College.
2        Q.   Do you know how many credits you've earned at
3    Austin Community College?
4        A.   I don't know.
5        Q.   Are you working towards a degree?
6        A.   Yes.
7        Q.   Are you currently taking any classes at Austin
8    Community College?
9        A.   Not this semester.
10       Q.   When did you last take any classes at Austin
11   Community?
12       A.   I think two semesters ago.
13       Q.   What was your course load, how many classes?
14       A.   I was taking three classes.
15       Q.   Do you have any plans to reenroll at Austin
16   Community College?
17       A.   Yes, upcoming semester.
18       Q.   So that would be in the fall?
19       A.   Summer.
20       Q.   Summer.  Do you know what you're going to take?
21       A.   Intermediate algebra and I don't know else.
22       Q.   Do you know how many classes you're going to
23   take?
24       A.   Two.
25       Q.   And do you have any plans to rejoin the labor

33

1   force?
2        A.   Yes, I'm currently seeking employment.
3        Q.   Have you been on any interviews?
4        A.   Not -- no.
5        Q.   Okay.  What if anything have you been doing as
6   part of your efforts to seek employment, Mr. Mirabella?
7        A.   Filling out applications, searching online for
8   jobs in the area.
9        Q.   Can you recall any applications that you filled
10  out?
11       A.   A lot of restaurants like Buffalo Wild Wings, I
12  did one at Home Depot, just random ones that I see posted on
13  Craigs List and driving around.
14       Q.   What position did you apply for at Buffalo Wild
15  Wings?
16       A.   Server.
17       Q.   Okay.  And at Home Depot, just general stock?
18       A.   Or whatever they needed.
19       Q.   Okay.  Have you ever given any thought,
20  Mr. Mirabella, to what you would like to do for a living?
21       A.   Become a physical therapist.
22       Q.   Let's go off for a minute, I wanted to ask
23  Mr. Eggnatz some housekeeping questions.
24            (Thereupon, a recess was had.)
25            (Thereupon, Defendant's Exhibit Number Two

34

1   was marked for Identification.)
2   BY MR. COHEN:
3        Q.   Mr. Mirabella, I've marked as Exhibit Two to your
4   deposition a copy of Plaintiff's amended answers to
5   Defendant's first set of interrogatories.  And your counsel
6   has represented that you're going to go get your license at
7   some point in time later today, which I understand is in the
8   car, so that we can get these properly notarized.
9            Do you recognize the document that's been marked
10  as Exhibit Two to your deposition?
11       A.   Yes.
12       Q.   Okay.  And did you prepare these, Mr. Mirabella?
13       A.   What do you mean by prepare?
14       Q.   Are these your answers?
15       A.   Yes.
16       Q.   Did anyone assist you in the preparation of these
17  answers?  It's not meant to be a trick question.
18       A.   My attorney, with legal terms.
19       Q.   Okay.
20       A.   Yeah.
21       Q.   Your attorney assisted you in preparing your
22  interrogatory responses?
23       A.   I answered everything.
24            MR. EGGNATZ:  He's not trying to trick you.
25            THE WITNESS:  I don't -- yes.

35

1   BY MR. COHEN:
2        Q.   Okay.  Did you have an opportunity to review the
3   document before you gave your attorney the approval to file
4   it?
5        A.   Yes.
6        Q.   Okay.  And you agree with all the responses set
7   forth herein?
8        A.   Yes.
9        Q.   Okay.  Is that your Social Security number in
10  answer number one?
11       A.   Yes.
12       Q.   And I know you've testified now a couple of times
13  this morning that you last used the Redline product on
14  July 20th, 2012, correct?
15       A.   Yes.
16       Q.   Okay.  Was that the only time that you've ever
17  consumed VPX Redline?
18       A.   No.
19       Q.   On how many other occasions had you previously
20  consumed VPX Redline?
21       A.   A couple including the first half of the drink
22  about a week prior.
23       Q.   So in your answer number one, and we'll
24  break it down a little bit, but you state that you purchased
25  a bottle of Redline Extreme Energy Drink, Watermelon flavor

36

1   from an Exxon gas station located in Cedar Park, Texas,
2   correct?
3        A.   Yes.
4        Q.   And that would be the bottle that we marked as
5   the Exhibit One to your deposition?
6        A.   Yes.
7            MR. EGGNATZ:  Just to clarify, that was
8   question two, not question one.
9            MR. COHEN:  Thank you, counsel.
10  BY MR. COHEN:
11       Q.   And is there any way that you can recall or
12  estimate for me how many previous bottles of VPX Redline
13  Extreme Energy Drink, Watermelon flavor you had purchased?
14       A.   I don't know the exact amount.
15       Q.   Is that the second bottle you ever bought, the
16  tenth bottle, the hundredth bottle?
17       A.   A handful, maybe like three --
18       Q.   Okay.
19       A.   -- four, you know.
20       Q.   Did you make all those purchases at that same
21  Exxon gas station?
22       A.   No.
23       Q.   And is there any way -- again it's not a memory
24  test.
25       A.   Yes.

37

1  Q.  Is there any way that you estimate for me how
2  much time passed between the first time you ever bought a
3  bottle of VPX Redline Extreme Watermelon and the last time
4  you ever bought a bottle?
5  A.  I don't know.
6  Q.  Was it over days, weeks, months?
7  A.  Probably months.
8  Q.  Months.  And the two to three bottles that you
9  had purchased previously, you consumed those, correct?
10  A.  Yes.
11  Q.  You didn't have any problems after you consumed
12  them, did you?
13  A.  No.
14  Q.  Do you recall the first time that you -- strike
15  that.
16      Do you recall any of the circumstances
17  surrounding the first time you ever purchased a bottle of
18  VPX Redline Extreme?
19  A.  What do you mean by circumstances?
20  Q.  Do you recall where you were, if anyone else was
21  with you, what you were doing that day?
22  A.  I got it from an HEB.
23  Q.  Supermarket?
24  A.  Yeah.
25  Q.  Was anyone with you?

38

1  A.  Not that I can recall.
2  Q.  Okay.  Were you grocery shopping or did you just
3  like run in to get a drink?
4  A.  I just ran in to get a drink.
5  Q.  Do you know where that HEB was located?
6  A.  Cedar Park.
7  Q.  Had you ever heard of Redline Extreme prior to
8  purchasing that first bottle at the HEB?
9  A.  No.
10  Q.  Did you know anyone else who had previously used
11  VPX Redline prior to making that first purchase?
12  A.  No.
13  Q.  And had you ever heard of VPX or Vital
14  Pharmaceuticals prior to that date?
15  A.  No.
16  Q.  Did you purchase anything else at the HEB?
17  A.  Not that I know of.
18  Q.  Do you recall how you made that purchase?
19  A.  With cash.
20  Q.  So you just ran in just to get something to drink
21  and ran out?
22  A.  Yeah.
23  Q.  Do you recall how long it took you to select the
24  VPX Redline Extreme product?
25  A.  Maybe a couple minutes.

39

1  Q.  You spent a couple minutes picking out a drink?
2  A.  Yeah.  I usually just grabbed a Monster, but I
3  saw this near it and picked one up and read it.
4  Q.  Were they out of Monster?
5  A.  No, I just wanted to try something new that day I
6  guess.
7  Q.  But going into the store you didn't have any
8  notion that you were going in to buy a bottle of VPX
9  Redline, fair?
10  A.  Yeah.
11  Q.  And I know you testified previously that you
12  believe that VPX Redline should be placed with dietary
13  stuff, correct?
14  A.  Yes.
15  Q.  Do you also believe that Monster should be placed
16  with dietary stuff?
17  A.  No.
18  Q.  Why not?
19  A.  Because it's labeled as an energy drink.
20  Q.  What's your understanding of what it means to be
21  labeled as an energy drink, Mr. Mirabella?
22  A.  It says energy drink on it and nothing else
23  really.
24  Q.  I know, but that's fair.  I mean did you have any
25  understanding of the governing FDA regulations regarding

40

1  energy drinks or dietary supplements?
2  A.  No.
3  Q.  So the fact that Monster is labeled as an energy
4  drink, you believe that it should be placed with other
5  energy drinks, correct?
6  A.  Yes.
7  Q.  But the fact that VPX Redline Extreme, Watermelon
8  flavor is not labeled as an energy drink means that it
9  should be placed somewhere else?
10  A.  Yes.
11  Q.  And how is VPX Redline Extreme labeled if not as
12  an energy drink?
13  A.  It says dietary supplement.
14  Q.  What does that mean?
15  A.  I don't know, I guess it's used for dietary
16  purposes.
17  Q.  Are you just guessing, you're just making that
18  up?
19  A.  Yeah, I'm guessing.
20      MR. EGGNATZ:  Don't guess.
21  BY MR. COHEN:
22  Q.  And is it your position, Mr. Mirabella, that VPX
23  Redline Extreme, that the label is misleading because it's
24  labeled as a dietary supplement?
25  A.  Yes.

41

1    Q.   Why is that?
2    A.   Can you repeat the question?
3    Q.   Why is that?
4    A.   The previous question.
5    Q.   Okay.  Can you read it back please.
6         (Thereupon, the requested portion of the
7    record was read by the Court Reporter as above
8    recorded.)
9         THE WITNESS:  It's because it's with the
10   energy drinks and not with dietary supplements.
11   BY MR. COHEN:
12   Q.   Okay.  So it's your position that there should be
13   an energy drink section in the retail store and there should
14   be a dietary supplement section in the retail store?
15   A.   At the HEB where I purchased that, we do have a
16   dietary supplement section and this wasn't with that, it was
17   with the energy drinks.
18   Q.   What sort of products were in what you are
19   calling the, quote, dietary supplement section of the store?
20   A.   Like the big things of protein and healthy stuff,
21   I don't know, I don't really go down that aisle.
22   Q.   Do you know whose decision it was, Mr. Mirabella,
23   to stock the VPX Redline with the energy drinks like Monster
24   as opposed to with the protein powders and the, quote,
25   healthy stuff at the HEB?

42

1    A.   No.
2    Q.   Do you feel that whatever individual or entity
3    placed the VPX Redline with the energy drinks as opposed to
4    with the protein powders and the healthy stuff acted
5    improperly?
6         MR. EGGNATZ:  Object to form.
7    BY MR. COHEN:
8    Q.   You can answer.
9    A.   I don't know, he's just doing what he was told, I
10   guess.
11   Q.   Whatever individual made the decision that VPX
12   Redline should be placed with the energy drinks as opposed
13   to the protein powders and healthy stuff, you take issue
14   with what that individual did, correct?
15   A.   I guess.
16   Q.   And do you seek to hold that individual
17   responsible for your damages in this lawsuit?
18   A.   No.
19   Q.   Why not?
20   A.   Because it's that way wherever you go,
21   convenience store, the Redline is always with the energy
22   drinks.
23   Q.   Okay.  And is that what -- was that the situation
24   when you bought the Redline at the Exxon gas station?
25   A.   Yes.

43

1    Q.   Let's talk about that.  Do you know who was
2    responsible for placing the Redline Extreme Energy drink
3    with other energy drinks at the Exxon gas station?
4    A.   No.
5    Q.   Certainly you feel that that individual bears
6    some responsibility for your injuries, correct?
7    A.   No.
8    Q.   Why not?
9    A.   I bought the product.
10   Q.   So it's your fault?
11   A.   No.
12        MR. EGGNATZ:  Object to form.
13   BY MR. COHEN:
14   Q.   I'm confused.
15   A.   It's misleading.
16   Q.   The placement of it, correct?
17   A.   And how it's presented, like ultimate energy
18   rush, you saw that, think it's an energy drink.
19   Q.   So I just want to make sure.  It's your position,
20   Mr. Mirabella, you're claiming that it's misleading that VPX
21   Redline was placed with other energy drinks at the Exxon
22   station, correct?
23   A.   And that the bottle is also misleading.
24   Q.   We'll get there, I'm just trying to break it
25   down, I'm trying to understand your testimony.  Let me ask

44

1    again.
2         It's your position, Mr. Mirabella, that it was
3    misleading for the VPX Redline Extreme, Watermelon flavor to
4    be placed with other energy drinks at the Exxon station,
5    correct?
6    A.   Yes.
7    Q.   Okay.  And in addition you also claim that the
8    label on the VPX Redline Extreme, Watermelon flavor is
9    misleading because it says ultimate energy rush, correct?
10   A.   Among other things, yes.
11   Q.   And it's your position that because the label
12   says, quote, ultimate energy rush, that therefore it's an
13   energy drink, it's not a dietary supplement, correct?
14   A.   Yes.
15   Q.   And what's your basis for that?
16   A.   It talks about the -- it doesn't really talk
17   about the dietary on here.  It talks about like how you'll
18   have energy, improving reaction time, it releases energy and
19   mental focus and it says pre-exercise.
20   Q.   You don't know how the FDA defines energy drinks,
21   correct?
22   A.   No.
23   Q.   You don't know how they're regulated, correct?
24   A.   No.
25   Q.   You don't know how the FDA defines dietary

WWW.USLEGALSUPPORT.COM
954-463-2933

45

1  supplements, correct?

2      A.   That I -- yes, that I don't know.

3      Q.   You don't know how the FDA regulates dietary

4  supplements, do you?

5      A.   No.

6      Q.   You don't know how the FDA defines dietary

7  supplements, do you?

8      A.   No.

9      Q.   Would you agree with me, Mr. Mirabella, if the

10 label on the VPX Redline Extreme, Watermelon flavor that you

11 bought from the Exxon gas station complies with the FDA

12 regulations that you don't have a lawsuit?

13     MR. EGGNATZ:  Object to form.

14     THE WITNESS:  I don't know.

15     MR. COHEN:  You don't know.  It would seem

16 to make sense, wouldn't it?

17     MR. EGGNATZ:  Object to form, asked and

18 answered, asking for a legal conclusion.

19     THE WITNESS:  What?

20     MR. COHEN:  Who do you think knows more

21 about labeling for dietary supplements, Adam

22 Mirabella or the Food and Drug Administration?

23     MR. EGGNATZ:  Object to form.

24     THE WITNESS:  I guess they do.

25                  * * *

46

1  BY MR. COHEN:

2      Q.   For example, Mr. Mirabella, do you know if there

3  are any other dietary supplements than are intended to

4  provide energy?

5      A.   I don't know.

6      Q.   Would it be your position that those other

7  dietary supplements are mislabeled because they're labeled

8  as dietary supplements as opposed to something else?

9      A.   I don't know.

10     Q.   Do you know if there are any other dietary

11 supplements that are intended to be used as pre-workouts?

12     A.   I don't know.

13     Q.   And is it your contention that other dietary

14 supplements that are intended to be used as pre-workout,

15 that those are mislabeled because they're labeled as dietary

16 supplements?

17     MR. EGGNATZ:  Object to form.

18     THE WITNESS:  I don't know.

19     MR. COHEN:  Where did you come up with the

20 idea for this lawsuit, Mr. Mirabella?

21     MR. EGGNATZ:  Object to form.

22     THE WITNESS:  It caused me damage and I just

23 wanted to let everybody else know that this could

24 happen to them.

25                  * * *

47

1  BY MR. COHEN:

2      Q.   Have you ever filed a lawsuit before?

3      A.   No.

4      Q.   How you did find Mr. Eggnatz?

5      A.   We found him online.

6      Q.   Who did?

7      A.   My mom and I.

8      Q.   Did you save any of the documentation surrounding

9  the search that you and your mom performed to try to find a

10 lawyer?

11     A.   No.

12     Q.   Do you know when you and your mom did that?

13     A.   I knew she started searching after my incident.

14     Q.   Is that something your mom primarily handled?

15     A.   Yeah, because she was looking up stories of

16 countless other people that had this effect on them.

17     Q.   Do you know if there -- did your mom primarily

18 handle the discussions with Mr. Eggnatz initially?

19     A.   It was all three of us.

20     Q.   You, your mom and Mr. Eggnatz?

21     A.   Yes.

22     Q.   Was it your mom's choice to hire Mr. Eggnatz?

23     A.   No.

24     Q.   Okay.  Did you talk with any other attorneys

25 before hiring Mr. Eggnatz?

48

1      A.   No.

2      Q.   I want to kind of take a step back and just ask

3  you a few more questions, Mr. Mirabella, about the first

4  time that you purchased Redline Extreme, Watermelon flavor

5  at the HEB in Cedar Park.  Did you read the whole label?

6      A.   Yes.

7      Q.   How long did that take you?

8      A.   A minute or two.

9      Q.   Did you have any difficulty reading the label?

10     A.   Yes.

11     Q.   Okay.  Were there certain -- and I understand

12 that's not the exact same bottle.

13     A.   This is the bottle.

14     Q.   That's the bottle from the HEB in Cedar Park?

15     A.   No, this is from the Exxon.

16     Q.   Okay.  So when you read the -- I understand it's

17 your testimony that you read the bottle, read the label on

18 the bottle before you made the first purchase at the HEB,

19 correct?

20     A.   Yes.

21     Q.   And I understand it's your testimony that you had

22 difficulty reading some of the label?

23     A.   Yes.

24     Q.   And so again understanding that that's not the

25 exact same bottle, using that bottle as an exemplar can you

49

1   show which portions of the label you had difficulty reading
2   on that day at the HEB?
3       A.   The nutritional information and this section of
4   the recommended use.
5       Q.   Do you wear glasses?
6       A.   No.
7       Q.   Have you ever had your eyes tested?
8       A.   Yes.
9       Q.   When is the last time you had your eyes tested?
10      A.   I don't remember.
11      Q.   Do you recall where you had your eyes tested?
12      A.   Probably with Vivian Frazier.
13      Q.   How long has Ms. [____] been your doctor?
14      A.   Quite a while now, I don't know the exact.
15      Q.   Can you recall any particular conditions for
16  which Dr. [____] ever treated you, had treated you in the
17  past?
18      A.   What do you mean?
19      Q.   Did you ever break anything, did you ever have
20  any sort of congenital defect, any sort of illness?
21      A.   Yeah, we -- I would go in if I would get sick and
22  just do like a yearly checkup also.
23      Q.   Can you recall other than going in for yearly
24  checkup or because you were sick, can you recall any other
25  conditions for which Dr. [____] ever provided you

50

1   treatment?
2       A.   No, if it was serious, we'd go to a hospital.
3       Q.   Okay.  Can you recall any instances where in the
4   past, this is prior to July 2012, when you had experienced
5   something, quote, serious in your words such that you went
6   to seek treatment from a hospital or some provider other
7   than Dr. Frazier?
8       A.   What do you mean?
9       Q.   Sure.  So if I understand your testimony, you
10  only treated with Dr. [____] for things like annual
11  checkups and if you were sick?
12      A.   Yes.
13      Q.   Prior to July 2012 had you ever required medical
14  attention by someone other than Dr. [____]?
15      A.   Yes.
16      Q.   Okay.  Can you recall when that was and what it
17  was for?
18      A.   Like I had hurt my knee pretty bad one time and
19  went to the hospital and sprained my elbow in the fifth
20  grade, just a lot of just injuries.
21      Q.   Okay.  Had you ever had any issues with your
22  lungs in the past?
23      A.   No.
24      Q.   Okay.  Never been diagnosed with any conditions
25  relative to your lungs?

51

1       A.   Nuh-huh.
2       Q.   No?
3       A.   No.
4       Q.   Had you ever had any issues in the past relative
5   to your heart?
6       A.   Just a small [____].
7       Q.   Okay.  What can you tell me about that?
8       A.   I went in because I was sick and she was
9   listening for fluid in my lungs.  And after about five
10  minutes she said did you know you had a [____]  She
11  said it's very minute and nothing I need to do worry about.
12      Q.   When was that?
13      A.   In about middle school, around there.
14      Q.   Did you ever see anyone for treatment of your
15  heart murmur other than Dr. [____]?
16      A.   No, I never needed to.
17      Q.   Stepping back to the occasion when you first
18  purchased the Redline Extreme at the HEB, I understand your
19  testimony is that you had some difficulty reading the
20  nutritional info and recommended use sections, correct?
21      A.   Uh-huh.
22      Q.   Yes?
23      A.   Yes.
24      Q.   Are you doing okay, do you need to take a break?
25      A.   No, I'm -- we're good.

52

1       Q.   You're good, okay.  Did you ask anyone at the
2   store for any assistance reading those portions of the
3   bottle?
4       A.   No.
5       Q.   Did you ask anyone at the store any questions
6   about the product?
7       A.   Well, I asked -- there was somebody else in the
8   aisle and I asked them if they had it before and they said
9   no, that's about it.
10      Q.   That was it?
11      A.   (Witness nods head).
12      Q.   But even though in your words you had some
13  difficulty reading the nutritional info and the recommended
14  use section, you still felt comfortable going ahead and
15  purchasing it, correct?
16      A.   Yes.
17      Q.   Did you do any additional research about VPX
18  Redline or VPX before you made that purchase?
19      A.   Yeah.  Before the purchase?
20      Q.   Yeah.
21      A.   No, I didn't know it existed.
22      Q.   Okay.  Do you recall what time of day it was that
23  you made this purchase?
24      A.   Before school, 7:30.
25      Q.   Okay.

53

1    A.  A.M.
2    Q.  And were you taking classes at Austin Community
3  at that time?
4    A.  I was back in high school or that was after high
5  school, that was right after, I think that was ACC then,
6  yeah, that was -- I'm not sure.
7    Q.  Do you think now that you may have actually first
8  purchased VPX Redline Extreme sometime before 2012?
9    A.  No, maybe in 2011, I don't know.
10   Q.  Okay.
11   A.  That's about it.
12   Q.  Did you save the bottle?
13   A.  (Witness shakes head).
14   Q.  No?
15   A.  There was no need to.
16   Q.  Why did you save this bottle?
17   A.  Well, after I drank it, I threw it in the back of
18  my vehicle and I forgot it was there until he asked me if we
19  still had it and I found it in the back of my truck.
20   Q.  Okay.  How do you know that that's the same
21  bottle if you bought at least three to four bottles in the
22  past?
23   A.  That's the only one in my vehicle and I knew I
24  had put it in there.
25   Q.  You knew -- I don't understand your testimony.

54

1  My question is how did you know -- strike that.
2       When did you find that bottle?
3    A.  When my attorney asked me if we still had it, I
4  went and looked for it.
5    Q.  When was that?
6    A.  I don't know what day.
7    Q.  Do you know the month?
8    A.  I don't know.
9    Q.  Was it within days of having used the VPX
10  Redline, weeks, months?
11   A.  I don't know, probably like a couple weeks.
12   Q.  When did you first contact Mr. Eggnatz?
13   A.  After the incident in the hospital.
14   Q.  The day you got discharged, weeks later, months
15  later?
16   A.  I guess like a week or two later.
17   Q.  Okay.
18   A.  I don't know the exact.
19   Q.  And then in relation to this first communication,
20  do you know how much time passed before you went and you
21  found that bottle in your car?
22   A.  I don't know.
23   Q.  And again my question is how do you know that it
24  was the bottle that you bought at the Exxon gas station as
25  opposed to one of the other bottles that you purchased?

55

1    A.  Because that was the only Redline in the vehicle
2  and I knew I put it there.
3    Q.  What do you mean when you say you knew you put it
4  there?
5    A.  Like when I was drinking it, I just threw it back
6  into my vehicle and that was the only one.
7    Q.  When you found the bottle in the back of your
8  vehicle, was the cap closed?
9    A.  Yes.
10   Q.  Was there any liquid still in the bottle?
11   A.  What do you mean?  Like maybe like a drop.
12   Q.  Is that drop still in there or did you empty it
13  out?
14   A.  I emptied it out.
15   Q.  Okay.  Do you recall where it was in your
16  vehicle?
17   A.  On the floor.
18   Q.  And this was weeks if not months after you had
19  last -- after you had used it, is that fair?
20   A.  Yeah.
21   Q.  Had anyone else been in your vehicle during that
22  time period?
23   A.  Maybe my mom or dad.
24   Q.  Your girlfriend, had she been in the car?
25   A.  I didn't have one at the time.

56

1    Q.  Do you have a girlfriend now?
2    A.  Yes.
3    Q.  What's her name?
4    A.  Karli Papa.
5    Q.  Spell that.
6    A.  K-a-r-l-i, P-a-p-a.
7    Q.  And how long have you been dating Ms. Papa?
8    A.  About five months.
9    Q.  Where you did meet?
10   A.  We met at a party, New Year's Eve party.
11   Q.  Was that a party at a friend's house or at a
12  club?
13   A.  At an apartment complex in Austin.
14   Q.  After you bought the first bottle at the HEB on
15  the way to school, how much time passed before leaving the
16  store and consuming the Redline Extreme?
17   A.  Couple minutes.
18   Q.  Okay.
19   A.  School is right down the road from the HEB.
20   Q.  And then you testified that you usually used --
21  usually grabbed a Monster but on this day you decided that
22  you wanted to drink something new, fair?
23   A.  Yes.
24   Q.  How often prior to that date would you typically
25  drink a Monster?

14  (Pages 53 to 56)

**57**

1    A.   Like one a day during the weekdays.
2    Q.   How about weekends?
3    A.   I usually didn't need to drink one.
4    Q.   And some of your friends actually call you
5  Monster, right?
6    A.   They used to.
7    Q.   And was that because of your consumption of
8  Monster energy drink or for some other reason?
9    A.   Yes, because I just sip on one all day at school
10  so I'd always have one in my hand.
11    Q.   And it's your testimony that you would just drink
12  one a day?
13    A.   Yes.
14    Q.   And for how long had that been the case that you
15  would drink approximately one Monster energy drink a day?
16    A.   I didn't always used to drink that much. I would
17  have one every now and then when I was in middle school and
18  then I just -- I guess I increased the amount over the
19  years.
20    Q.   So you've been drinking it for years before you
21  bought the VPX Redline Extreme?
22    A.   Yes.
23    Q.   Were there any other energy drinks or caffeinated
24  beverages that you regularly consumed other than Monster?
25    A.   Sometimes I would grab a NOS or an Amp.

**58**

1    Q.   Monster was your favorite?
2    A.   Yes.
3    Q.   When you consumed the VPX Redline Extreme for the
4  first time within a few minutes of leaving the HEB, do you
5  recall how much you consumed?
6    A.   Half.
7    Q.   You drank a half bottle?
8    A.   Yeah.
9    Q.   Why is that?
10    A.   Because it says to.
11    Q.   You were able to read that on the label?
12    A.   Yes.
13    Q.   Was anyone with you when you drank it?
14    A.   No.
15    Q.   How did you feel?
16    A.   It gave me energy, kind of jittery.
17    Q.   Do you remember anything else?
18    A.   Not really, it little made my skin tingle a
19  little bit.
20    Q.   Did you like the way it made you feel?
21    A.   Not really, I didn't know why my skin was
22  tingling until I read it here, it causes tingling of skin.
23  Then I relaxed and it just gave me energy for school.
24    Q.   So you bought it because you thought it was an
25  energy drink, correct?

**59**

1    A.   Yeah.
2    Q.   And it gave you energy, right?
3    A.   (Witness nods head).
4    Q.   Right?
5    A.   Yes.
6    Q.   I mean it did what you thought it was going to
7  do, right?
8    A.   Yes.
9    Q.   Do you recall when you -- strike that.
10         Did you ever finish that bottle?
11    A.   Yeah.
12    Q.   Do you recall when you finished it?
13    A.   I don't remember, probably a couple days
14  afterwards.
15    Q.   And how did you feel when you drank the second
16  half of the bottle?
17    A.   Same way.
18    Q.   So you thought it would give you energy, right?
19    A.   Uh-huh.
20    Q.   Yes?
21    A.   Yes.
22    Q.   It gave you energy, right?
23    A.   Yes.
24    Q.   In fact you liked it enough that you went out and
25  you bought it again, right?

**60**

1    A.   Not that often but, yes.
2    Q.   I mean do you generally buy products more than
3  once that you don't like, Mr. Mirabella?
4    A.   No.
5    Q.   I believe it's your testimony that you believe
6  that you bought the VPX Redline Extreme, Watermelon flavor
7  three or four times, correct?
8    A.   Yes.
9    Q.   Did you ever buy any other VPX Redline products
10  at any point in time?
11    A.   Not that I know of.
12    Q.   From the time period of when you bought the first
13  bottle of VPX Redline Extreme at the HEB up until the time
14  you bought the last bottle of VPX Redline Extreme at the
15  Exxon station, are you with me?
16    A.   Yes.
17    Q.   During that time period did you do any research
18  on VPX or Redline Extreme energy drink?
19    A.   I Googled and found the Web site.
20    Q.   So you looked at the Web site?
21    A.   Yeah.
22    Q.   Do you recall when that was that you first looked
23  at the Web site?
24    A.   Sometime in this timeframe.
25    Q.   And why did you do that?

61

A. I was bored.

Q. Okay. Did you print out anything that you saw on the Web site?

A. No.

Q. Do you recall anything that you saw on the Web site?

A. Just the -- you can buy it in bulk.

Q. Anything else?

A. That's about it.

Q. I mean did you compare what was on the Web site to what was on the bottle?

A. No.

Q. Did you make any notes of anything that you saw about the Web site?

A. No.

Q. Did you click through any hyperlinks or read any articles?

A. No.

Q. So for example you didn't look to see if there was any information regarding the university proven statements on the bottle on the Web site?

A. No.

Q. I want to talk a little bit about the circumstances surrounding your purchase of the bottle of VPX Redline Extreme at the Exxon station, okay?

62

A. Uh-huh.

Q. Do you recall what time of day it was?

A. Nighttime, I bought it before I went to go work out around 10:30.

Q. 10:30 at night?

A. Yes.

Q. Is that typical that you would work out after 10:30 at night?

A. Yeah, I like doing nighttime workouts.

Q. And would you typically stop at that particular Exxon station to get an energy drink on your way to work out at night?

A. No, I just stopped that time because I needed gas.

Q. Had you ever been to that Exxon station before?

A. Yes.

Q. Had you ever bought an energy drink at that Exxon station before?

A. Yes.

Q. Had you ever bought Redline Extreme from that gas station before?

A. Not that I remember.

Q. What gym were you on your way to?

A. Gold's Gym.

Q. Where is that located?

63

A. There's a bunch of them, I think I was at the Cedar Park one, it was close.

Q. Do you still belong to Gold's Gym?

A. Yes.

Q. Do you still go there?

A. Yes.

Q. How often?

A. Not that often anymore.

Q. And the reason why?

A. I get nervous working out now because sometimes it gives me palpitations.

Q. Working out does?

A. Sometimes.

Q. Do you think that's because you drank Redline Extreme that you bought in the Exxon gas station?

A. Well, I never got palpitations before my hospitalization so I guess it's related.

Q. You believe it's related, yes?

A. That what's related?

Q. You believe that the fact that you purchased and consumed Redline Extreme at an Exxon gas station July 20th, 2012 is related to the palpitations which you experience sometimes when you work out at Gold's Gym, correct?

A. Yes.

Q. And you believe that VPX should reimburse you for

64

that?

A. Reimburse me for what?

Q. The fact that you're experiencing heart palpitations a year and-a-half after consuming the drink.

A. How would they reimburse, are they going to make my heart stop?

Q. You understand that our legal system is based on the payment of money to compensate individuals for their damages, correct?

A. Yes.

Q. So is it your position, Mr. Mirabella, that VPX should pay you money because you believe that heart palpitations that you experienced while working out are related to your purchase and use of Redline Extreme from an Exxon station July 20th, 2012?

A. No.

Q. Why not?

A. Because money isn't going to stop my palpitations.

Q. I mean are you independently wealthy, Mr. Mirabella?

A. No.

Q. Would you say that you're financially secure?

A. No.

Q. I'd asked you if you had done any research

16 (Pages 61 to 64)

65

1  regarding VPX or Redline Extreme before you first purchased
2  at the HEB station and your last purchase at the Exxon
3  station, you told me you looked at the Web site, do you
4  recall that testimony?
5      A.  Yes.
6      Q.  Did you do anything else?
7      A.  No.
8      Q.  And when you bought the bottle, which you claim
9  is that bottle of Redline Extreme at the Exxon station, did
10  you look at the label again?
11     A.  Yes.
12     Q.  Why?  I thought you bought it two, three, four
13  times before?
14     A.  What do you mean why?  Did I -- I was -- I always
15  look at the bottle.
16     Q.  So every time you buy a product at a gas station
17  whether you've used it one time before or a hundred times
18  before, it's your testimony that you read the whole label?
19     MR. EGGNATZ:  Object to form.
20  BY MR. COHEN:
21     Q.  You can answer.
22     A.  Yeah, sometimes they switch ingredients or do
23  something new.
24     Q.  Okay.  Did you buy anything yesterday,
25  Mr. Mirabella?

66

1      A.  No.
2      Q.  You didn't buy anything?
3      A.  I wanted food.
4      Q.  At the sushi place?
5      A.  Yeah.
6      Q.  Okay.  How about the last time you went to a gas
7  station, Mr. Mirabella, did you make any purchases other
8  than for fuel?
9      A.  Gum.
10     Q.  You bought gum.  Did you read the label on the
11  gum?
12     A.  No.
13     Q.  Why not?
14     A.  It's gum, I don't know.
15     Q.  Okay.  How about Monster, when you used to drink
16  a can of Monster every day, would you read the label on the
17  can every time you made a purchase?
18     A.  Not every time, but I did read it.
19     Q.  Okay.  And when you went into the Exxon station
20  on July 20th, 2012, did you know that you were going to get
21  a Redline Extreme?
22     A.  No.
23     Q.  Okay.  You just wanted something to drink before
24  your workout?
25     A.  Yes.

67

1      Q.  Something that would give you energy?
2      A.  Yes.
3      Q.  You knew Redline Extreme had given you energy in
4  the past?
5      A.  Yes, and it said it was safe for pre-workout.
6      Q.  And it had given you energy in the past, right?
7      A.  Yes.
8      Q.  Had you ever previously consumed VPX Redline
9  before a workout?
10     A.  Yes.
11     Q.  Tell me about that?
12     A.  I drank half of one and went to the gym and
13  worked out.
14     Q.  When was that?
15     A.  I don't remember.
16     Q.  Was it days before July 20th, weeks before,
17  months before?
18     A.  Maybe two or three months before.
19     Q.  Okay.  And was that another evening workout?
20     A.  Yes.
21     Q.  Do you know where you bought that bottle of VPX
22  Redline Extreme?
23     A.  I don't.
24     Q.  Did you go to Gold's Gym?
25     A.  Yes.

68

1      Q.  The one in Cedar Park?
2      A.  Or the one at Hester's Crossing, I don't
3  remember.
4      Q.  And what did your workout consist of on that day?
5      A.  The same, cardio and some weights.
6      Q.  Do you recall what you did for cardio on that
7  day?
8      A.  Spin bike.
9      Q.  Is that what you typically do for cardio?
10     A.  That or the stationary bike.
11     Q.  Do you recall how long that workout lasted?
12     A.  Maybe two hours.
13     Q.  That's a long workout.  And did you have any
14  issues with your workout on that day?
15     A.  No.
16     Q.  And how did that Redline Extreme make you feel
17  before your workout?
18     A.  The same as it always has.
19     Q.  It gave you energy?
20     A.  And kind of jittery.
21     Q.  Did your skin tingle a little bit?
22     A.  Yes.
23     Q.  Was that your experience every time you consume
24  Redline Extreme?
25     A.  Not every time.

17  (Pages 65 to 68)

1    Q.   Isn't it true, Mr. Mirabella, that when you
2  purchased the VPX Redline Extreme on July 20th at the gas
3  station prior to your workout, that you did so because you'd
4  used it before, you liked it and you had even used it before
5  a workout before, right?
6    A.   Yes.
7    Q.   It wasn't because of anything that was on the
8  label that you saw on July 20th, 2012, right?
9    MR. EGGNATZ:  Object to form.
10   THE WITNESS:  Well, it was on the label, it
11  said it's safe for pre-workout.
12   MR. COHEN:  You had seen this label before,
13  right?
14   MR. EGGNATZ:  Object to form, asked and
15  answered.
16   MR. COHEN:  Right?
17   MR. EGGNATZ:  Asked and answered.
18   MR. COHEN:  Are you instructing him not to
19  answer?
20   MR. EGGNATZ:  No, I'm not.  I'm objecting
21  for the record.
22   THE WITNESS:  What was the question?
23   MR. COHEN:  You had seen, you had certainly
24  seen the label before July 20th, 2012, correct?
25   THE WITNESS:  Yes.

1    MR. EGGNATZ:  Object to form.
2  BY MR. COHEN:
3    Q.   I believe it's your testimony that you spent
4  minutes reading it at the HEB the first time you ever bought
5  it?
6    A.   Yes.
7    Q.   And also you'd used it before a workout before,
8  right?
9    MR. EGGNATZ:  Object to form.
10   THE WITNESS:  Yes.
11   MR. COHEN:  And it gave you energy, right?
12   MR. EGGNATZ:  Object to form.
13   THE WITNESS:  Yes.
14   MR. COHEN:  You liked it, right?
15   MR. EGGNATZ:  Object to form.
16   THE WITNESS:  Yes.
17   MR. COHEN:  That's why you bought it on
18  July 20th, right?
19   MR. EGGNATZ:  Object to form.
20   THE WITNESS:  I bought it because it said
21  pre-workout on it.  It said it was good for
22  pre-workout so I got it.
23  BY MR. COHEN:
24   Q.   Is that the first time that you'd ever seen that
25  language on the label July 20th, 2012?

1    A.   No.
2    Q.   You'd seen it before, right?
3    A.   Yes.
4    Q.   You'd used it to work out before, right?
5    A.   Yes.
6    Q.   But it's your testimony that you made the
7  purchase on July 20th, 2012 because of something you saw on
8  the label on that day, not because of your prior use and
9  experience with the product, is that your testimony under
10  oath?
11   MR. EGGNATZ:  Object to form.
12   THE WITNESS:  I got it because I knew it
13  would give me energy and I knew it was good for
14  pre-workout.
15  BY MR. COHEN:
16   Q.   Okay.  You're seeking a refund -- strike that.
17   Do you recall how much you paid for the bottle
18  VPX Redline at the Exxon station?
19   A.   Around 2.50.
20   Q.   Okay.
21   A.   I don't know the exact amount.
22   Q.   You don't have the receipt, right?
23   A.   No.
24   Q.   Okay.  And you're asking to have that money
25  refunded in connection with this lawsuit, correct?

1    A.   Yes.
2    Q.   Are you seeking a refund for the other two or
3  three whatever number of VPX Redline bottles that you
4  previously purchased?
5    A.   Yes.
6    Q.   Okay.  How much is that?
7    A.   The exact amount?
8    Q.   Estimate it for me.
9    A.   Around ten dollars I guess.
10   Q.   Okay.  So you filed this lawsuit to get about ten
11  bucks, is that right?
12   MR. EGGNATZ:  Object to form.
13   THE WITNESS:  And I feel like everybody who
14  bought the product should be refunded because it's
15  dangerous and also to get the label changed.
16  BY MR. COHEN:
17   Q.   Let me ask you a question, Mr. Mirabella, I'm a
18  little confused, it happens at times.
19   It's your testimony that you bought a bottle of
20  VPX Redline Extreme for about $2.50 at the Exxon gas station
21  July 20th, 2012, correct?
22   A.   Yes.
23   Q.   You drank half a bottle, correct?
24   A.   Well, yes.
25   Q.   Okay.  Then you worked out, right?

73

A.   Yes.

Q.   And you didn't feel well, right?

A.   Afterwards.

Q.   Right.

A.   Yes.

Q.   You went to the hospital, right?

A.   Yes.

Q.   Okay.  So you believe that VPX should give you a refund for that bottle that you drank that made you feel bad, right?

A.   Yes.

Q.   Okay.  Well, why is it that you believe that VPX should give you a refund for the other bottles of Redline that you purchased in the past that you drank which didn't make you feel bad?

A.   Because they were all -- they could have -- they're all equally as dangerous.

Q.   I thought you testified that you drank Redline Extreme in the past, it gave you energy, made you feel a bit jittery, made your skin tingle a bit, you used it for workouts and you liked the way it made you feel, right?

A.   Yes.

Q.   But it's your position that VPX should still refund your money for those purchases, right?

A.   Because I could have been hospitalized any of

74

those times.

Q.   And more broadly speaking you understand that you filed what's called a class action, right, Mr. Mirabella?

A.   Yes.

Q.   What's your understanding of what a class action is?

A.   Where everybody in the same cause is against one person or company.

Q.   Okay.  So anyone who bought VPX Redline Extreme and it made them sick, you believe that they're entitled to the refund?

A.   Yes.

Q.   How about individuals who bought VPX Redline who didn't get sick, are they entitled to a refund?

A.   Yes.

Q.   How about people who bought VPX Redline who liked it and kept buying it again and again, as you had done prior to July 20th, 2012, are they entitled to refunds?

A.   Yes.

Q.   Why is that?

A.   Because the product's dangerous and the same thing could happen to them if the -- with any purchase of the product.

Q.   What do you mean, Mr. Mirabella, when you say that the product is dangerous, what do you mean by that?

75

A.   Well, I consumed the exact amount they told me to and it had an adverse reaction on me.

Q.   It's your position, Mr. Mirabella, that any time an individual consumes a product as directed and has an adverse event that the product is dangerous, right?

A.   Yes.

Q.   And by extension it's your position, Mr. Mirabella, that any time there's an individual who consumes a product as directed and has an adverse event, that every other individual who's ever purchased the product is entitled to a refund, right?

A.   Yes.

Q.   Okay.  And it's your testimony, Mr. Mirabella, that you drank the half bottle of Redline Extreme the same day or the same evening that you purchased it from the Exxon station?

A.   Yes.

Q.   And again I just want to make sure I understand the chronology.  So about 10:30 at night on July 20th, 2012 you go to the Exxon station, did you consider purchasing any other energy drinks?

A.   Well, yeah, I looked over the energy drink section.

Q.   Do you recall what else they had in stock?

A.   The Monster, Amp, Red Bull, usual.

76

Q.   And did you read the labels on the other products?

A.   No, because after I saw this one I grabbed it because I have read what it said and knew what it did.

Q.   And you used it and liked it in the past, right?

A.   Yes.

Q.   Do you recall how long after leaving the Exxon station you consumed it?

A.   No.

Q.   And how much did you consume?

A.   Half.

Q.   You were in your car?

A.   Yes.

Q.   Okay.  That was on the way to the gym?

A.   I had the other half.  I purchased it before, I drank half and then this was the other half I had.

Q.   Okay.  Let's try to explore that a little bit.  Is it still your testimony that you purchased the bottle at about 10:30 at night at the Exxon station on July 20th?

A.   Yes.

Q.   And why did you -- and was that on your way to Gold's Gym?

A.   Yes.

Q.   And you worked out?

A.   Yes.

77

1  Q.   And you felt fine, right?
2  A.   Uh-huh.
3  Q.   Yes?
4  A.   Yes.
5  Q.   It gave you energy, right?
6  A.   Uh-huh.
7  Q.   Yes?
8  A.   Yes.
9  Q.   Okay.  Then it's your testimony at some later
10 point in time you drank the second half bottle?
11 A.   Yes, that's the one that -- yes.
12 Q.   Okay.  What did you do with the half bottle
13 after -- I understand you drank half of it on July 20th
14 before you worked out, right?
15 A.   Uh-huh.
16 Q.   Yes?
17 A.   Yes.
18 Q.   Okay.  And then what did you do with the other
19 half of the bottle?
20 A.   I put it in my refrigerator.
21 Q.   When did you do that?
22 A.   At my house.
23 Q.   When?
24 A.   When I got home.
25 Q.   Okay.  Do you recall what time that was?

78

1  A.   No.
2  Q.   Was that another approximate two hour workout?
3  A.   I'm not sure.
4  Q.   Okay.  And do you know how much time passed
5  between getting the Redline Extreme out of the cooler case
6  at the Exxon gas station and putting the half of a remaining
7  bottle back into the refrigerator at your parents' house?
8  A.   I don't know.
9  Q.   And then when did you drink the second half
10 bottle, Mr. Mirabella?
11 A.   About a week later.
12 Q.   Okay.  And did you have any other energy drinks
13 during that time period?
14 A.   No.
15 Q.   Did you have any other caffeinated beverages
16 during that time period?
17 A.   Not that I -- no.
18 Q.   Was anyone with you when drank the second half of
19 the bottle?
20 A.   No.
21 Q.   Do you recall what time of day it was?
22 A.   That was the nighttime workout.
23 Q.   That was for another nighttime workout?
24 A.   Yes, because I worked out and then went home, the
25 heart and I went to the hospital.

79

1  Q.   Okay.  Do you recall what time that day you
2  consumed the second half of the Redline, six p.m.,
3  10:30 p.m.?
4  A.   The night before the night workout.
5  Q.   Do you recall what time you worked out that
6  night?
7  A.   Around the same time.
8  Q.   Okay.  And this time the Redline Extreme made you
9  feel a little differently, right?
10 A.   Yes.
11 Q.   Had you eaten anything that day?
12 A.   Yes.
13 Q.   Okay.  Did you have dinner that day?
14 A.   Uh-huh.
15 Q.   Yes?
16 A.   Yes.
17 Q.   What did you have for dinner?
18 A.   I don't remember.
19 Q.   Do you recall how much time passed between your
20 last meal and drinking the second half bottle of Redline
21 Extreme?
22 A.   Three, four hours maybe.
23 Q.   Okay.  Did you have anything else in your
24 stomach?
25 A.   No.

80

1  Q.   Okay.  And did you drink the second half of the
2  Redline Extreme at your home or in the car or at the gym?
3  A.   On the way to the gym.
4  Q.   Okay.  This time you felt different, right?
5  A.   Well, after the workout.
6  Q.   It wasn't until after the workout?
7  A.   Because my heart wouldn't stop racing.
8  Q.   Okay.  So during the workout you felt fine,
9  right?
10 A.   I felt a little nauseous towards the end.
11 Q.   Okay.  You felt that you had increased energy,
12 correct?
13 A.   Yes.
14 Q.   You felt a little jittery, correct?
15 A.   Yes.
16 Q.   Was your skin tingling?
17 A.   Yes.
18 Q.   Did you feel like you had an increased focus?
19 A.   Not really.
20 Q.   Do you know what that means?
21 A.   That your focus is increased.
22 Q.   Okay.  Did you feel that you had an improvement
23 in your reaction time?
24 A.   No.
25 Q.   Do you know what that means?

81

1   A.  Not really.
2   Q.  Okay.  Have you ever looked at the university
3   study that's identified on the Redline Extreme label?
4   A.  I've read that what it says on here.
5   Q.  Right.  My question, Mr. Mirabella, is have you
6   ever actually looked at the study?
7   A.  No.
8   Q.  Do you know whether or not VPX makes this study
9   available through its Web site?
10  A.  I don't know.
11  Q.  Okay.  So if I understand your testimony, during
12  the workout that evening, you generally felt the same as you
13  had in the past when you had used Redline Extreme, but you
14  felt a little nauseous, is that fair?
15  A.  Yes.
16  Q.  And again it's not a memory test, do you recall
17  what you did to work out that evening?
18  A.  I started with weight, arms and then for recovery
19  did cardio on the bike.
20  Q.  And I believe it's your testimony that your heart
21  remained at an elevated rate?
22  A.  Yes.
23  Q.  When did you first notice that your heart was
24  kind of maintaining an elevated rate?
25  A.  When I got home I turned on the TV and realized

82

1   it was still beating really fast and I thought I just got
2   done working out, it will stop.  But hours went by and it
3   was still the same rapid heart rate.
4   Q.  Did you try to self-medicate at all at home?
5   A.  I tried just to calm myself down, splash a little
6   water on my face and just try to just sit there and watch TV
7   and not really think about it.
8   Q.  Did you drink a beer?
9   A.  No.
10  Q.  Did you smoke any marijuana?
11  A.  No.
12  Q.  And at some point in time did you communicate to
13  one of your family members that you were concerned about the
14  rate at which your heart was beating?
15  A.  Yes.  In the morning I got to the point where I
16  was too worried and told my mom that I was driving to the
17  hospital.
18  Q.  Do you recall what time that was?
19  A.  In the -- I don't know the exact time, nine, ten
20  in the morning.
21  Q.  Did you sleep at all that night?
22  A.  No.
23  Q.  Was that I understand -- strike that.
24      Having a rapid heartbeat throughout the night,
25  it's your testimony that was not a regular occurrence,

83

1   right?
2   A.  Yes.
3   Q.  Were you experiencing insomnia at that time?
4   A.  No, I just couldn't sleep because of my heart
5   rate.
6   Q.  Okay.  So it's your testimony you stayed up all
7   night and then around nine or ten in the morning you told
8   your mom that your heart was still beating fast and you
9   asked her to take you to the ER?
10  A.  She was in the shower and I yelled up at her and
11  drove myself to the ER and she showed up 20 minutes later.
12  Q.  And how far was it from your house to the ER?
13  A.  Ten miles.
14  Q.  You drove to the hospital by yourself?
15  A.  Yes.
16  Q.  You checked yourself into the ER?
17  A.  Yes.
18  Q.  Do you recall what you communicated to the ER
19  staff as your primary complaints?
20  A.  I felt like I was having a heart attack because
21  my heart felt really weak and I felt a pain in my arm and I
22  was nauseous and dizzy.
23  Q.  Did you have anything to eat after you got home
24  after the gym?
25  A.  No, I was -- I felt nauseous, I couldn't eat, I

84

1   just drank water.
2   Q.  Okay.  Had you had anything to eat since dinner
3   three to four hours before going to the gym?
4   A.  No.
5   Q.  So that whole night when you were up, you had
6   nothing to eat?
7   A.  Yes.
8   Q.  Do you recall how long you were in the ER?
9   A.  I don't know, I was sedated and was asleep part
10  of the time.
11  Q.  Were you there for hours or days or weeks?
12  A.  A couple hours I think.
13  Q.  Do you recall the name of any of the doctors or
14  nurses who treated you at the ER?
15  A.  I don't know.
16  Q.  Did anyone provide you with a diagnosis at the
17  ER?
18  A.  It's -- I don't remember, but it's on the medical
19  files, whatever they said.
20  Q.  So someone did provide you with a diagnosis, you
21  just don't recall what it was?
22  A.  I was asleep most of the time, they told my mom.
23  Q.  Okay.  How about discharge instructions, do you
24  recall receiving any discharge instructions?
25  A.  They said no more caf -- or energy drinks or

21 (Pages 81 to 84)

85

1  caffeine and that to take the Lorazepam the next two days
2  and then as needed basis.
3      Q.   And did you receive any further medical care
4  after being discharged from the emergency room?
5      A.   I did, I had to do a checkup with Dr. [       ] I
6  think like five, six days later.
7      Q.   Do you know how that checkup went?
8      A.   That's when she switched me from the [        ] to
9  the --
10     Q.   [        ].
11     A.   Yeah.
12     Q.   Did you ever have to wear a telemetry unit?
13     A.   I don't know what that is.
14     Q.   Did you ever have anything hooked to you with any
15  wires measuring your heart rate?
16     A.   During the hospitalization, yes.
17     Q.   How about after the hospitalization?
18     A.   No.
19     Q.   Had you ever had to wear a heart rate monitor
20  before the occasion you drank -- before July 20th, 2012?
21     A.   No.
22     Q.   And it's your testimony you never had to wear one
23  since, just at the hospital?
24     A.   I wore a heart rate monitor, I saw a cardiologist
25  and he wanted to measure my palpitations when I wore one for

86

1  about a month.
2      Q.   When was that?
3      A.   I think a year ago, I don't know the date.
4      Q.   2013?
5      A.   Yeah, this was a while after the hospitalization.
6  My mom was worried so she made me go see a heart doctor.
7      Q.   Does your mom worry about you a lot,
8  Mr. Mirabella?
9      A.   Yes.
10         MR. EGGNATZ:  Object to form.
11  BY MR. COHEN:
12     Q.   Has that always been the case?
13     A.   She's my mom, she always worries.
14     Q.   Do you recall the name of the cardiologist?
15     A.   Goldberg I think, I'm not sure.
16     Q.   Do you know Dr. Goldberg's first name?
17     A.   I don't know.
18     Q.   Do you know where Dr. Goldberg's office is
19  located?
20     A.   Austin.
21     Q.   Is it your position, Mr. Mirabella, that the
22  heart palpitations that Dr. Goldberg -- for which
23  Dr. Goldberg prescribed the heart monitor were used due to
24  your use of VPX Redline Extreme?
25     A.   Yes.

87

1      Q.   Do you believe that VPX should reimburse you for
2  those medical bills?
3      A.   No.
4      Q.   Why not?
5      A.   Because I'm not looking for reimbursement for
6  that.
7      Q.   Okay.  I just want to go over -- we're actually
8  making good progress, I want to go through your response
9  number two in just a little more detail.
10         All right.  Mr. Mirabella, I'm focusing on this
11  portion of the response, it's a semicolon, it says I
12  remember relying on the statements.  Do you see that?
13     A.   Yes.
14     Q.   I'm just going to ask you a few questions about
15  that and then we'll take a short break.
16         You state that you relied on the statements,
17  quote, ultimate energy rush, correct?
18     A.   Yes.
19     Q.   I believe you previously testified that you
20  understood that to mean that Redline Extreme was an energy
21  drink, correct?
22     A.   Yes.
23     Q.   Then you've also stated in your answer to
24  interrogatories that you relied on the statement 7.5 percent
25  faster reaction time?

88

1      A.   Yes.
2      Q.   Okay.  How did you rely on that statement,
3  Mr. Mirabella?
4      A.   It seemed like if it was a study proven that it
5  was going to help me in any way, so I thought it would be
6  good to use it.
7      Q.   It seems like it would help you with what?
8      A.   Well, reaction time and it says increase in
9  energy, mental focus.  If it increases those things, it
10  sounded good.
11     Q.   Okay.  So it was your understanding that if
12  Redline Extreme could improve reaction time and increase
13  energy and increase mental focus, that therefore it was
14  good?
15     A.   Yes.
16     Q.   How about the statement you say that you relied
17  on the statement electrolytes, why was that important to
18  you, Mr. Mirabella?
19     A.   Well, those are in Gatorade and stuff like that,
20  those usually help replenish salts to your body and it's
21  usually good for you.
22     Q.   And do you know if Redline Extreme in fact
23  includes electrolytes?
24     A.   Yes.
25     Q.   How is that misleading?

89

1  MR. EGGNATZ:  Objection to form.  The
2  statement doesn't say it, but object to form.
3  THE WITNESS:  I don't know.
4  BY MR. COHEN:
5  **Q.   Okay.  And the fact that it said, quote,**
6  **university proven, how was that important to you?**
7  A.   If there's a study done on it that said that it
8  does all these things, I trusted it.
9  **Q.   You don't know if the study says that or not,**
10  **right, Mr. Mirabella?**
11  A.   It says it right there.
12  **Q.   But you don't know whether or not the study**
13  **actually showed a 7.5 percent faster reaction time, correct?**
14  A.   I don't know.
15  **Q.   You would agree with me if that the study did in**
16  **fact show a 7.5 percent faster reaction time, that that**
17  **element of the label is not misleading, correct?**
18  MR. EGGNATZ:  Object to form.
19  THE WITNESS:  Yes.
20  BY MR. COHEN:
21  **Q.   Yes, you agree with me?**
22  A.   That it's not.
23  **Q.   I'll try to ask you without a negative.**
24  **Do you agree with me that a study which you're**
25  **not familiar with, right?**

90

1  A.   Yes.
2  **Q.   That if the study did in fact show a 7.5 percent**
3  **faster reaction time --**
4  A.   Okay.
5  **Q.   -- that there's nothing wrong with the label**
6  **saying that, right?**
7  MR. EGGNATZ:  Object to form.
8  THE WITNESS:  I'm not sure.
9  MR. COHEN:  You're not sure, okay.
10  BY MR. COHEN:
11  **Q.   Are you familiar with the concept of statistical**
12  **significance?**
13  A.   No.
14  **Q.   No?**
15  A.   No.
16  MR. COHEN:  Okay.  Let's take a break.
17  (Thereupon, Defendant's Exhibit Number One
18  was marked for Identification.)
19  BY MR. COHEN:
20  **Q.   Mr. Mirabella, after your discharge from the**
21  **hospital, your mom contacted VPX, correct?**
22  A.   Yes.
23  **Q.   Do you know when that was?**
24  A.   I don't know the exact date.
25  **Q.   Do you know how she contacted VPX?**

91

1  A.   She e-mailed them.
2  **Q.   Did you look at that e-mail before it went out?**
3  A.   No.
4  **Q.   Have you ever seen that e-mail?**
5  A.   Yes.
6  **Q.   You saw it after it went out?**
7  A.   Yes.
8  **Q.   Do you know if VPX responded?**
9  A.   Yes.
10  **Q.   Have you seen that response?**
11  A.   Yes.
12  **Q.   Do you know if your mother had any other**
13  **communications with anyone at VPX?**
14  A.   Not that I know of.
15  **Q.   Do you know if she talked to anyone at VPX on the**
16  **phone?**
17  A.   I don't know.
18  **Q.   Have you had any communication with anyone at**
19  **VPX?**
20  A.   Not that I can remember.
21  **Q.   You never talked to anyone at VPX on the phone,**
22  **told them about what had happened to you?**
23  A.   I don't remember.
24  **Q.   You may have, you just don't remember?**
25  A.   Yes.

92

1  **Q.   When did you first get the nickname Monster?**
2  A.   Sophomore year of high school.
3  **Q.   The only time that you ever had an adverse**
4  **reaction from VPX Redline Extreme was the last time you**
5  **drank that half bottle before going to the gym, correct?**
6  A.   Yes.
7  **Q.   And I want to just talk a little bit about what**
8  **if any symptoms you experienced at that time, okay?**
9  A.   Okay.
10  **Q.   Did you experience chills?**
11  A.   Some.
12  **Q.   Some chills, okay.  Did you experience excessive**
13  **sweating?**
14  A.   Yes.
15  **Q.   Did you vomit?**
16  A.   If, what's that called, my body went into it, but
17  nothing came out.
18  **Q.   So you didn't vomit?**
19  A.   No.
20  **Q.   Did you have any convulsions?**
21  A.   Yes.
22  **Q.   Did you experience chest pain?**
23  A.   Yes.
24  **Q.   Did you experience a rapid heartbeat?**
25  A.   Yes.

23  (Pages 89 to 92)

93

Q. Do you know if anyone else who has consumed VPX Redline Extreme has experienced chills?

A. I don't know.

Q. Do you know if anyone else who has consumed VPX Redline Extreme has experienced excessive sweating?

A. I don't know.

Q. Do you know if anyone else who has consumed VPX Redline Extreme has vomited?

A. I don't know.

Q. Do you know if anyone else who has consumed VPX Redline Extreme has had convulsions, chest pain or a rapid heartbeat?

A. I don't know.

Q. Do you know if anyone else who has consumed Redline Extreme has required hospitalization other than yourself?

A. Yes, we were searching that online and found multiple of people who had the same -- had been hospitalized.

Q. Do you know any of their names?

A. No.

Q. Have you ever talked to any of them?

A. No.

Q. Do you believe everything that you read on the Internet, Mr. Mirabella?

94

A. No.

Q. There's a lot of junk on the Internet, right?

A. Yes.

Q. Do you know Kristin Aarondale (phonetic)?

A. I know her name.

Q. Where do you know her name from?

A. She's also in this class action lawsuit.

Q. Okay. Do you know anything else about her?

A. That she had an adverse reaction to Redline, that's it.

Q. Where did you get that information?

A. My attorney.

Q. Have you ever talked to Ms. Aarondale?

A. No.

Q. Do you know where she lives?

A. No.

Q. Do you know how old she is?

A. No.

Q. Do you know how many times she's used VPX Redline Extreme?

A. No.

Q. Have you ever heard of an individual by the name of Sheri Zidenberg-Cherr?

A. Yes.

Q. Who is Sheri Zidenberg-Cherr to you?

95

A. She's some kind of expert.

Q. Have you ever talked to her?

A. No.

Q. Do you know where she's located?

A. No.

Q. Looking at your answer to interrogatory number three, it's page three of 11, what's been marked as Exhibit Two, do you have that in front of you?

A. Yes.

Q. And I just want to ask you a couple questions about some of your responses, Mr. Mirabella. And right here where it says the product also failed to adequately warn, do you see that?

A. Yes.

Q. Okay. And one of your complaints is that there's no warning about, quote, the true strength of the product, end quote. Do you see that?

A. Yes.

Q. What do you mean by that?

A. That nobody really knows how strong it is. When they get it, they think it's just going to give them energy.

Q. Okay. So what should the label say about the, quote, true strength of the products?

A. That it could put you in the hospital.

Q. Have you ever heard of anyone ever being

96

hospitalized for drinking too much water?

A. Yes.

Q. Do you think a bottle of water should have a warning on it that says that it could put you in the hospital?

MR. EGGNATZ: Object to form.

THE WITNESS: No.

BY MR. COHEN:

Q. Why not?

A. Water, nothing else in it.

Q. Okay. You further say in your response that there's a failure to warn about, quote, the dangers of consuming the product without supervision. Do you see that?

A. Yes.

Q. And what do you mean by that?

A. Meaning that when I got it, it says it's not intended for under 18, but nobody asked to see my ID or anything when I bought it. So younger people could get this product and it could be dangerous.

Q. Okay. So the fact is that you take issue with the fact that the retailer didn't ask you to show an ID?

A. I never got asked to see my ID any time because the retailer thought it was an energy drink.

Q. How do you know what the retailer thought, Mr. Mirabella?

24 (Pages 93 to 96)

97

1    A.   The first time I bought it, they didn't even know
2  what it was.
3    Q.   So you think that's something that VPX is
4  responsible for, the fact that a clerk at a supermarket
5  wasn't familiar with VPX Redline Extreme?
6    A.   Yes, it's their product.
7    Q.   Okay.  So VPX should go around to every
8  supermarket in the country and provide educational training
9  to the cashiers about their products?
10        MR. EGGNATZ:  Object to form.
11 BY MR. COHEN:
12   Q.   That was a yes?  You can answer.
13   A.   Yes.
14   Q.   Okay.  When you bought the Redline Extreme in
15 July 20th, 2012, how old were you?
16   A.   Twenty.
17   Q.   Twenty, okay.  Just to be clear you believe that
18 the cashier at the Exxon gas station on July 20th, 2012
19 should have asked to see your ID?
20   A.   Yes.
21   Q.   But he didn't do that?
22   A.   No.
23   Q.   You also state that you believe there's a failure
24 to warn of, quote, the precautions to take to avoid negative
25 effects.  What do you mean by that?

98

1    A.   I don't know, I guess research the product before
2  you get it.
3    Q.   Okay.  And you continue that you believe that
4  there was a failure to, quote, caution consumers to use
5  extra care when using the product before physical activity,
6  end quote.  Do you see that?
7    A.   Yes.
8    Q.   What do you mean by that?
9    A.   Because it says it's good before physical
10 activity and I did physical activity and it hurt me.
11   Q.   So what should it say, what caution should it
12 provide to consumers regarding using extra care when using
13 it before physical activity?
14   A.   Say it should just caution like this could happen
15 if you take it before a workout.
16   Q.   When you say this, what do you mean?
17   A.   Like you could be hospitalized, you could get
18 any -- anything could happen.
19   Q.   Okay.  And there's one I skipped over, I
20 apologize for that.  Up at the top of that sentence with all
21 the commas you state that there's a failure to adequately
22 warn consumers, quote, of the unfitness of the products, end
23 quote.  Do you see that, Mr. Mirabella?
24   A.   Yes.
25   Q.   What did you mean by that?

99

1    A.   That if the product is dangerous, it's unfit
2  to -- like if somebody goes out and buys one, they could be
3  hospitalized.
4    Q.   Okay.  I'm just trying to understand your
5  definition of unfitness.  When you say unfit, you mean that
6  it's dangerous, correct?
7    A.   Yes.
8    Q.   And you believe that it's dangerous because it
9  caused you an injury?
10   A.   No, not just me and it's caused others injuries.
11   Q.   Are you talking about the stuff you saw on the
12 Internet?
13   A.   Yeah.
14   Q.   I want to make sure I understand your testimony
15 position in this lawsuit.
16        Is it your position that every time a product
17 causes an injury to an individual, that it's unfit?
18        MR. EGGNATZ:  Object to form.
19        THE WITNESS:  Depends on what the injury is.
20 BY MR. COHEN:
21   Q.   How about if it sent someone to the hospital?
22   A.   Yes.
23   Q.   Okay.  So any time a product causes an individual
24 to go to the hospital, it's unfit, correct?
25        MR. EGGNATZ:  Object to form.

100

1         THE WITNESS:  Yes.
2  BY MR. COHEN:
3    Q.   Okay.  I apologize if I already asked you this, I
4  don't think I did.  You bought the -- you bought the Redline
5  Extreme at the Exxon station July 20th, 2012, you drank half
6  a bottle and you finished it about a week later, right?
7    A.   Yes.
8    Q.   Did you have any other energy drinks during that
9  time?
10   A.   No.
11   Q.   I actually think I did ask you that.  That's good
12 when I start repeating myself, that means I may be nearing
13 the end, we'll see.
14        Answer number nine, it's on page six of 11,
15 continues onto page number seven and you were asked whether
16 you purchased any energy drinks or caffeinated beverages
17 since you purchased the bottle of Redline on July 20th, 2012
18 and you say you haven't purchased any energy drinks since
19 that time, is that true?
20   A.   Yes.
21   Q.   And you continue, you say, you rarely if ever
22 drink caffeinated soda.  Do you see that?
23   A.   Where?
24   Q.   Right above number ten.
25   A.   Yes.

101

Q. What do you mean by that when you say that you rarely drink caffeinated soda, how often is that?

A. I don't.

Q. When is the last time you drank a caffeinated soda, was it when you had that sip of coke --

A. Sip of coke.

Q. -- in August of 2012?

A. I just drink Sprite now.

Q. Turning to answer number 14, it's on page nine, Mr. Mirabella.

A. Okay.

Q. You were asked to identify the, quote, premium that you paid for the product. Do you see that?

A. Yes.

Q. Okay. And in your response you state, this is after all the objections from your lawyer, quote -- you didn't write the objections did you, Mr. Mirabella?

A. I trusted my attorney for that.

Q. Okay. So after objections it states, quote, Plaintiff states as follows. That's you?

A. Uh-huh.

Q. The premium I paid for the product was the asking price approximately $2.50. Had I known the product was not fit, I would not have purchased it and I would not have paid any money for it. Do you see that?

102

A. Yes.

Q. And you previously answered some questions about what did you mean when you said something's unfit, do you recall that testimony?

A. Yes.

Q. So is it your testimony, Mr. Mirabella, that if VPX had told you that VPX Redline Extreme, Watermelon flavor may cause you to be hospitalized, that you wouldn't have bought it?

A. Yes.

Q. That's what this lawsuit is about, right?

A. Uh-huh, to get awareness out that you could be hospitalized from this product.

Q. Right. If VPX Redline had told you that drinking that product could cause you to be hospitalized, you wouldn't have bought it, right?

A. Yes.

Q. That's why you believe you're entitled to a refund, right?

A. Yes.

Q. That's what this lawsuit is about, right?

MR. EGGNATZ: Object to form.

THE WITNESS: Vaguely.

BY MR. COHEN:

Q. You want VPX to tell people that if they consume

103

the product, they may end up in the hospital, right?

A. That's part of it, yes.

Q. You want to get the word out, right?

A. Yes.

Q. That's why you filed the lawsuit, right?

A. It's part of it.

Q. Not because you want any money, right?

A. Yes.

Q. I'm going to mark as Exhibits Three and Four to your deposition, Number Three is Defendant's request for admissions to the Plaintiff and Number Four are Plaintiff's responses to Defendant's request for admissions.

(Thereupon, Defendant's Exhibits Number Three and Four were marked for Identification.)

BY MR. COHEN:

Q. I just have a couple of questions on this, this will move pretty quickly.

Mr. Mirabella, I'd like to direct your attention to request number seven in Exhibit Number Three. You were asked to admit that you had never heard of VPX prior to purchasing the Redline Extreme on July 20th, 2012. And then in your response if you compare that to your response in Exhibit Number Four, number seven.

A. Okay.

Q. And you deny that you had never heard of Redline

104

prior to July 20th, 2012, do you see that?

A. Yes.

Q. Is that because you'd actually purchased and used Redline before that date?

A. No, I thought it was that I heard of VPX, not Redline.

Q. Right. But you were familiar with Redline before July 20th, 2012, correct?

A. Yes.

Q. That's because you bought it and you'd used it, right?

A. Yes.

Q. Let me ask you a question, Mr. Mirabella. If you didn't get sick after drinking that second half of the bottle about a week after July 20th, 2012, you wouldn't have filed this lawsuit, right?

A. Probably, but it would have hospitalized me later.

Q. I mean but for the fact that you were hospitalized at some point in time after consuming Redline Extreme, you would not have filed this lawsuit, right?

A. I'm not sure.

Q. You agree with me, Mr. Mirabella, that if you never suffered any adverse reactions from using Redline Extreme that you wouldn't have any injuries, correct?

26 (Pages 101 to 104)

105

1　　　　MR. EGGNATZ:  Object to form.
2　　　　THE WITNESS:  I guess.
3　　　　MR. COHEN:  Okay.  And similarly other
4　individuals who have purchased Redline Extreme and
5　consumed it without any adverse effects, they
6　haven't suffered an injury either, right?
7　　　　MR. EGGNATZ:  Object to form.
8　BY MR. COHEN:
9　　　Q.   They have not?
10　　　A.   That if they wouldn't have --
11　　　Q.   Is it your understanding, Mr. Mirabella, that
12　every individual who's ever purchased and consumed Redline
13　Extreme has had an adverse reaction?
14　　　A.   I don't know.
15　　　Q.   You think maybe every individual who's ever
16　purchased Redline Extreme has had an adverse reaction?
17　　　A.   I don't know.
18　　　Q.   Okay.  I'm just going to show you, and maybe I'll
19　mark it, maybe I won't -- I'll just mark it as a composite,
20　mark this Composite Exhibit Five.
21　　　　(Thereupon, Defendant's Exhibit Number Five
22　　　was marked for Identification.)
23　BY MR. COHEN:
24　　　Q.   And I'll represent to you, and you can confirm it
25　with your lawyer, that Defendant's Composite Exhibit Five

106

1　are the documents that have been produced by you in this
2　lawsuit in response to Defendant's request for production.
3　So for example you'll see, Mr. Mirabella, the first 96 pages
4　actually contain a little stamp at the bottom with your name
5　on it, do you see that?
6　　　A.   Yes.
7　　　Q.   Okay.  And I'll represent to you that that
8　represents that these were documents that were produced on
9　your behalf in this lawsuit, okay?
10　　　A.   Okay.
11　　　Q.   Then the last few documents do not have a stamp
12　because these were recently sent via e-mail, okay?
13　　　A.   Okay.
14　　　Q.   Did you personally play any role in terms of
15　compiling these documents?
16　　　A.   I took these pictures.
17　　　Q.   Can you identify the page number, what we call a
18　Bates number for the pictures that you say that you took?
19　　　A.   What does that mean?
20　　　Q.   Okay.  So for example you look at starting at
21　page 55, there's a series of pictures, I think your set's in
22　color.
23　　　A.   Okay.
24　　　Q.   Did I give you the original set?  Okay.  Are
25　those the pictures that you took, Mr. Mirabella?

107

1　　　A.   I don't know.
2　　　Q.   It looks like it runs from 55 all the way to 75?
3　　　A.   It's some pictures, I don't know.
4　　　Q.   Okay.  Anything else that you did in connection
5　with compiling documents that were produced in response to
6　Defendant's request to produce other than maybe taking some
7　of these pictures?
8　　　A.   Not that I know of.
9　　　Q.   So for example if you haven't looked at it, it
10　will certainly save us some time today.  There are various
11　Internet postings and articles contained in Exhibit Five.
12　Did you do anything in terms of collecting any of these
13　materials?
14　　　A.   No.
15　　　Q.   Have you reviewed any of those materials?
16　　　A.   No.
17　　　Q.   That was quick.  What did you do to prepare for
18　your deposition?
19　　　A.   I looked over my interrogatories and flew here.
20　　　Q.   Did you meet with your lawyer?
21　　　A.   Yes.
22　　　Q.   When did you do that?
23　　　A.   He picked me up from the airport yesterday.
24　　　Q.   How much time did you guys spend together?
25　　　A.   A couple, an hour or two.

108

1　　　Q.   Okay.  Other than your mom and your dad does
2　anyone else know that you're here giving a deposition in
3　this case today?
4　　　A.   I think my mom told my girlfriend.
5　　　Q.   Have you had any discussions with your girlfriend
6　about this lawsuit?
7　　　A.   She just knows that I'm in one.
8　　　Q.   Are you familiar with Tumblr, Mr. Mirabella?
9　　　A.   Yes.
10　　　Q.   What's Tumblr?
11　　　A.   We post pictures on it.
12　　　Q.   Do you have a Tumblr account?
13　　　A.   I don't know.
14　　　Q.   You don't know if you have a Tumblr account.  Is
15　that you?
16　　　A.   Yes.
17　　　Q.   Okay.  And it looks like this was printed from
18　Tumblr yesterday, do you see that?
19　　　A.   Uh-huh.
20　　　Q.   Okay.  And do you recognize that being your
21　Tumblr account, Mr. Mirabella?  It looks like the account
22　name is I'm awesome.
23　　　A.   Yes.
24　　　Q.   That's yours?
25　　　A.   Yes.